**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

THE TENEYCK MINERAL TRUST,
BY C. ANDREW TENEYCK, TRUSTEE,

     Plaintiff,

v.                            CASE NO. _____

CHESAPEAKE ENERGY CORPORATION,
SILVER LAKE ENERGY, LLC,
ENCANA CORPORATION, and       JURY TRIAL DEMANDED
ENCANA OIL & GAS (USA) INC.

     Defendants.

---

Brian J. Masternak (P57372)
Charles N. Ash, Jr. (P55941)
Lance R. Zoerhof (P63980)
David R. Whitfield (P73352)
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
bmasternak@wnj.com
cash@wnj.com
lzoerhof@wnj.com
dwhitfield@wnj.com
616.752.2000
Co-Counsel for Plaintiff

Susan L. Hlywa Topp (P46230)
TOPP LAW PLC
213 Main St.
Gaylord, MI 49734
susan@topplaw.com
989.731.4014
Co-Counsel for Plaintiff

---

## **COMPLAINT**

    Plaintiff, the TenEyck Mineral Trust, brings this action against Defendants for damages

under the antitrust laws of the United States, the antitrust laws of the State of Michigan, and

1

Michigan common law. Plaintiff alleges the following upon information and belief except as to those paragraphs applicable to the named Plaintiff, which are based on personal knowledge:

**INTRODUCTION**

1. The spring of 2010 appeared to be a time of unbridled optimism for owners of subterranean mineral rights in northern Michigan. Thanks to advancements in the field of hydraulic fracturing (commonly known as "fracking") and related oil and gas exploration techniques, the Utica/Collingwood shale formation – an oil-and-gas-rich geological formation lying approximately 9,000 to 12,000 feet below the surface of most of Northern Michigan – had become a commercially viable source for natural gas and oil. Early that year, an affiliate of Defendant Encana Corporation drilled an exploratory well in Missaukee County, known as the "Pioneer Well," that yielded promising results and set off an unprecedented frenzy for northern Michigan mineral rights.

2. On May 4, 2010, triggered at least in part by the results of the Pioneer Well, the State of Michigan held a mineral lease auction which generated $178 million, more than all the money raised in the previous 81 years of the State's mineral lease sales combined. Competition was intense at the May state auction, particularly between the two predominant bidders: Encana Corporation and Chesapeake Energy Corporation. Chesapeake and Encana are two of the most prominent oil and gas exploration companies in the nation, and have been among the most aggressive bidders in shale plays (like the one happening in northern Michigan in 2010) throughout the nation.

3. The May 2010 State of Michigan mineral lease auction dramatically changed the reasonable pricing expectations for mineral rights holders in northern Michigan. Consistent with the price explosion witnessed at the May auction, northern Michigan mineral rights holders were

demanding, and receiving, dramatically higher lease bonus rates than had been available previously. Mineral rights interests that had been leasing for $25 per acre before the state auction suddenly were generating lease bonus payments substantially higher than that, sometimes exceeding $3,000 per mineral acre.

4.      Plaintiff was among the fortunate mineral rights holders that was positioned to benefit from the intense competition evident among mineral rights purchasers in 2010. Plaintiff owns the mineral rights beneath 625 acres of real estate in Kalkaska County, located in an advantageous position to be able to access and develop oil and gas reserves in the Collingwood/Utica shale formation.

5.      Initially, it appeared that the same competitive forces that escalated prices at the State's May auction would benefit Plaintiff and hundreds of other private landowners holding similar mineral rights interests in northern Michigan. In the period immediately after the May auction, Defendants actively and aggressively competed to lease such private mineral acreage. Informational seminars were conducted at township halls, advertisements were placed in local newspapers, and mass lease signings were organized by Defendants and others, all in an effort to get the private sector minerals under their control.

6.      Through their affiliates, Defendants sent solicitation letters to prospective oil and gas lessors, including Plaintiff, seeking to lease their mineral rights and promising top compensation for doing so. Many owners, like Plaintiff, accepted those offers and, in good faith, discontinued efforts to lease their rights to any other prospective buyer.

7.      Unknown to Plaintiff at that time, key executives at Chesapeake and Encana were hatching a plot. As described more fully below and in the exhibits to this Complaint, officials at the very highest levels of Chesapeake and Encana conspired to depress prices for mineral rights

interests in northern Michigan by dividing responsibility for dealing with private landowners on a county-by-county basis; agreeing to leases with such landowners to prevent them from entertaining bids from other potential purchasers (leases, which – in the end – they did not honor); and stringing those landowners along until those involved in the conspiracy had the opportunity to "reset" the pricing level for mineral rights interests at the State's next auction in October 2010.

8.      As clearly reflected in a series of emails leading up to the State's October auction (described more fully in Paragraph 75 of this Complaint), this time Chesapeake and Encana worked as collaborators rather than competitors.  In an email just days before the October auction, Chesapeake CEO Aubrey McClendon sent an email to Encana USA President Jeff Wojahn in which he stated, "Understand our teams are working on a cooperative approach to state leasing, that's good I think."  That "cooperative approach" had a dramatic impact on the results of the October auction.  Unlike in May, when Chesapeake and Encana issued competing bids on over 80% of the properties that were sold, Chesapeake and Encana did not compete for a single parcel at the October auction.  Although both leased substantial tracts of land at the October auction, neither Chesapeake nor Encana leased a single acre in a county where the other had leased.

9.      Not coincidentally, the results of the October auction were a far cry from May.  At the May sale, 118,000 mineral acres were leased generating $178 million, an average of $1,413 per acre.  At the October sale, 273,000 mineral acres were leased for only $10 million, resulting in an average lease price of less than $40 per acre.

10.     Having reset the market for northern Michigan mineral rights through their collusive conduct, Defendants were no longer interested in paying pre-October lease prices; and,

as a result, hundreds of private mineral owners who had leased or entered into agreements for their minerals in good faith to Chesapeake or one of its affiliates, including, Defendant Silver Lake Energy, LLC ("Silver Lake"), O.I.L. Niagaran, LLC ("OILN"), and Western Land Services, Inc. ("WLS"), began receiving notices that their mineral leases had been voided and the accompanying orders for payment of signing bonuses would not be funded. Plaintiff was among the victims of this attempt to renege on previously agreed-upon sales.

11.    Unknown to the lessors at the time they entered into their agreements with Chesapeake in the summer of 2010, Defendants were colluding to avoid competition and depress the prices that were being paid for the oil and gas leases, both at the State's October auction and in private lease transactions.

12.    This suit seeks recovery for the substantial damage Defendants' wrongful actions have caused to Plaintiff by colluding to depress prices in violation of federal and state antitrust laws, improperly seeking to avoid their contractual obligations to Plaintiff, and engaging in numerous other common law violations.

## JURISDICTION AND VENUE

13.    This action relates to a scheme between and among Defendants Chesapeake Energy Corporation ("Chesapeake"), Silver Lake Energy, LLC ("Silver Lake"), and Encana Corporation and Encana Oil & Gas (USA) Inc. (collectively "Encana") (all together, "Defendants") to suppress the price that they would pay to mineral owners in Michigan to enter into mineral leases by refusing to bid against one another to acquire such leases and by allocating bid-responsibility between themselves for mineral leases that could be used to access the Utica/Collingwood shale formation.

5

14.    This Complaint is brought under Sections 4 and 26 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15 and 26 ("Clayton Act"), to recover treble damages and the costs of this suit, including reasonable attorney fees, against Defendants for the injuries sustained by Plaintiff by reason of Defendants' violations of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act").  This Complaint is also brought pursuant to the Michigan Antitrust Reform Act ("MARA"), M.C.L. §§ 445.771 *et seq.*, to recover treble damages and the costs of this suit, including reasonable attorney fees, against Defendants for the injuries sustained by Plaintiff by reason of Defendants' violations of that Act.  And, finally, this Complaint alleges Michigan common law claims arising out of Defendants' collusive actions or refusals to act.

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 [federal question], 1337 [commerce and antitrust], and 1367 [supplemental jurisdiction], and pursuant to 15 U.S.C. §§ 15 and 26 [antitrust].

16.    The amount sought to be recovered by Plaintiff exceeds $1,125,000 and is well in excess of the jurisdictional minimum of this Court.

17.    This Court has *in personam* jurisdiction over Defendants because each was engaged in an illegal conspiracy to fix prices and to divide bidding responsibilities among themselves and otherwise directed and/or caused injury to persons and entities residing in, located in, or doing business in the Western District of Michigan.  Moreover, all Defendants had systematic and continuous contacts with and otherwise conducted business in this district.

18.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d), because the Defendants resided, transacted business, were found, or had agents in this district; a substantial part of the events giving rise to Plaintiff's claims occurred in this district; a substantial part of the property that is the subject of the action is situated in this

6

district; and a substantial portion of the affected trade and commerce described below was carried out in this district.

## THE PARTIES AND BACKGROUND

19.     Plaintiff owns the mineral rights underlying 625 acres of land in Kalkaska County, Michigan, from which the Utica/Collingwood shale formation can be accessed and exploited for commercial gain.

20.     Defendant Chesapeake is an Oklahoma corporation with its principal place of business located at 6100 N. Western Ave., Oklahoma City, Oklahoma 73118.  Chesapeake is the second-largest natural gas producer in the United States.

21.     Defendant Silver Lake is a Michigan limited liability company with a registered office and agent located at 222 North Washington Square #400, Lansing, Michigan 48933. Silver Lake was incorporated on May 18, 2010, (**Ex. 1**, Articles of Organization for Silver Lake), to (among other things) represent and/or acquire mineral lease rights for certain oil and gas purchasers in Michigan.  That included acquiring such leases for Chesapeake, either directly or through third parties.

22.     Defendant Encana Corporation is a Canadian corporation with its principal place of business located at 1800, 855 2 Street S.W., Calgary, Alberta T2P 2S5, which does business in the United States through its US-based affiliate, Encana USA.

23.     Defendant Encana USA is a Delaware corporation with its principal place of business located at 370 17th Street, Suite 1700, Denver, Colorado 80202; and it is a wholly owned subsidiary of Encana Corporation.  Encana describes itself as "North America's largest natural gas producer."

24.     The illicit acts alleged to have been done by Defendants – as set forth more fully below – were authorized, ordered, and/or done by their directors, officers, agents, employees, or representatives while actively engaged in each of the Defendants' separate business affairs.

## THE RELEVANT MARKETS

25.     The relevant geographic market is that portion of northern Michigan, including Kalkaska, Emmet, Cheboygan, Charlevoix, Crawford, Roscommon, Antrim, Presque Isle, and Missaukee counties, that includes the Utica/Collingwood shale formation.

26.     The relevant product market—that is, the market where the restraint occurred—is the market for oil and gas leaseholds from which the Utica/Collingwood shale may be accessed and developed.

## TRADE AND COMMERCE

27.     Throughout the period of time relevant to the actions that are the subject of this Complaint, there was a continuous and uninterrupted flow of commerce in the exploration, development, and disposition of crude oil and natural gas which had a direct and reasonably foreseeable effect upon interstate commerce in the United States.

28.     Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce; and the conduct alleged herein had substantial effects on commerce in and outside of Michigan.  Encana is a Canadian corporation which does business in the United States through Encana USA.  As reported by Encana, from 2008 to 2010, Encana spent over $37 million in bonuses acquiring approximately 250,000 net acres in Michigan. (**Ex. 2,** Encana Press Release dated May 7, 2010)  Chesapeake is an Oklahoma corporation with representative companies acquiring mineral rights in multiple states, including Silver Lake acquiring leases for Chesapeake in Michigan.  Chesapeake has publically stated that it "has

invested approximately $400 million to acquire leases in Michigan." (**Ex. 3,** Bloomberg Article dated June 26, 2012, p. 2)

29. Silver Lake's Michigan acquisitions were made to facilitate Chesapeake's plan to produce oil and gas that would be transported and sold outside of Michigan. Out-of-state Defendants Chesapeake and Encana have made, and will continue to make, investments in and affecting oil and gas leases in Michigan. For example, as Encana has detailed, Encana's 2012 drilling plan was initially "estimated to cost $36.5 million, [and] translates to . . . local purchases and hiring of contractors and their employees in central Michigan. Any gathering or other production facilities would be in addition to these expenditures, and would inject even more money into the central Michigan economy." (**Ex. 4**, Prefiled Direct Testimony of Russell Kimmitt on behalf of Encana Oil & Gas (USA) Inc., MPSC Case No. U-16999, September 20, 2012, p. 11) Encana further believes that additional investments in Michigan will occur "by other oil and gas producers who will follow Encana's lead in developing their production areas in central Michigan . . ." (*Id.*)

30. Defendants' acquisition and development of oil and gas leaseholds in northern Michigan has had (and will continue to have) substantial effects on commerce outside of Michigan. For instance, both Chesapeake and Encana brought in landmen from outside Michigan to investigate and acquire the Utica/Collingwood leases. Chesapeake and Encana relied on money transferred from or financed by out-of-state banks to acquire such leaseholds. Moreover, Chesapeake and Encana relied on out-of-state companies to evaluate prospective oil and gas wells in Michigan and to drill and operate wells on acquired Michigan leaseholds.

31. Chesapeake and Encana also transport oil and/or gas products out of Michigan through interstate and international pipeline systems. Encana's Utica/Collingwood wells already

or in the near future will connect to the MichCon pipeline system, which interconnects with a natural gas pipeline system reaching from Wisconsin to Maine. Moreover, oil, natural gas, or natural gas liquids obtained from the Utica/Collingwood in northern Michigan would almost certainly be offered for sale outside of Michigan through the introduction of those products into this pipeline system. Alternatively, if such oil, natural gas, or natural gas liquids are not sold outside of Michigan, the proceeds of those sales would still affect interstate commerce as the sale proceeds would be returned to Encana or Chesapeake, both of which are located outside of Michigan.

## **THE CONSPIRACY**

**A.** **Speculation and Heightened Demand for Northern Michigan Oil & Gas Leases.**

32. The Collingwood shale is an oil and natural gas field lying roughly 9,000-12,000 feet below Northern Michigan, some two miles below the surface, and is approximately 40-45 feet thick. The Utica shale is a thicker formation lying immediately above the Collingwood shale. Advances in drilling technology in recent years—including advances in "hydraulic fracturing" or "fracking"—have led to substantial interest by large natural gas companies in developing the Utica/Collingwood shales.

33. The oil and gas industry began to recognize the commercial viability of the Utica/Collingwood shales in early 2010, based on reports from the field that the exploratory Pioneer Well drilled to access the Utica/Collingwood in Missaukee County, Michigan, was visibly flaring gas. Both of these formations are now thought to be commercially productive formations for oil, natural gas, and natural gas liquids.

34. On April 24, 2010, that speculation heightened even further when the results of the initial flowback tests on the Pioneer Well became public and indicated that the Utica/Collingwood might present a commercially viable oil and natural gas play. Eventually, it

was disclosed that Encana, through a related company, was the entity that drilled the Pioneer Well.

35.     The effort to secure and develop oil and gas rights in "deep well plays," such as the Utica/Collingwood, is very capital intensive, not only for the acquisition of oil and gas rights but also due to the costs and resources needed to develop and build the expertise, equipment, and infrastructure to exploit such plays successfully.  Encana and Chesapeake were two of the few industry players in 2010 that had the resources and desire to exploit the deep well Utica/Collingwood play.

36.     In 2010, Plaintiff held oil and gas rights to 625 acres in northern Michigan.  These oil and gas rights included the rights to explore and drill for oil or gas from the Utica/Collingwood play.

37.     In 2010, Encana and Chesapeake were the only two large oil and gas exploration and production companies actively acquiring, directly or through third parties, Utica/Collingwood oil and gas interests in northern Michigan in significant quantities. Chesapeake and Encana are both major players for acquiring the rights to develop oil and gas rights for shale plays, such as the Utica/Collingwood, with Chesapeake being the single biggest buyer of such rights.  In Michigan, Chesapeake and Encana have held at relevant times the rights to more than 975,000 acres.

38.     In early 2010, Encana and Chesapeake were in direct and fierce competition to acquire the rights for deep well oil and gas rights in northern Michigan.

**B.      Price Terms Paid at the State of Michigan May 2010 Auction.**

39.     At the May 2010 auction by the State of Michigan's Department of Natural Resources, Chesapeake and Encana were the dominant buyers. Through intermediary bidders, the two companies spent almost $165 million combined to acquire the rights to develop more

than 84,000 acres of state lands. Their successful bids constituted about 93% of the $178 million total spent by auction bidders; and Chesapeake alone spent around $138 million to acquire leases at this auction.

40. The bidding for such leases was highly competitive, particularly between Encana and Chesapeake; and resulted in substantial prices being paid for acreage. The average winning bid at that auction was $1,413 per acre for the right to extract oil and gas from state owned land; and 83% of those winning bids had competing offers. Prime acreage at the May auction sold for approximately $5,000 per acre.

41. After this auction, in June of 2010, private landowners were receiving offers of more than $3,000 per acre.

42. In or around this same time, Plaintiff, as well as other private landowners in Michigan, became aware of the substantial bonuses being paid by oil and gas companies to acquire acreage in northern Michigan.

43. A bonus is paid to a landowner before oil and gas production occurs for the privilege of exploring for and developing oil and gas reserves. The amount of a bonus is a function of the lessee's perceived value of the property, and the bonus is to be paid regardless of whether or to what extent the lease ultimately proves to be profitable. In contrast, a royalty is the landowner's share of production free of the cost of production. A royalty is paid only when oil and gas is produced.

44. On May 14, 2010, Plaintiff received a written offer from Atlas Oil and Gas Company ("Atlas") to pay a lease bonus for Plaintiff's minerals of $750 per acre. (**Ex. 5**, Atlas's Offer to Plaintiff) But, knowing the bonuses that were paid per acre at and in the wake of the

State's May auction for mineral rights within the vicinity of Plaintiff's property, Plaintiff sought bids from other oil and gas companies.

**C.      Improper Sharing of Confidential Information and the Conspiracy to Depress Prices.**

45.     While Plaintiff was entertaining bids, top officials at Chesapeake and Encana were hatching a scheme to depress prices for mineral rights interests in northern Michigan.  By at least June 6, 2010, Chesapeake and Encana executives had started discussions of a collusive, joint strategy to avoid direct competition between the two companies, and their affiliates, in acquiring leases for Utica/Collingwood acreage, with the objective of depressing the prices both were paying for such leases.

46.     Numerous emails between executives at Chesapeake and Encana revealed the existence of this plan.  On June 6, 2010, Chesapeake VP Doug Jacobson sent an email to Encana USA VP John Schopp, copying Aubrey McClendon, Chesapeake's CEO, and Jeff Wojahn, Encana USA's president.   The email, with the subject line "CHK/ECA-Mi," stated, "Our proposal is pretty simple but hopefully should be effective for both of us."  He offered a strategy that included swapping land already leased in Michigan and dividing up counties and private landowners where new leases might be secured.[1]   "ECA would be responsible for new leasing in Charlevoix, Cheboygan, Missaukee and western Roscommon Counties while CHK would be responsible for leasing in Emmett [sic], Antrim, Kalkaska, western Otsego and western Crawford counties."    The email continued stating that, under the proposed strategy, the two companies "will have the option of acquiring 50% of the acreage acquired by the other" within the area of mutual interest "on the same terms as the initial acquiring party."

---

[1] In email communications, Chesapeake and Encana regularly abbreviated the names of their companies, using CHK and ECA respectively.

47.     The very next day, Encana's Schopp responded to Jacobsen's proposal to divide bids with a "few suggestions that would maximize our effectiveness." Among his recommendations was one that the two companies split the owners into two groups. Chesapeake would handle negotiations with one group and Encana would handle negotiations with the second group. That way, the two companies would not bid against one another. Schopp copied Encana's CEO, Randy Eresman.

48.     On June 14, 2010, Chesapeake VP Doug Jacobson stated in response to Encana VP John Schopp's proposal to divide private landowners between Chesapeake and Encana: "On the various points below, here's our thoughts: A) CHK is agreeable to ECA taking Kalkaska, Cheboygan, and Emmitt [sic].  CHK will work Charlevoix, Missaukee, Antrium [sic], western Roscommon, western Otsego, and western Crawford[.]"   Jacobson further noted, "The split of responsibilities as to specific companies you've suggested below will work with the exception of 'Anderson' [a deep rights leaseholder]."

49.     On June 15, 2010, McClendon, CEO of Chesapeake, sent an email to Jacobson and Schopp, with a copy direct to Encana USA's president Wojahn and Eresman, stating that it "looks like Northstar [another northern Michigan mineral rights owner] wants us to bid against each other next week, let's discuss who should handle that one—thanks."[2]

50.     Also on June 15, 2010, Chesapeake's Jacobson sent an email to Schopp suggesting that they discuss plans to split up where and from whom each company would lease land in Michigan. The reasoning he gave to Schopp was the following: "when you are back in the saddle, I'd like to visit with you about the implications of the impact of our competition on acreage prices and whether or not the sooner we do this the better shot we have of keeping

---

[2] NorthStar Energy, LLC, is an energy company in Traverse City, Michigan, that, on February 22, 2013, filed suit with this Court seeking damages against Encana and Chesapeake related to their anticompetitive scheme to depress mineral lease pricing in northern Michigan.  That is Case No. 1:13-cv-00200-PLM before this Court.

14

acreage prices from continuing to push up."  Two minutes later, Jacobson forwarded that email to Chesapeake's CEO, McClendon, and three other Chesapeake executives.

51.    Later that same day, on June 15, 2010, Chesapeake CEO Aubrey McClendon forwarded the email correspondence between Chesapeake VP Doug Jacobson and Encana VP John Schopp quoted in the previous paragraph to Encana USA CEO Jeff Wojahn and Encana CEO Randy Eresman.    McClendon assured the Encana CEOs that Chesapeake was working toward their agreement:    "Fyi, pushing from our end to save us both some money, Aubrey."    Eresman responded: "Agreed. The sooner the better. Thanks for continuing to move this forward."

52.    On June 16, 2010, McClendon sent an email to Jacobson and others at Chesapeake stating that it was time "to smoke a peace pipe" with Encana "if we are bidding each other up."

53.    In response, Jacobson reported to McClendon that he had contacted Encana "to discuss how they want to handle the entities we are both working to avoid us bidding each other up in the interim."  McClendon replied, "Thanks."

54.    A Chesapeake internal document dated June 16, 2010, setting forth a summary of Michigan land deals, confirmed that McClendon "does not want to complete [sic] with Encana on this deal if CHK is interested."

55.    On June 17, 2010, Encana VP John Schopp sent Chesapeake VP Doug Jacobson an email, with a copy to Encana USA President Jeff Wojahn, commenting, "I certainly feel that combining forces will be helpful for preventing further inflation. After a time, we might benefit from some deflation as well.    Your thoughts?"    Schopp's comment about "deflation"

foreshadowed the events that culminated in the conspirators' successful effort to reset the market prices for mineral rights after the October 2010 State of Michigan auction.

56.     In addition to the above emails, internal log entries at Chesapeake reported that, on June 18, 2010, a Chesapeake vice president was "working with [Encana] to try and avoid bidding each other up"; and a subsequent entry, dated June 25, 2010, reported that a Chesapeake official continued to work with Encana "so we don't continue to push the price up" on northern Michigan leases.

57.     On June 22, 2010, Encana VP John Schopp sent another email to Chesapeake VP Doug Jacobson, with a copy to Encana USA President Jeff Wojahn, stating "As we continue with our leasing activities, it is becoming increasingly apparent that we need an AMI [area of mutual interest] in place soon versus our alternative to escalate prices."

58.     On the same day at a meeting held in Calgary, Alberta, Schopp reported the status of the AMI negotiations to Encana's "executive team," including Eresman and Wojahn.   At that meeting, Schopp reported that the objective of the negotiations was to remove the tug of war between the two competitors in northern Michigan.   Schopp projected that Encana would likely pay 20% more for acreage going forward without an agreement with Chesapeake in place.

59.     According to Schopp, the Encana executive team supported moving forward with its joint efforts with Chesapeake after this June 22, Calgary meeting.

60.     Thereafter, Encana and Chesapeake coordinated their bids for oil and gas interests of private landowners in part through the exchange of drafts of a purported "area of mutual interest" agreement.

61.     These drafts expressly communicated those areas and landholders over which Encana would have exclusive bidding responsibility, and those over which Chesapeake would have exclusive bidding responsibility.

16

62.    Proposed drafts of the agreement contemplated by the above-quoted emails and logs were subsequently circulated within Chesapeake.   The contents of the drafts show the anticompetitive purpose of the agreement:

> A paragraph, addressing future state lease sales, states: "At any time during the bidding process a party may stop bidding on any designated tract, at which point the other party may commence bidding on such tract."
>
> A comment in the margin next to this paragraph from David Bolton, a senior landman at Chesapeake closely involved in Chesapeake's Michigan land leasing, notes: "This will be difficult to enforce – I would suggest we keep this simple and coordinate our bidding efforts within the AMI lands prior to the lease sale.   Then offer each the lease according to this agreement just as we would any other.  Your thoughts?"
>
> Another paragraph of that draft AMI states: "With respect to the tracts that are designated for bidding by only one party, the other party will be free to bid independently bid [sic] on said tracts, including bidding against the designated party."   A comment on this paragraph from Bolton states: "Why have this [paragraph] if the goal is to keep from running the prices up on each other?"
>
> (**Ex. 6**, Reuters Article dated December 27, 2012, p.3)

63.    This exchange of drafts and related discussions did not result in Chesapeake and Encana actually entering into an area of mutual interest agreement.  That proved unnecessary, as the parties were able to achieve their intended and true purpose of dividing the northern Michigan market, coordinating their offers to mineral rights owners, and ultimately depressing prices and competition in the market.  It now appears that the exchange of drafts and discussions surrounding this purported "area of mutual interest agreement" was nothing more than a sham vehicle used to facilitate illegal and anticompetitive planning between the Defendants.

**D.**    **Defendants Crash the Market and Back Out of Leases.**

64.    The Defendants' conspiracy had immediate effects.   In the weeks after the discussions began, Defendants sharply cut the prices they were offering for land in Michigan,

17

and average lease prices sharply plunged in areas that had been hotly contested.   At the time, Chesapeake and Encana, often acting through their representatives or affiliates, were the largest lease buyers in Michigan.

65.     For example, both Chesapeake and Encana stopped negotiating with one large landowner, the Zaremba Family Farms, Inc.,[3] at the same time.  By approximately mid-July, as a result of the collusive conduct set forth in this Complaint, both Encana and Chesapeake had cut the maximum per acre bonus amount they were offering for Utica/Collingwood interests in northern Michigan by 50% or more.   And, by July 15, 2010, Encana announced it was discontinuing its leasing program.  Through these actions, Defendants were able to avoid paying fair market prices for mineral rights interests throughout the summer of 2010, pending the outcome of the October state auction.

66.     On July 16, 2010, David Bolton of Northern Michigan Exploration Company, LLC ("NMEC")[4] notified David McGuire of OILN that effective immediately all leasing prices were to be dropped by 50% and directed him to rescind all offers outside this parameter that were not signed and in his hands by noon that day.  In an email that same day, McGuire noted that Encana had started reducing its offers in equal measure and asked whether this was a "coincidence."   Clearly, it was not.

67.     On July 25, 2010, Brian Exline of Chesapeake notified McGuire, "effective immediately, please freeze all acquisition and leasing efforts… [F]reeze all activity until further notice."  On July 28, 2010, Leslie Irish of OILN instructed OILN representatives to stop all title

---

[3] The Zarembas have filed suit with this Court seeking damages from Encana related to Encana's involvement in the anticompetitive scheme to depress mineral lease pricing in northern Michigan.  That is Case No. 1:12-cv-369 before this Court.
[4] Chesapeake formed Northern Michigan Exploration Company, LLC ("NMEC"), for the purposes of taking assignment of certain oil and gas leases from Silver Lake, OILN, and WLS.  NMEC is a subsidiary of Chesapeake with a registered office and resident agent in Michigan.

curative work: "[W]e got shut down yesterday, we were told to <u>stop ALL Leasing and the lease</u> <u>related jobs insofar as curative, All title and ALL abstracting</u>."

68.    In addition to slashing prices on pending negotiations, Defendants began to seek ways to avoid the contracts they had already entered into at a time when prices were still inflated by the May auction.  On July 30, 2010, Irish asked Henry Hood, VP of Chesapeake, to confirm whether leases would still be paid by Chesapeake when title work was already completed. Bolton of Chesapeake/NMEC responded on behalf of Henry Hood, "[T]hat was not our instruction.  There should be no misunderstanding, as Henry advised, we do <u>not wish for you to</u> <u>tender payments on any leases</u>."

69.    After the shutdown in July of 2010, NMEC instructed all of its agents and brokers to fail all titles under leases taken by the brokers at the May auction.  Likewise, McGuire has admitted that Chesapeake instructed OILN, another representative of Chesapeake's in Michigan, to fail as many leases as it could, and OILN followed through on that request as Chesapeake had instructed.

70.    Consistent with the bad-faith approach that Chesapeake took in dealing with mineral rights owners, like the Plaintiff here, McGuire has admitted that Chesapeake's agent, NMEC, sent rejection letters to lessors in situations where he did not believe that title defects existed.

71.    In September of 2010, Chesapeake's agents, RedSky Land, LLC ("RedSky")[5] and Silver Lake, retained several title agents and landmen for the express purpose of carrying out Defendants' collusive strategy of voiding acquired oil and gas leases, thereby avoiding paying prices at the market level set by the May state auction.  This has been confirmed by Joe

---

[5] Chesapeake contracted with RedSky, an Oklahoma LLC, to assist in the leasing activity in the State of Michigan.

McFerron, affiliated with both RedSky and Silver Lake, who admits in an email communication that they were instructed to fail all leases.

72.     Chesapeake's attempt to extricate itself from the obligation to pay the lessors the bonus money due under the oil and gas leases is consistent with Chesapeake's practice of treating oil and gas leases, not as contracts, but as speculative options.  Chesapeake prides itself in sending its "land acquisition machine" into a new shale play to grab up as many oil and gas leases as fast as possible to tie up the mineral rights before its competitors can.  Then, in the event Chesapeake determines it would be to its advantage to avoid those obligations for whatever reason, Chesapeake reneges on the leases and claims that the titles contain a defect or uses any other rationale in an attempt to justify its cancellation/rejection of the leases.

73.     That is exactly what Chesapeake and its agent, Silver Lake, did in Michigan between August and December of 2010 to avoid paying the higher bonus amounts it had already contractually agreed to pay under the oil and gas leases or agreements/contracts it had entered into earlier in the summer.

74.     More than 93% of the private sector oil and gas leases that had been entered into during the summer of 2010 were subsequently voided by Chesapeake and/or its agents (NMEC, Silver Lake, OILN, and WLS), allegedly due to "title defects."  Historically, the average mineral title failure rate in Michigan is less than 3%.

**E.     Defendants Succeed in Resetting the Market for Mineral Rights Prices at the October State Auction.**

75.     At the auction of state land on October 26, 2010, Chesapeake and Encana did not buy any state land in the same county.  This stood in stark contrast to the May 2010 state auction just months earlier (but before their collusive activity) where they had competed vigorously and

bid each other up for tracts in the same counties.  Emails leading up to the auction reveal Defendants' collusive efforts:

> On October 14, 2010, an Encana USA official emailed Chesapeake stating that he "wanted to identify Encana's suggested contract lands and bidding responsibilities so you can take a look" before the upcoming October State of Michigan lease auction.
>
> On October 17, 2010, Chesapeake CEO Aubrey McClendon emailed Encana USA President Jeff Wojahn: "Understand our teams are working on a cooperative approach to state leasing, that's good I think.  Anything else out there encouraging to talk about?"
>
> On October 20, 2010, Encana USA President Jeff Wojahn sent Chesapeake CEO Aubrey McClendon an update: "From what I understand John Schopp has been leading the charge on working with your team on arranging a bidding strategy.  I have a meeting planned on Friday and a review with Randy Monday."
>
> (**Ex. 7**, Reuters Article dated June 26, 2012, p. 4)

76.     A comparison of the results of the State of Michigan's May land auction with those of the October auction shows just how effective the Defendants' conspiracy was.  The State's May auction fetched $178 million for 118,000 acres at an average price per acre of $1,413.  The state's October auction fetched only $9.7 million for 274,000 acres—that is, more than twice the acreage of the May auction, but $170 million less.  The average winning bid in October was only $46 per acre, with most of the State's acreage selling for the minimum bid of $13 per acre.

## **FRAUDULENT CONCEALMENT**

77.     Throughout the relevant period, Defendants concealed their unlawful conduct from the Plaintiff and other mineral lessors.

78.     Plaintiff did not know about the Defendants' unlawful conduct until June 25, 2012, when investigative journalists for Reuters published an article titled, "SPECIAL REPORT:

CHESAPEAKE AND RIVAL PLOTTED TO SUPPRESS LAND PRICES."    The article

begins:

> By Brian Grow, Joshua Schneyer and Janet Roberts
> GAYLORD, MICHIGAN  Mon Jun 25, 2012 8:47am EDT
>
> (Reuters)  -  Under the direction of CEO Aubrey McClendon, Chesapeake Energy Corp. plotted with its top competitor to suppress land prices in one of America's most promising oil and gas plays, a Reuters investigation has found.  In emails between Chesapeake and Encana Corp., Canada's largest natural gas company, the rivals repeatedly discussed how to avoid bidding against each other in a public land auction in Michigan  two years ago and in at least nine prospective deals with private land owners here.
>
> In one email, dated June 16, 2010, McClendon told a Chesapeake deputy that it was time "to smoke a peace pipe" with Encana "if we are bidding each other up."  The Chesapeake vice president responded that he had contacted Encana "to discuss how they want to handle the entities we are both working to avoid us bidding each other up in the interim."  McClendon replied:  "Thanks."
>
> That exchange—and at least a dozen other emails reviewed by Reuters—could provide evidence that the two companies violated federal and state laws by seeking to keep land prices down, antitrust lawyers said.
>
> "The famous phrase is a 'smoking gun.'  That's a smoking H-bomb," said Harry First, a former antitrust lawyer for the Department of Justice.  "When the talk is explicitly about getting together to avoid bidding each other up, it's a red flag for collusion, bid-rigging, market allocation."

A true and correct copy of the June 25, 2012, Reuters article is attached hereto as **Exhibit 7**.

79.    Plaintiff did not discover, and could not have discovered through reasonable

diligence, that Defendants were violating the federal and state antitrust laws as alleged herein

until June 25, 2012, at the earliest.  Plaintiff had no reason to know of the violations earlier than

that time because Defendants conducted their conspiracy in secret, concealed the nature of their

unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities

through means and methods designed to avoid detection.  The conspiracy was by its nature self-concealing.

80.     Likewise, Plaintiff had no reason to be aware of Chesapeake and Silver Lake's bad faith scheme to breach the parties' lease agreement until this conspiracy came to light.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE SHERMAN ACT
### AGREEMENT AND CONSPIRACY TO RESTRAIN TRADE
### AS TO ALL DEFENDANTS

81.     Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

82.     Defendants are "persons" as defined under the Sherman Act, 15 U.S.C. § 7.

83.     Beginning in May 2010, Defendants, as co-conspirators, engaged in an unlawful contract, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

84.     Specifically, Defendants conspired and colluded to avoid bidding against one another on Plaintiff's oil and gas deep rights leaseholds.

85.     Each of the Defendants has engaged in one or more overt acts in furtherance of the contract, combination, and conspiracy described herein.  The means and methods used by Defendants to implement the aforesaid agreement and conspiracy included, *inter alia*, the following:

      a.    Agreed, during e-mail conversations, to allocate territory between themselves;

      b.    Allocated territory between themselves, pursuant to such conversations;

      c.      Participated in conversations discussing which designated co-conspirator would purchase deep rights from particular leaseholders;

      d.      Agreed, during such conversations, which designated co-conspirator would purchase deep rights from particular leaseholders;

      e.      Agreed, during such meetings and conversations, not to bid against each other.

86.    As a direct and proximate result of the violations of law alleged herein, Plaintiff has suffered antitrust injury to its business and property. Plaintiff has been injured by the Defendants' unlawful conspiracy in that Plaintiff agreed to sell its leasehold interests during the Defendants' conspiracy at a lower price and less favorable terms than it would have absent the Defendants' conspiracy. Further, Defendants caused Plaintiff to remove its leasehold interests from the market at a time during which it might otherwise have been sold, and then wrongfully sought to avoid the agreement to purchase Plaintiff's leasehold interest while they endeavored to comprehensively depress the market for such leasehold interests at the state auction in October of 2010.

87.    The Defendants' unlawful conduct has therefore unreasonably restrained trade in the relevant market, which is the market for oil and gas leaseholds.

88.    Moreover, Defendants are liable for treble damages, plus Plaintiff's reasonable attorney fees, costs, and interest pursuant to 15 U.S.C. § 15.

WHEREFORE, Plaintiff respectfully requests that this Court adjudge and decree that the conspiracy and collusion between and among Encana, Chesapeake, and their related entities violates Section 1 of the Sherman Act, 15 U.S.C. § 1; award Plaintiff treble its damages sustained, to be proven at trial, plus interest, costs, and attorney fees; and award such other relief as this Court deems appropriate.

## COUNT II
## VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
## AGREEMENT AND CONSPIRACY TO RESTRAIN TRADE
## AS TO ALL DEFENDANTS

89.     Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

90.     The anticompetitive agreement described in Count I unreasonably restrains trade in violation of Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

WHEREFORE, Plaintiff respectfully requests that this Court adjudge and decree that the conspiracy and collusion between and among Encana, Chesapeake, and their related entities violated Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772; award Plaintiff treble its damages sustained, to be proven at trial, plus interest, costs, and attorney fees; and award such other relief as this Court deems appropriate.

## COUNT III
## BREACH OF CONTRACT UNDER MICHIGAN LAW
## AS TO SILVER LAKE AND CHESAPEAKE

91.     Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

92.     On May 20, 2010, Plaintiff sent an email to Chesapeake's land leasing mailbox inquiring if Chesapeake was interested in leasing Plaintiff's mineral rights. Gary Dunlap of Chesapeake forwarded the Plaintiff's inquiry to Richard Dawson of RedSky, who then forwarded the same to Joe McFerron, Land Manager for RedSky and the newly formed Silver Lake.

93.     On June 9, 2010, Al Couturier, agent for Silver Lake, sent Plaintiff a "Solicitation Letter."  (**Ex. 8**, Silver Lake's Solicitation Letter)  At the time, it was unknown to Plaintiff that

Silver Lake was leasing for Chesapeake. In that Solicitation Letter, Silver Lake represented in part, the following:

 a. That Silver Lake was acquiring oil and gas leases in the area;

 b. That Silver Lake was acting as the agent for NMEC, one of the premier oil and gas exploration companies in the country;

 c. That Silver Lake had checked the records and found that the prospective lessor owned all or part of the mineral interest underlying its property;

 d. That they wanted to make the prospective lessor a "very attractive offer" for an oil and gas lease;

 e. That they would give the lessor the "best offer available" based upon where the property fell within their area of interest.

94. On June 16, 2010, Couturier sent Plaintiff an email confirming that Silver Lake wanted to acquire the Plaintiff's mineral lease. On that same date, Plaintiff informed Couturier that Plaintiff had been receiving bids on the mineral lease from other companies and invited Silver Lake to submit its offer for royalty percentage, bonus payment, and primary and secondary terms.

95. On June 17, 2010, Couturier sent another email to Plaintiff again stating that Silver Lake wanted to lease Plaintiff's minerals, and could offer Plaintiff 3/16 royalty and between $1,200 to $1,500 per acre as a bonus.

96. Plaintiff responded to Couturier and inquired whom Silver Lake was taking the leases for and whether or not Silver Lake would be the operator. Couturier confirmed that the company he was leasing for was located in Oklahoma City and that company would be doing the drilling.

97.     On June 17, 2010, Silver Lake prepared and submitted to Plaintiff a Letter of Intent, for Plaintiff's review and signature, to lease Plaintiff's 625 mineral acres with a payment of 3/16 royalty, $1,500 per acre bonus, primary term of 5 years, and secondary term of 5 years.

98.     Couturier called Plaintiff on July 7, 2010.   Plaintiff informed Couturier that Energy West had offered Plaintiff a 3/16 royalty and $1,750 per acre as a signing bonus for a portion of Plaintiff's minerals.   Couturier told Plaintiff he was working for Chesapeake, to forget the Letter of Intent (as that was only to buy time) and now he wanted to get the actual oil and gas lease signed, and that he was increasing the leasing bonus to $1,750 to match the Energy West offer, on all 625 acres. Couturier stated that the gas had been in the ground for millions of years so Plaintiff should not rush to sign with any competitor, adding emphatically, "We want to be the last bidder."

99.     That same day, shortly after the phone call, Couturier conveyed to Plaintiff that he was increasing the bonus per acre to $1,800 and, in turn, sent Plaintiff an oil and gas lease form consistent with the offered price terms.

100.    Plaintiff, through counsel, notified Couturier on July 15, 2010 that Plaintiff accepted Silver Lake's offer to lease at 3/16 royalty and $1,800 per acre.   (**Ex. 9**, Plaintiff's Acceptance of Silver Lake's Offer, p. 2)

101.    At a meeting between Couturier, Wayne Baker, agent for RedSky, and Plaintiff's counsel on July 17, 2010, Baker stated that all pending oil and gas lease offers were being cut by 50%.   But, since Silver Lake had reached agreement on terms with the Plaintiff, Baker identified the revisions Silver Lake wanted counsel to make to the Addendum to Lease.   The Addendum to Lease was revised as requested by Baker and sent to Couturier on July 19, 2010. (**Ex. 10**, Plaintiff/Silver Lake's August 2, 2010 Email Exchange, p. 2-3)

102.    On July 21, 2010, Plaintiff received a call from Couturier where he purported to rescind Silver Lake's already accepted offer; stating that Silver Lake is only leasing in certain areas and any bonus would be limited to $500 with 1/6 royalty.

103.    On August 2, 2010, Baker confirmed to McFerron that there was an offer and acceptance of that offer by Plaintiff via email.  (**Ex. 11**, Baker/McFerron's August 2, 2010 Email Exchange, p. 1)

104.    Prior to being contacted by Silver Lake, Plaintiff had received offers to lease Plaintiff's minerals from other competitive oil and gas companies, including an offer from Atlas for $750 per acre.  (**Ex. 5**, Atlas's Offer to Plaintiff)  In addition, Plaintiff had received an offer from Energy West for $1,750 per acre for Plaintiff's property located in Excelsior Township (**Ex. 12**, Energy West's Offer to Plaintiff); and it was in negotiations with WLS.

105.    As a result of the above representations and assurances made by Silver Lake to the Plaintiff, Plaintiff discontinued negotiations with Atlas, Energy West, and WLS.

106.    Plaintiff has suffered damages as a result of the above in the amount of at least $1,125,000, plus interest and attorney fees.

107.    The contract for Plaintiff's mineral rights impose on  Silver Lake and Chesapeake a duty of good faith and fair dealing with respect to the bonus amounts due to the Plaintiff under such contract.

108.    Silver Lake and Chesapeake breached their duty of good faith and fair dealing through their combinations and conspiracies by artificially depressing the prices available to the Plaintiff and by failing to pay Plaintiff anything.  The specific actions of the Silver Lake and Chesapeake that constituted breaches of each's duty of good faith and fair dealing with respect to the Plaintiff under their contract are:

      a.     Including lease terms in their leases that reflected conspiratorially set bonuses instead of competitively-set bonuses;

      b.     Refusing to compete with one another for leases;

      c.     Refusing to pay Plaintiff any bonus when there was a written offer and acceptance of the lease terms.

109.    These wrongful actions proximately caused, and will continue to cause, Plaintiff substantial injury, including, but not limited to, the nonpayment of the bonus owed under the parties' oil and gas lease.

110.    As a direct result of the Silver Lake and Chesapeake's breach of their agreement with Plaintiff, including their duty of good faith and fair dealing, the Plaintiff has suffered damages in that it did not receive payment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Silver Lake and Chesapeake in whatever amount is shown to be established by the proofs in the case, together with interest, costs, exemplary and punitive damages, expert witness fees, and reasonable attorney fees; grant equitable and declaratory relief; and award such other relief as this Court finds is equitable and just.

### COUNT IV
### QUANTUM MERUIT/UNJUST ENRICHMENT
### AS TO SILVER LAKE AND CHESAPEAKE
### PLED IN THE ALTERNATIVE

111.    Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

112.    Upon information and belief, Silver Lake and Chesapeake assert that there is no binding contract between Plaintiff and Silver Lake as there was no valid offer and acceptance.

113.    In the event the Court finds there is a failure of the contract or the contract is unenforceable, Plaintiff seeks – in the alternative – an equitable remedy.

114.    Plaintiff alternatively seeks recovery of the reasonable value of the oil and gas lease and sums due under the offer and acceptance under this Court's equitable powers.

115.    Silver Lake and Chesapeake offered the terms of the oil and gas lease and Plaintiff accepted them.  Silver Lake and Chesapeake knew that Plaintiff expected the monies promised to it.

116.    The Plaintiff's mineral interests were taken off the market, precluding Plaintiff from leasing the mineral rights to another company, such as Atlas or Energy West, and giving Silver Lake and Chesapeake, and the other Defendants, the benefit of a competitive advantage.

117.    Silver Lake and Chesapeake treated the offer and acceptance by Plaintiff as a mere option, and received the benefit of the same, yet they have not paid Plaintiff any compensation for this benefit.

118.    It is inequitable for Silver Lake and Chesapeake to retain these benefits when the Plaintiff has received nothing.

119.    Plaintiff has been harmed by the inequitable removal of its mineral rights from the market, precluding the leasing of those rights to another company, and Defendants' failure to pay the sums due it.

WHEREFORE, Plaintiff respectfully requests this Honorable Court grant equitable and declaratory relief, enter judgment in its favor and against Silver Lake and Chesapeake in whatever amount is shown to be established by the proofs in the case, together with interest, costs, exemplary and punitive damages, expert witness fees, and reasonable attorney fees, and award such other relief as this Court finds is equitable and just.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
## AS TO ALL DEFENDANTS

120.    Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

121.    Plaintiff had offers to lease its mineral rights from other oil and gas companies or had been negotiating to lease its minerals rights to other oil and gas companies. Plaintiff had written offers from Atlas for $750 an acre with a 1/6 royalty and from Energy West for $1,750 per acre with a 3/16 royalty.  (**Ex. 5**; **Ex. 12**)

122.    Because of the lease agreement reached with Silver Lake and Chesapeake, Plaintiff forbore from negotiating with and/or turned down lease offers made to it by Defendants' competitors.

123.    Plaintiff had a business relationship or expectancy with Atlas and Energy West. Plaintiff also had an advantageous leasehold position when profitability peaked for northern Michigan deep well rights.

124.    Defendants knew of the existence of the Plaintiff's business relationships or expectancies with their competitors as well as Plaintiff's advantageous leasehold position in the northern Michigan market.

125.    With this knowledge, Defendants intentionally interfered with the Plaintiff's business relationship or expectancy by manipulation of the market by offering Plaintiff large bonus amounts, effectively pricing the competition out of the market, and then defaulting on their obligation to pay.

126.    Plaintiff has been harmed by not receiving the bonus money and missing the opportunity to lease its minerals to another company.

127.    Defendants' acts were intentional and per se wrongful.

31

128.    Defendants' acts were intentional and malicious and unjustified in law for the purpose of invading Plaintiff's business relationship.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in its favor and against Defendants in whatever amount is shown to be established by the proofs in the case, together with interest, costs, exemplary and punitive damages, expert witness fees, and reasonable attorney fees; grant equitable and declaratory relief; and award such other relief as this Court finds is equitable and just.

## COUNT VI
## FRAUDULENT MISREPRESENTATION AND FRAUD IN THE INDUCEMENT AS TO SILVER LAKE AND CHESAPEAKE

129.    Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

130.    Silver Lake represented to Plaintiff that it had an office in Traverse City, Michigan.

131.    Silver Lake represented to Plaintiff that Silver Lake and its principal were developing the Collingwood Shale in Michigan and were in it for "the long haul."

132.    Silver Lake and Chesapeake sent letters to prospective oil and gas lessors representing the following:

    a.    That Silver Lake was acquiring oil and gas leases in the area;

    b.    That Silver Lake was acting as the agent for NMEC, one of the premier oil and gas exploration companies in the country;

    c.    That Silver Lake had checked the records and found that the prospective lessor owned all or part of the mineral interest underlying its property;

    d.    That they wanted to make the prospective lessor a "very attractive offer" for an oil and gas lease;

e.   That they would give the lessor the "best offer available" based upon where the property fell within their area of interest.

(*See*, **Ex. 8**, Silver Lake's Solicitation to Plaintiff)

133.   The above representations were false, misleading, and material misrepresentations for the following reasons:

a.   Silver Lake did not have an office in Traverse City, Michigan;

b.   Silver Lake and its principal, NMEC, were not developing the Collingwood Shale in Michigan and were not in it for "the long haul";

c.   Silver Lake did not acquire oil and gas leases in the area;

d.   Silver Lake was formed on May 18, 2010 and was not one of the "premier oil and gas exploration companies in the country";

e.   NMEC was formed on April 28, 2010 and was not one of the "premier oil and gas exploration companies in the country";

f.   Contrary to the Defendants' representation that the Plaintiff would receive the "best offer available," the Plaintiff has received nothing.

134.   Silver Lake and Chesapeake misrepresented that they wanted to be the "last bidder," when, in fact, the intent was to tie up the Plaintiff's mineral rights and then determine at a later time whether to honor or disregard their obligation.

135.   Silver Lake and Chesapeake encouraged Plaintiff not to accept other pending offers from Energy West and Atlas and, instead, allow them the opportunity to match or beat those offers.  Silver Lake and Chesapeake did, in fact, raise their lease offer to Plaintiff higher than the offers from Atlas or Energy West, thereby winning Plaintiff's lease and taking control of Plaintiff's mineral rights.

136.   During the negotiations with Plaintiff, Silver Lake and Chesapeake knew that, if they later determined that the deal they cut with Plaintiff was no longer financially advantageous,

they would not pay Plaintiff (and many other mineral owners) the monies due under their respective leases or contracts/agreements, but rather would walk away from the deal.

137. This pre-conceived plan allowed Silver Lake and Chesapeake to treat the oil and gas leases and mineral rights they were grabbing up and holding as mere "options." Despite the fact that neither Silver Lake nor Chesapeake paid any consideration for the grant of such an "option."

138. Silver Lake and Chesapeake made a material misrepresentation that Plaintiff would be paid $1,800 per acre for their mineral rights, totaling $1,125,000, when Defendants in fact paid nothing.

139. Silver Lake and Chesapeake made these misrepresentations with the express intention that the Plaintiff would act upon them.

140. Plaintiff did, in fact, act upon the misrepresentations by accepting Silver Lake and Chesapeake's offer and removing its minerals from the market.

141. Silver Lake and Chesapeake made the misrepresentations knowing them to be false or with reckless disregard for the truth of the assertion.

142. Plaintiff has suffered damage and harm as a result.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Silver Lake and Chesapeake in whatever amount is shown to be established by the proofs in this case, together with interest, costs, exemplary and punitive damages, expert witness fees, and reasonable attorney fees, and award such other relief as this Court finds is equitable and just.

## COUNT VI
## CIVIL CONSPIRACY
## AS TO ALL DEFENDANTS

143.    Plaintiff incorporates the preceding paragraphs of the Complaint as though fully restated here.

144.    Defendants conspired and acted in concert to engage in bid-rigging, collusion, price fixing, market allocation, and other unlawful activities that directly affected their negotiations to acquire the property of Plaintiff.

145.    Defendants also conspired and acted in concert to defraud and tortuously interfere with Plaintiff's right to receive a competitive price for the purchase of its oil and gas interests and then to deprive it of any price at all.

146.    Defendants conspired and acted in concert to accomplish an unlawful purpose.

147.    Plaintiff was damaged as a result of Defendants' conspiracy.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in its favor and against Defendants in whatever amount is shown to be established by the proofs in the case, together with interest, costs, exemplary and punitive damages, expert witness fees, and reasonable attorney fees; grant equitable and declaratory relief; and award such other relief as this Court finds is equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants based on the above alleged counts of this Complaint in an amount to be determined at trial, including treble damages, attorney fees and costs of litigation, and pre- and post-judgment interest, and such other relief as the Court deems appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

of the claims asserted in this Complaint so triable.


Dated:  February 28, 2014                    By:  <u>/s/ Lance R. Zoerhof</u>
                                                   Brian J. Masternak (P57372)
                                                   Lance R. Zoerhof (P63980)
                                                   WARNER NORCROSS & JUDD LLP
                                                   900 Fifth Third Center
                                                   111 Lyon Street NW
                                                   Grand Rapids, MI 49503-2487
                                                   bmasternak@wnj.com
                                                   616.752.2000
                                                   Co-Counsel for Plaintiff

                                                   Susan L. Hlywa Topp (P46230)
                                                   TOPP LAW PLC
                                                   213 Main St.
                                                   Gaylord, MI 49734
                                                   susan@topplaw.com
                                                   989.731.4014
                                                   Co-Counsel for Plaintiff


10064010-7

36