# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| THE TENEYCK MINERAL TRUST, BY C. ANDREW TENEYCK, TRUSTEE, | Case No.14-cv-00201-GJQ |
| Plaintiff, | Hon. Gordon J. Quist |
| v. | |
| CHESAPEAKE ENERGY CORPORATION, SILVER LAKE ENERGY, LLC, ENCANA CORPORATION, and ENCANA OIL & GAS (USA) INC., | **BRIEF IN SUPPORT OF CHESAPEAKE ENERGY CORPORATION'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

Brian J. Masternak (P57372)
Charles N. Ash, Jr. (P55941)
Lance R. Zoerhof (P63980)
David R. Whitfield (P73352)
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
bmasternak@wnj.com
cash@wnj.com
lzoerhof@wnj.com
dwhitfield@wnj.com
616.752.2000
Co-Counsel for Plaintiff

Susan L. Hlywa Topp (P46230)
TOPP LAW PLC
213 Main St.
Gaylord, MI 49734
susan@topplaw.com
989.731.4014
Co-Counsel for Plaintiff

Molly S. Boast
Jason D. Hirsch
Hanna A. Baek
Ryan D. Tansey
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212.230.8800
molly.boast@wilmerhale.com
jason.hirsch@wilmerhale.com
hanna.baek@wilmerhale.com
ryan.tansey@wilmerhale.com

Anthony J. Rusciano (P29834)
Dennis G. Cowan (P36184)
Michael J. Barton (P34509)
PLUNKETT COONEY, P.C.
38505 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
arusciano@plunkettcooney.com
248.901.4000
*Attorneys for Defendants Chesapeake Energy Corporation and Silver Lake Energy, LLC*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT .......................................................................................................... 5

I.      LEGAL STANDARD ................................................................................... 5

II.     PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT ............... 5

     A.     There Is No Contract Between The Parties ........................................... 5

          1.     The parties never signed and executed a lease agreement ......................... 6

          2.     The parties did not reach agreement on "all essential points" ................... 7

          3.     The July 15 e-mail cannot substitute for a lease agreement ...................... 9

     B.     The Statute Of Frauds Bars Plaintiffs' Breach Of Contract Claim ...................... 10

          1.     The Lease Form and Addendum fail to meet the statute of frauds' signed writing requirement ................................................................................ 11

          2.     The July 15 e-mail does not satisfy the statute of frauds ......................... 12

III.    PLAINTIFF'S QUASI-CONTRACT CLAIMS ALSO MUST FAIL ............................. 14

     A.     Plaintiff Fails To State A Claim For Breach Of The Duty Of Good Faith And Fair Dealing ...................................................................................... 14

     B.     Plaintiff Fails To State A Claim For Unjust Enrichment ................................... 15

IV.    THE TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP CLAIM IS NOT VIABLE AS A MATTER OF LAW ................................................................ 16

     A.     Competitors' Weeks-Old Proposals On Bonus and Royalty Alone Did Not Create A Valid Business Expectancy For Plaintiff ................................................. 16

     B.     Defendants Did Not Intentionally Commit An Improper Or Wrongful Act That Interfered With Plaintiff's Business ......................................................... 17

V.     PLAINTIFF'S FRAUD-BASED CLAIMS FAIL AS A MATTER OF LAW ................. 19

     A.     Plaintiff Fails To State A Claim For Fraudulent Misrepresentation ..................... 20

          1.     Statements (1) and (2) are not pleaded with particularity .......................... 21

          2.     Statements (3), (4), and (5) are not false ............................................... 21

          3.     Statements (6)-(9) are statements of future expectation .......................... 23

     B.     Plaintiff Fails To State A Claim For Fraud In The Inducement ........................... 23

CONCLUSION ..................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abbas v. Bank of America N.A.*,
No. 1:12-CV-607, 2013 WL 1340309 (W.D. Mich. Mar. 29, 2013)......................................12

*American Bentonite Corp. v. Clark Equipment Co.*,
43 F.2d 392 (W.D. Mich. 1928), *aff'd*, 43 F.2d 1023 (6th Cir. 1930)....................................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................5

*Bassett v. National Collegiate Athletic Association*,
528 F.3d 426 (6th Cir. 2008) ...............................................................................................4

*Burton v. William Beaumont Hospital*,
373 F. Supp. 2d 707 (E.D. Mich. 2005)..............................................................................14

*Compuware Corp. v. International Business Machines*,
259 F. Supp. 2d 597 (E.D. Mich. 2002)..............................................................................16

*Cook v. Little Caesar Enterprises, Inc.*,
210 F.3d 653 (6th Cir. 2000) .........................................................................................20, 21

*Grand Rapids Plastics, Inc. v. Lakian*,
188 F.3d 401 (6th Cir. 1999) ...............................................................................................18

*Hamilton Foundry & Machinery Co. v. International Molders & Foundry Workers Union of North America*,
193 F.2d 209 (6th Cir. 1951) .................................................................................................6

*Hana v. Wells Fargo Bank*,
No. 11-14442, 2012 WL 1694643 (E.D. Mich. May 15, 2012) ............................................12

*Hoover v. Langston Equipment Associates, Inc.*,
958 F.2d 742 (6th Cir. 1992) ...............................................................................................20

*KSR International Co. v. Delphi Automobile System, LLC*,
523 F. App'x 357 (6th Cir. 2013) ...........................................................................................4

*Moore v. U.S. Bank, N.A.*,
No. 1:12-CV-1087, 2013 WL 1500594 (W.D. Mich. Apr. 10, 2013) ...................................20

*Mulbarger v. Royal Alliance Associates, Inc.*,
10 F. App'x 333 (6th Cir. 2001) .............................................................................................5

*Perino v. Wells Fargo Bank, N.A.*,
  No. 12-CV-15182, 2013 WL 5340800 (E.D. Mich. Sept. 23, 2013).....................................12

*Ross v. Michigan State University Board of Regents*,
  837 F. Supp. 2d 712 (W.D. Mich. 2011), *aff'd*, No. 11-2278, 2012 WL 3240261 (6th
  Cir. June 20, 2012)...........................................................................................................5

*Saab Automobile AB v. General Motors Co.*,
  953 F. Supp. 2d 782 (E.D. Mich. 2013)...........................................................................17

*Sanderson v. HCA-The Healthcare Co.*,
  447 F.3d 873 (6th Cir. 2006) .....................................................................................20, 21

*Stephenson v. Allstate Insurance Co.*,
  328 F.3d 822 (6th Cir. 2003) ............................................................................................14

*Super Sulky, Inc. v. U.S. Trotting Association*,
  174 F.3d 733 (6th Cir. 1999) ..............................................................................................6

*Uhl v. Komatsu Forklift Co.*,
  512 F.3d 294 (6th Cir. 2008) ............................................................................................24

**STATE CASES**

*Baker v. Arbor Drugs, Inc.*,
  544 N.W.2d 727 (Mich. Ct. App. 1996) ...........................................................................20

*Baldwin v. Schiappacasse*,
  66 N.W. 1091 (Mich. 1896).............................................................................................13

*Board of Control of Eastern Michigan University v. Burgess*,
  206 N.W.2d 256 (Mich. Ct. App. 1973) ......................................................................15, 17

*Berlin v. Superintendent of Public Instruction*,
  448 N.W.2d 764 (Mich. Ct. App. 1989) ...........................................................................16

*Bonelli v. Volkswagon of America, Inc.*,
  421 N.W.2d 213 (Mich. Ct. App. 1988) ...........................................................................17

*BPS Clinical Laboratories v. Blue Cross & Blue Shield of Michigan*,
  552 N.W.2d 919 (Mich. Ct. App. 1996) ...........................................................................18

*Cedroni Association, Inc. v. Tomblinson, Harburn Associates, Architects & Planners,
  Inc.*,
  821 N.W.2d 1 (Mich. 2012)..............................................................................................16

*Custom Data Solutions, Inc. v. Preferred Capital, Inc.*,
  733 N.W.2d 102 (Mich. Ct. App. 2006) ...........................................................................24

*Eerdmans v. Maki*,
 573 N.W.2d 329 (Mich. Ct. App. 1997) ............................................................................11, 13

*Feaheny v. Caldwell*,
 437 N.W.2d 358 (Mich. Ct. App. 1990) ...................................................................................18

*Feldman v. Green*,
 360 N.W.2d 881 (Mich. Ct. App. 1984) ...................................................................................18

*Fisk v. Fisk*,
 44 N.W.2d 184 (Mich. 1950) ..................................................................................................6, 7

*Forge v. Smith*,
 No. 177588, 1996 WL 33359123 (Mich. Ct. App. Sept. 17, 1996),
 *aff'd*, 580 N.W.2d 876 (Mich. 1998) .........................................................................................14

*Formall, Inc. v. Community National Bank of Pontiac*,
 421 N.W.2d 289 (Mich. Ct. App. 1988) ...................................................................................18

*Goslin v. Goslin*,
 120 N.W. 2d 242 (Mich. 1963) ...................................................................................................9

*Grow v. Davis*,
 203 P. 683 (Kan. 1922) ..............................................................................................................10

*Heritage Broadcasting Co. v. Wilson Communications, Inc.*,
 428 N.W.2d 784 (Mich. Ct. App. 1988) .....................................................................................7

*Hi-Way Motor Co. v. International Harvester Co.*,
 247 N.W.2d 813 (Mich. 1976) ..................................................................................................20

*In re Smith Trust*,
 745 N.W.2d 754 (Mich. 2008) ...................................................................................................15

*Jennings v. Southwood*,
 521 N.W.2d 230 (Mich. 1994) ...................................................................................................13

*Joe v. Advanced Resources of Michigan*,
 No. 218719, 2001 WL 1231852 (Mich. Ct. App. Oct. 16, 2001) .............................................17

*Kloian v. Domino's Pizza, LLC*,
 733 N.W.2d 766 (Mich. Ct. App. 2006) .................................................................................7, 12

*Lohse v. Atlantic Richfield Co.*,
 389 N.W.2d 352 (N.D. 1986) .....................................................................................................10

*McFadden v. Imus*,
 481 N.W.2d 812 (Mich. Ct. App. 1992) ....................................................................................11

iv

*McMahon Helicopter Services, Inc. v. Mid-West Development, L.L.C.*,
    No. 269982, 2007 WL 1828810 (Mich. Ct. App. June 26, 2007) ..........................................11

*Michigan Wisconsin Pipeline Co. v. Michigan National Bank*,
    324 N.W.2d 541 (Mich. Ct. App. 1982) .........................................................................10

*Morris Pumps v. Centerline Piping, Inc*.,
    729 N.W.2d 898 (Mich. Ct. App. 2006) .........................................................................15

*Oakrock Exploration Co. v. Killam*,
    87 S.W.3d 685 (Tex. App. 2002) .............................................................................8, 9, 10

*Opdyke Investment Co. v. Norris Grain Co.*,
    320 N.W. 2d 836 (Mich. 1982) ....................................................................................9

*Roy Annett, Inc. v. Kerezsy*,
    57 N.W.2d 483 (Mich. 1953) .....................................................................................21

*Rutila Properties, LLC v. Thumb Cellular, LLC*,
    No. 294907, 2011 WL 475198 (Mich. Ct. App. Feb. 10, 2011) .....................................13

*Samuel D. Begola Services, Inc. v. Wild Bros*.,
    534 N.W.2d 217 (Mich. Ct. App. 1995) .........................................................................24

*Schroeder v. Terra Energy, Ltd*.,
    565 N.W.2d 887 (Mich. Ct. App. 1997) .........................................................................10

*Schuler v. American Motors Sales Corp*.,
    197 N.W.2d 493 (Mich. Ct. App. 1972) .........................................................................23

*Seit-Olsen v. Reliance Appraisals, LLC*,
    No. 264470, 2006 WL 1113936 (Mich. Ct. App. Apr. 27, 2006) ..........................................23

*Smith v. Sabine Royalty Corp*.,
    556 S.W.2d 365 (Tex. Civ. App. 1977) .........................................................................10

*Transnation Title Insurance Co. v. Livingston*,
    No. 243509, 2004 WL 203075 (Mich. Ct. App. Feb. 3, 2004) .......................................15

*Ulrich v. Federal Land Bank of St. Paul*,
    480 N.W.2d 910 (Mich. Ct. App. 1991) .........................................................................14

*Van Tassel v. McDonald Corp*.,
    407 N.W.2d 6 (Mich. Ct. App. 1987) .........................................................................23

*Wayne County v. Fuller*,
    229 N.W. 911 (Mich. 1930) ......................................................................................13

*World Book, Inc. v. Michigan Department of Treasury*,
    590 N.W.2d 293 (Mich. 1999) ................................................................................13

*Zander v. Ogihara Corp.*,
    540 N.W.2d 702 (Mich. Ct. App. 1995) ...............................................................11

**STATE STATUTES**

M.C.L. § 566.108 ..........................................................................................11, 12, 13

M.C.L. § 566.132 ..........................................................................................11, 12, 13

**RULES**

Federal Rule of Civil Procedure 9(b) ................................................................19, 20, 21

**OTHER AUTHORITIES**

1A Summers Oil & Gas § 10:3 (3d ed. 2013) ...........................................................9, 11

3-6 Williams & Meyers, Oil & Gas Law § 631 (2013) ..................................................8

5A Mich. Civ. Jur. Contracts § 3 ...............................................................................6

17A C.J.S. Contracts § 430 .......................................................................................15

27 Williston on Contracts § 69:53 (4th ed. 2014) .......................................................24

Nancy J. Forbis, *The Shut-In Royalty Clause: Balancing the Interests of Lessors and
    Lessees*, 67 Tex. L. Rev. 1129 (1989) .......................................................................8

## INTRODUCTION

The market for leases of mineral rights in northern Michigan was briefly transformed in the spring and summer of 2010.  Speculation about the viability of drilling in this area drove up lease prices.  Ultimately, prices peaked at a May 2010 lease auction held by the State of Michigan.  Witnessing this rise in the market, Plaintiff, TenEyck Mineral Trust ("TenEyck") sought to capitalize by leasing the mineral rights to its own land.  To gin up interest in its mineral rights, Plaintiff solicited Defendant Chesapeake Energy Corporation ("Chesapeake"), among other oil and gas exploration companies, to bid for a lease.

Plaintiff carefully orchestrated the bidding process for its land, playing one bidder against another to drive up the price.  As is typical, bids from potential lessees included only two of the litany of material terms comprising a lease for mineral rights—bonus and royalty.  After two months of entertaining bids, Plaintiff selected Chesapeake's proposal, submitted by its leasing agent, Silver Lake Energy LLC ("Silver Lake"), allowing the parties to proceed to negotiations on all other material terms.  That negotiation process was initiated by Plaintiff, when it sent a proposed agreement titled the Lease Addendum" ("Addendum"), containing twenty-five additional terms beyond bonus and royalty, to Silver Lake.  The proposed terms were highly favorable to Plaintiff compared to the draft form lease proposed by Silver Lake.  After less than a week of good-faith negotiations, and before the parties reached agreement on proposed terms, Silver Lake informed Plaintiff that it would not be consummating a lease.

Based on these facts, Plaintiff now sues Chesapeake and Silver Lake for breach of contract (Count III), along with other tort and fraud claims.  The Addendum, which the complaint omits, shows why Plaintiff's allegations fail to state a contract claim.  It is not signed by either party, demonstrating that an agreement was never consummated.  Further, the twenty-six detailed terms in the Addendum illustrate the true scope of a lease for mineral rights.  Despite

1

the complaint's implications, e-mails between the parties addressing one or two of those terms cannot substitute for a lease agreement. The statute of frauds bars Plaintiff's attempts to enforce these fragments.

Plaintiff's other claims are likewise inadequately pleaded. The claim for unjust enrichment (Count IV) is insufficient because the alleged improper benefit received by Defendants was an option to lease Plaintiff's land, yet the complaint does not allege an offer, agreement, or consideration to establish the existence of such an option. In fact, Plaintiff explicitly alleges that no consideration was provided. Moreover, the theory behind Plaintiff's tortious interference with a business relationship claim (Count V) seeks to turn the tort on its head. Plaintiff asserts that Chesapeake's participation in bidding for a lease of its mineral rights, participation which it proactively solicited and used to increase proposed bonus amounts, constitutes knowing and improper interference with Plaintiff's leasing process. Finally, the fraud claims (Count VI) are riddled with fatal flaws. Most of the alleged misstatements are actually true, not pleaded with particularity, or simply subjective predictions about future events.

Accordingly, Counts III, IV, V, and VI of the complaint should be dismissed for failure to state a claim.

## BACKGROUND

Plaintiff holds the mineral rights to 625 acres in Kalkaska County in northern Michigan, including the right to drill for oil and gas. Compl. ¶¶ 4, 19. In the spring of 2010, "speculation heightened" about the commercial viability of an oil and gas play in Michigan. Compl. ¶ 34. Among other things, this speculation led participants at the State of Michigan's May 4, 2010 lease auction to pay much higher than usual prices for mineral rights. Compl. ¶ 2. The May 2010 auction "dramatically changed the reasonable pricing expectations" for Plaintiff regarding

2

its mineral rights.  Compl. ¶ 3.  To capitalize on the opportunity, Plaintiff sought out oil and gas companies to lease its land.  Compl. ¶ 44.

One of the companies to which Plaintiff reached out to generate interest in leasing its land was Chesapeake, an oil and gas exploration company.  Compl. ¶ 20.  Specifically, on May 20, 2010, Plaintiff sent an email to Chesapeake's land leasing mailbox inquiring if Chesapeake was interested in leasing Plaintiff's mineral rights.  Compl. ¶ 92.  Chesapeake notified one of its leasing agents in Michigan about the communication.  Compl. ¶¶ 21, 92.  In response, Silver Lake sent Plaintiff a solicitation letter indicating that it represented an oil and gas exploration company interested in leasing the mineral rights to Plaintiff's land.  Compl. Ex. 8.  On June 16, 2010, Plaintiff invited Silver Lake to submit a bid on royalty percentage and bonus payment.[1] Compl. ¶ 94.  The next day, Silver Lake submitted to Plaintiff a Letter of Intent to lease Plaintiff's land for 3/16 royalty and $1,500 per acre bonus.  Compl. ¶ 97.  Plaintiff did not accept the bonus and royalty terms in the June 17 Letter of Intent, but further negotiations ensued. Compl. ¶¶ 98-99.

Chesapeake was not the only company with which Plaintiff was negotiating over its mineral rights.  On May 14, 2010, Atlas Oil and Gas Company ("Atlas") proposed paying Plaintiff a bonus of $750 per acre and a 1/6 royalty to lease its land.  Compl. Ex. 5.  But Plaintiff thought it may be able to secure more advantageous terms, which led, a week later, to its outreach to Chesapeake.  Compl. ¶¶ 44, 92.  Further, on June 22, 2010, Energy West, another oil and gas company, offered Plaintiff a bonus of $1,750 per acre and a 3/16 royalty.  Compl. ¶ 98; Compl. Ex. 12.  Both offers remained open at least as of July 15, 2010, but neither proposal was accepted by Plaintiff during that time.  Compl. ¶ 122.

---

[1] A bonus is an upfront payment to a landowner for the right to explore oil and gas reserves.  In contrast, a royalty is the landowner's share of production profit and is thus paid only when oil and gas is produced.  Compl. ¶ 43.

On July 7, 2010, Plaintiff informed Silver Lake of the Energy West proposal.  Compl. ¶ 98.  Silver Lake increased its proposed bonus payment to $1,800 per acre the same day and sent Plaintiff a blank, unsigned oil and gas lease form ("Form Lease").  Compl. ¶ 99; Boast Decl., Ex. A.  As negotiations continued, Plaintiff's counsel sent Silver Lake a proposed addendum to the Form Lease ("Addendum").  *See* Compl. Ex. 10; Boast Decl., Ex. B.[2]  The Addendum contains approximately 25 additional proposed terms beyond bonus price and royalty.  Boast Decl., Ex. B.  On July 15, Plaintiff's counsel sent an e-mail to Silver Lake communicating that "Mr. Ten Eyck has decided to accept Silver Lakes offer of 3/16 and $1,800 for all the Ten Eyck and Trust property."  Compl. Ex. 9.  The e-mail further explained that the parties would now need to "work out the details on the addendum."  *Id*.  Over the next few days, Plaintiff's counsel and Silver Lake engaged in negotiations over the remaining terms of the Addendum.  Compl. ¶ 101& Ex. 10.  Despite those efforts, Silver Lake informed Plaintiff on July 21, 2010 that its leasing strategy had been revised such that it would now "only [be] leasing in certain areas and any bonus would be limited to $500 [per acre]."  Compl. ¶ 102.  Neither party ever executed the Form Lease or the Addendum.  Boast Decl., Ex. A & B.  On August 2, 2010, Silver Lake e-mailed Plaintiff's counsel to confirm that the Addendum was never accepted by Silver Lake.  Compl. Ex. 10.

Based on these facts, Plaintiff asserts claims for breach of contract, tortious interference with a business relationship, fraudulent misrepresentation, fraud in the inducement, unjust enrichment, and breach of the duty of good faith and fair dealing.

---

[2]Because the complaint references the Form Lease and the Addendum (Compl. ¶¶ 99, 101), and because both documents are central to Plaintiff's claims, this Court may properly consider them on a motion to dismiss.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also KSR Int'l Co. v. Delphi Auto. Sys., LLC*, 523 F. App'x 357, 359 (6th Cir. 2013)  (noting that, in breach of contract case, the key documents were "[t]ellingly" not attached to the complaint but were properly considered part of the pleadings when attached to defendants' motion to dismiss).

**ARGUMENT**

## I.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "This plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility.'"  *Ross v. Mich. State Univ. Bd. of Regents*, 837 F. Supp. 2d 712, 716 (W.D. Mich. 2011) (quoting *Iqbal*, 556 U.S. at 678), *aff'd*, No. 11-2278, 2012 WL 3240261 (6th Cir. June 20, 2012).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to render allegations plausible.  *Iqbal*, 556 U.S. at 678.  In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*

"A court is *not* bound to accept either (1) unwarranted inferences, including allegedly inferable 'facts' or conclusions which contradict documentary evidence appended to, or referenced within, the plaintiff's complaint; or (2) alleged legal conclusions."  *Mulbarger v. Royal Alliance Assocs., Inc.*, 10 F. App'x 333, 335 (6th Cir. 2001) (emphasis in original).

## II.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

### A.    There Is No Contract Between The Parties

To sustain a breach of contract claim, Plaintiff must allege the existence of an enforceable agreement between the parties.  "Mere discussions and negotiations cannot be a substitute for the formal requirements of a contract.  A contract is not made if, in the

contemplation of both parties, something remains to be done to establish the contractual relationship."  5A Mich. Civ. Jur. Contracts § 3.[3]

### 1. The parties never signed and executed a lease agreement

As a general rule, it "is settled that an unsigned contract cannot be enforced by either of the parties."  *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union of N. Am.*, 193 F.2d 209, 213 (6th Cir. 1951).  Where a plaintiff seeks to enforce an unsigned contract, that plaintiff must demonstrate *both* that the parties reached a meeting of the minds on all material terms, *Fisk v. Fisk*, 44 N.W.2d 184, 185 (Mich. 1950), *and* that the defendant signified an intent to be bound by the agreement despite the omission of a signature.  *Am. Bentonite Corp. v. Clark Equip. Co.*, 43 F.2d 392, 393 (W.D. Mich. 1928), *aff'd*, 43 F.2d 1023 (6th Cir. 1930).

Plaintiff's breach of contract claim should be dismissed for a straightforward reason.  The parties never consummated an oil and gas lease.  Rather, Silver Lake and TenEyck were involved in ongoing negotiations, but reached no "meeting of the minds."  The potential lease at issue was comprised of two separate documents, the Form Lease and the Addendum.  These two documents, both of which were tellingly omitted from the complaint, were never signed by either party.  *See* Boast Decl., Ex. A, B.  Critically, given that the lease documents are unsigned, nowhere does the complaint allege that Silver Lake (or Chesapeake) intended to be bound by the potential lease *without* signing the Addendum, the customary form of expressing an intent to be bound.  Absent any allegation that the parties had a meeting of the minds on all material terms and that Defendants evinced an intent to be bound without the execution of a formal writing, the agreements are unenforceable under Michigan law.  *See, e.g.*, *Am. Bentonite Corp.*, 43 F.2d at

---

[3] Where, as here, a federal court has supplemental jurisdiction over state law claims, the court "is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction."  *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).

393 (If the defendant in a breach of contract action did not "signif[y] . . . an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed.").  As the appended Form Lease and Addendum make plain, Plaintiff's breach of contract claim must fail.

### 2.    The parties did not reach agreement on "all essential points"

Under Michigan law, "[a] meeting of the minds upon *all* essential points is necessary to constitute a valid contract."  *Fisk*, 44 N.W.2d at 185 (internal quotation marks omitted) (emphasis added); *see also Heritage Broad. Co. v. Wilson Commc'ns, Inc.*, 428 N.W.2d 784, 787 (Mich. Ct. App. 1988) ("In order to form a valid contract, there must be a meeting of the minds on all the material facts.").  "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kloian v. Domino's Pizza, LLC*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006) (internal quotation marks omitted).

Viewed objectively, the conclusion that the parties did *not* reach agreement on "all essential points" is inescapable.  On this score, the Addendum is instructive.  It is six pages long and contains twenty-six separate provisions, including one that has ten subparts.  *See* Boast Decl., Ex. B.  Twenty-five of the twenty-six terms are not addressed in the complaint or any of its attachments.  These other terms address a range of topics to be negotiated, such as the types of production equipment that can be located on the land, methods for lease termination, and importantly, how the royalty would be calculated.  *See id.*

The Addendum also evidences the materiality of the terms it covers.  It addresses, for example, a number of the same issues as the Form Lease, while modifying the terms:

- *Calculation of royalties.*  The Form Lease provides that the royalty percentage would be taken from the "net amount realized by Lessee, . . . minus post-production costs," which are defined as the cost and expenses of, *inter alia*, treating, processing, and transporting

7

oil and/or gas. Boast Decl., Ex. A at ¶ 3. The Addendum changes this significantly by providing that Plaintiff's royalty interest would be "calculated and payable free of all development, production, and operating expenses of any wells located on said land . . . ." Boast Decl., Ex. B at ¶ 3.

- *"Shut-in" Royalty.*[4] The Form Lease provides for a $1.00/acre payment, Boast Decl., Ex. A ¶ 4, whereas the Addendum changes it to $5.00/acre for the first year after the primary or extended primary term, to be increased in $2.00 increments per acre per year until the wells are no longer shut in, Boast Decl., Ex. B ¶ 19.

- *Pugh Clause.* The Addendum adds a "Pugh Clause" to the lease agreement, which provides that the lease will terminate as to the portions of the land that are not included in a production unit at the end of the primary term or extended primary term. Boast Decl., Ex. B ¶ 20. The Form Lease contained no such provision.

- *Depth / Horizon Limitation.* The Addendum adds a depth limitation to the lease, defining the scope of the lessee's mineral rights and providing that the lease "shall cover all depths and horizons from the surface down to 100 feet below the base of the Trenton Black River Formation." Boast Decl., Ex. B ¶ 1. The Form Lease contained no such limitation.

- *Consultation and Development Plan.* The Addendum adds a provision requiring the Lessee to "consult with Lessor" to reach a further agreement on, among other items, the location of drill sites, roads, and pipeline installations *before* commencing any drilling operations on the leased land. Boast Decl., Ex. B ¶ 4. The Form Lease merely stated that the Lessee had the right to "lay pipelines, build roads, drill, establish and utilize wells, pits, and facilities . . ." and did not make such rights contingent on prior approval by the Lessor. Boast Decl., Ex. A at p. 1.

All of these provisions, which are illustrative but not exhaustive, bear on the "character, extent, and duration of the rights to the oil and gas," *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690-91 (Tex. App. 2002), making them material to the lease.[5] If the terms of the Addendum were not material, it is implausible that the parties would have opted against the more efficient path of simply agreeing to the Form Lease, which was emailed to the Plaintiff on July 7, 2010,

---

[4] A "shut-in" royalty provision provides for payment in the case that wells on the lessee's land are capable of producing oil and/or gas but are "shut in," meaning temporarily closed. *See, e.g.*, 3-6 Williams & Meyers, Oil & Gas Law § 631 (2013); Nancy J. Forbis, *The Shut-In Royalty Clause: Balancing the Interests of Lessors and Lessees*, 67 Tex. L. Rev. 1129, 1129 n.1 (1989).

[5] Moreover, the significant changes proposed in the Addendum weigh heavily in favor of Plaintiff, which is not surprising since Plaintiff drafted it. Modifications of that sort would be less likely to be accepted by Defendants, and highly unlikely to be accepted without negotiation.

8

Compl. ¶ 99, rather than negotiating the terms of the Addendum through July 19, 2010, Compl. ¶ 101.

### 3.   The July 15 e-mail cannot substitute for a lease agreement

To the extent the complaint suggests that a July 15, 2010 e-mail from Plaintiff's counsel to Silver Lake constitutes the lease agreement, that theory fails. Plaintiff alleges that through the July 15 e-mail, the parties agreed on the royalty and bonus price for TenEyck's land. Compl. ¶ 100. The complaint does not assert—as it could not—that the parties reached agreement on any other terms of the potential lease. As explained above, royalty and bonus are just two of myriad essential terms in an oil and gas lease. In other words, agreement on royalty and bonus is necessary, but far from sufficient, to finalize such a lease.

That the July 15 email cannot constitute a lease agreement is not only demonstrated by the material differences between the Form Lease and the Addendum, but also finds ample support in cases specifically assessing oil and gas leases. In Michigan, a written agreement must sufficiently set forth the essential terms of the agreement, *Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W. 2d 836, 841-42 (Mich. 1982), and the writing's sufficiency "'depends in each case upon the setting in which it is found.'" *Id.* (quoting *Goslin v. Goslin*, 120 N.W. 2d 242, 244 (Mich. 1963)). In the oil and gas lease context, the essential terms of an agreement include, at a minimum, "a description of the land, the term of the lease, the time for commencement of drilling, and the amount of royalties and delay rentals." 1A Summers Oil & Gas § 10:3 (3d ed. 2013); *Oakrock*, 87 S.W.3d at 690-91 ("The term of the lease, the drilling commencement date, time and amount of payments in lieu of drilling operations, and amounts to be paid for produced gas are essential elements in describing an oil and gas lease."). As numerous courts have held, agreements on bonus and royalty alone are unenforceable as a matter of law for lack of

agreement on other essential lease terms. *See Oakrock,* 87 S.W.3d at 691 (holding that letter setting forth number of acres, bonus payment, and royalty percentage was not enforceable contract as matter of law because it lacked other essential terms of oil and gas lease); *Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352, 356 (N.D. 1986) (agreement as to royalty, bonus, and primary term alone was "insufficient to constitute an enforceable oil and gas lease," "[i]n view of the complexity of the various rights and obligations of the parties to an oil and gas lease"); *Grow v. Davis*, 203 P. 683, 685 (Kan. 1922) (finding oil and gas lease unenforceable for failure to reach agreement on specifics of delay rental clause, stating "[t]he time limit within which a well should be commenced or rental begin was a subject of primary importance . . . . the lease could not be written without further negotiation respecting its terms, and so the contract was not binding"); *Smith v. Sabine Royalty Corp.*, 556 S.W.2d 365, 370 (Tex. Civ. App. 1977) (noting that agreement was not sufficiently definite to be enforced where it lacked the effective date of the lease, the duration of the primary term, how the 1/4 royalty would be paid, and "such common terms as pooling arrangements, offset well obligations, [and] warranties").[6]

Because the parties never reached agreement on the Form Lease or the Addendum, and because the July 15 e-mail does not, as a matter of law, constitute an oil and gas lease, Plaintiff's breach of contract claim should be dismissed.

### B.    The Statute Of Frauds Bars Plaintiffs' Breach Of Contract Claim

Should the Court determine that an agreement was made, the statute of frauds provides an independent basis to dismiss Plaintiff's claim.  The oil and gas lease alleged to have been consummated is subject to Michigan's statute of frauds:  It was for the leasing of land for longer

---

[6] Michigan courts have looked to courts in other jurisdictions for persuasive authority on the law governing oil and gas leases.  *E.g.*, *Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 893 (Mich. Ct. App. 1997) ("We also find guidance for interpreting 'gross proceeds at the wellhead' in case law from other jurisdictions."); *Mich. Wis. Pipeline Co. v. Mich. Nat'l Bank*, 324 N.W.2d 541, 544 (Mich. Ct. App. 1982) (citing to decisions from Texas and Arkansas for authority on the proper interpretation of a provision in an oil and gas lease).

than one year and, by its terms, was not to be performed within a year of its making.  M.C.L. §
566.108; M.C.L. § 566.132(1).  The statute of frauds precludes enforcement of alleged
agreements, like the one at issue here, that are not evidenced in a signed writing containing
sufficient detail to establish that a contract was formed.  *Id.*; *see also* 1A Summers Oil & Gas §
10:3 (3d ed. 2013) ("Contracts to make an oil and gas lease are within that section of the statute
of frauds which provides that agreements to lease for more than one year must be in writing.").
Whether a purported contract is barred by the statute of frauds is determined as a matter of law.
*Zander v. Ogihara Corp.*, 540 N.W.2d 702, 704 (Mich. Ct. App. 1995).

> **1.**     **The Lease Form and Addendum fail to meet the statute of frauds'
> signed writing requirement**

Neither the Form Lease nor the Addendum is signed by *either* party.  *See supra* pp. 6-7.
The lack of any signature fails the statute of frauds' requirements.  *See* M.C.L. § 566.132(1)
(providing that "[a]n agreement that, by its terms, is not to be performed within 1 year from the
making of the agreement" is "void unless that agreement . . . is in writing and signed with an
authorized signature by the party to be charged with the agreement"); M.C.L. § 566.108 ("Every
contract for the leasing for a longer period than 1 year . . . shall be void, unless the contract . . .
be in writing, and signed by the party by whom the lease or sale is to be made, or by some person
thereunto by him lawfully authorized in writing . . . .").  Michigan courts routinely dismiss
breach of contract claims for lack of a signed writing in compliance with the statute.  *E.g.*,
*McMahon Helicopter Servs., Inc. v. Mid-W. Dev., L.L.C.*, No. 269982, 2007 WL 1828810, at *4
(Mich. Ct. App. June 26, 2007); *Eerdmans v. Maki*, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997);
*McFadden v. Imus*, 481 N.W.2d 812, 814 (Mich. Ct. App. 1992).  Similarly, federal courts in
Michigan have dismissed breach of contract claims on statute of frauds grounds in these very
circumstances, where the plaintiff failed to allege a written agreement and did not attach a copy

of the alleged agreement to the complaint.  *See, e.g.*, *Abbas v. Bank of Am. N.A.*, No. 1:12-CV-607, 2013 WL 1340309, at *5 (W.D. Mich. Mar. 29, 2013); *Hana v. Wells Fargo Bank*, No. 11-14442, 2012 WL 1694643, at *8 (E.D. Mich. May 15, 2012); *Perino v. Wells Fargo Bank, N.A.*, No. 12-CV-15182, 2013 WL 5340800, at *9-10 (E.D. Mich. Sept. 23, 2013).  Plaintiff has failed to—and could not possibly—plead the existence of a signed agreement consistent with the statute of frauds.

### 2. The July 15 e-mail does not satisfy the statute of frauds

Plaintiff cannot rely on the July 15 e-mail, Compl. Ex. 10, to satisfy the signed writing requirements.  The email is deficient because it is not signed by the proper parties.  "Michigan's principal statute of frauds[,] M.C.L. § 566.132," provides that a contract not to be performed within one year is "void" unless it is "signed with an authorized signature by the party to be charged with the agreement."  *Kloian*, 733 N.W.2d at 772 n.3.  In this instance, the party "to be charged with the [lease] agreement" is Chesapeake, which did not sign the July 15 e-mail.  Any purported agreement reflected in the e-mail, therefore, is void as a matter of law.

A separate provision in Michigan's statute of frauds places a further obstacle in Plaintiff's path.  M.C.L. § 566.108 explains that "[e]very contract for the leasing for a longer period than 1 year . . . shall be void, unless the contract . . . be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing."  *Id.*  When read together with M.C.L. § 566.132, this provision provides an additional hurdle for lease agreements to satisfy the statute of frauds.  As the only Michigan court to squarely address the interplay of these two provisions explained:  "[S]tatutory provisions are to be read together and harmonized to the extent possible.  The requirements of . . . 566.108 must be applied *in addition to* the general rules in M.C.L 566.132(1).  Therefore, the statute of frauds requires a lease for more than a year to be signed by the lessor *and* by the party to be

12

charged, unless they are the same entity." *Rutila Props., LLC v. Thumb Cellular, LLC*, No. 294907, 2011 WL 475198, at *3 (Mich. Ct. App. Feb. 10, 2011) (citation omitted) (emphases in original). That holding accords with well-established principles of statutory interpretation. *See Wayne Cnty. v. Fuller*, 229 N.W. 911, 913 (Mich. 1930) ("[A]ll statutes upon the same general subject matter [are] part of one system" and "are to be construed together," such that "repeals by implication are not favored" (internal quotation marks omitted)); *World Book, Inc. v. Mich. Dep't of Treasury*, 590 N.W.2d 293, 300 (Mich. 1999) (explaining that when construing two statutes on the same subject matter the provisions "must be read together to produce an harmonious whole and to reconcile any inconsistencies wherever possible"); *Jennings v. Southwood*, 521 N.W.2d 230, 235 (Mich. 1994) (same). As a result, where a lessor brings a contract claim against a lessee, the statute of frauds requires the lease agreement to be signed by *both* the lessor and the lessee.

Even if the Court decides that the requirements of M.C.L. § 566.132 do not apply here, the July 15 e-mail still fails to satisfy the statute of frauds. M.C.L. § 566.108 requires that a lease be "signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing." The July 15 e-mail is signed only by Susan Topp. Compl., Ex. 10. Ms. Topp is not "the party by whom the lease is made"—that is the Plaintiff—nor is she "some person [the lessor] authorized in writing." Nowhere does the complaint assert that Plaintiff gave Ms. Topp written authorization to enter a lease on its behalf. By the express terms of the statute, apparent authority is not enough; the signatory must be authorized "*in writing*." *See also Baldwin v. Schiappacasse*, 66 N.W. 1091, 1092 (Mich. 1896) (finding contract for sale of land invalid under statute of frauds where it was not signed by the seller or by an agent authorized in writing to execute such a sale); *Eerdmans*, 573 N.W.2d at 332

13

(same); *Forge v. Smith*, No. 177588, 1996 WL 33359123, at *4 (Mich. Ct. App. Sept. 17, 1996)

(same), *aff'd*, 580 N.W.2d 876 (Mich. 1998).

## III.     PLAINTIFF'S QUASI-CONTRACT CLAIMS ALSO MUST FAIL

### A.     Plaintiff Fails To State A Claim For Breach Of The Duty Of Good Faith And Fair Dealing

Plaintiff asserts, but does not separately set forth as a count, a breach of the duty of good

faith and fair dealing.  *See* Compl. ¶¶ 108-110.  As there is no underlying contract, this claim

cannot stand.  *Burton v. William Beaumont Hosp*., 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005)

("Michigan common law recognizes an implied covenant of good faith and fair dealing that

applies to the *performance and enforcement of contracts*." (emphasis added)).  Even assuming

the existence of a contract, Plaintiff fails to allege the existence of a provision in any contract

that left the performance of the contract to the Defendants' discretion such that the duty of good

faith and fair dealing would attach.  *See, e.g.*, *Stephenson v. Allstate Ins. Co*., 328 F.3d 822, 826

(6th Cir. 2003) ("An implied covenant of good faith and fair dealing in the performance of

contracts is recognized by Michigan law *only* where one party to the contract makes its

performance a matter of its own discretion." (emphasis added)).  Lastly, Michigan does not

recognize an independent tort action for an alleged breach of a contract's implied covenant of

good faith and fair dealing.  *Ulrich v. Fed. Land Bank of St. Paul*, 480 N.W.2d 910, 911-12

(Mich. Ct. App. 1991).  For these reasons, Plaintiff fails to state a claim for breach of the duty of

good faith and fair dealing.

## B.    Plaintiff Fails To State A Claim For Unjust Enrichment

Plaintiff's unjust enrichment claim is meritless.[7]  To sustain such a claim, Plaintiff must establish "the receipt of a benefit by the defendant from the plaintiff."  *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006).  To that end, the complaint alleges receipt of a single benefit by Defendants: "a mere option" to lease Plaintiff's land.  Compl. ¶ 117.  As a result of this option, the complaint asserts, Plaintiff's land was taken off the market, precluding Plaintiff from leasing the mineral rights to another company.  Compl. ¶ 116.

Contrary to Plaintiff's assertion, Defendants have received no benefit.  An option is a contract.  If Defendants had received the exclusive right to negotiate with Plaintiff, it would have required a separate offer, acceptance, and consideration.  *See In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008); 17A C.J.S. Contracts § 430 ("An option is a binding contract, which is subject to the general rules of contract construction.").  Yet all of those elements are missing from the complaint, amply demonstrating that Defendants did not have an exclusive option to lease Plaintiff's land.  *Bd. of Control of E. Mich. Univ. v. Burgess*, 206 N.W.2d 256, 258 (Mich. Ct. App. 1973) ("[T]hat which purports to be an option, but which is not based on valid consideration, is not a contract and will not be enforced.").  In fact, Plaintiff is adamant that it has received no consideration:  Defendants "have not paid Plaintiff any compensation for" the purported benefit.  Compl. ¶ 117.

Plaintiff attempts to work around these fatal flaws by alleging that Defendants "treated" the purported agreement as an option.  But this assertion fares no better.  As a matter of law, how Defendants "treated" the negotiations is irrelevant to whether they received a benefit.  And as a

---

[7]"A breach of contract claim and a claim for unjust enrichment are inconsistent claims as a contract will only be implied under a theory of unjust enrichment if no express contract covering the same matter or issue exists." *Transnation Title Ins. Co. v. Livingston*, No. 243509, 2004 WL 203075, at *4 (Mich. Ct. App. Feb. 3, 2004).  Thus, as Plaintiff admits, Compl. ¶ 113, it cannot ultimately advance both claims.

matter of fact, even if such allegations were relevant, the complaint is devoid of any assertions showing that Defendants treated the negotiations as legally binding or otherwise acted as though they had an option on the lease.

## IV.    THE TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP CLAIM IS NOT VIABLE AS A MATTER OF LAW

Plaintiff's claim for tortious interference is not adequately pleaded.  To state the claim successfully, the complaint must establish both that the existence of other interested, prospective lessees created a valid business expectancy for Plaintiff, and that Defendants intentionally interfered with that expectancy through improper, unjustifiable conduct, which caused the expectancy to be lost.  *See Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012).  If the complaint falls short on *either* element, the claim must be dismissed.

### A.    Competitors' Weeks-Old Proposals On Bonus and Royalty Alone Did Not Create A Valid Business Expectancy For Plaintiff

Plaintiff fails to plead the existence of a valid business relationship or expectancy.  In order to establish this first element, "[t]he expectancy must be a reasonable likelihood or probability, not mere wishful thinking." *Cedroni*, 821 N.W.2d at 3.  "[H]aving a subjective expectation of entering into a relationship is not enough." *Compuware Corp. v. Int'l Bus. Machines*, 259 F. Supp. 2d 597, 604 (E.D. Mich. 2002).  Whether the relationship in question is existing or prospective, it "must be of some substance and particularity" and must "provid[e] a specific and reasonable economic advantage." *Berlin v. Superintendent of Pub. Instruction*, 448 N.W.2d 764, 768 (Mich. Ct. App. 1989).

Plaintiff alleges that it had a valid business expectancy in the form of proposals from Atlas and Energy West on two of the lease terms.  Compl. ¶ 123.  Specifically, each company had submitted a bid proposing a bonus and royalty price, without addressing other terms.

16

Compl. ¶ 121.  Mere receipt of these proposals, however, is not sufficiently concrete to constitute a valid business expectancy because such proposals, even if accepted, would only *start* the process of negotiating a lease agreement.  *See supra* Sections II.A.2, II.A.3.  Thus, Plaintiff's allegations amount only to a "subjective expectation" of business.  *See Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 789-90 (E.D. Mich. 2013) (finding plaintiff had no valid business expectancy under a "Framework Agreement" because it was "nothing more than an agreement to negotiate a series of additional agreements" and "[t]here were no facts presented that indicate that any of the various agreements were close to or in the process of being negotiated or approved").

Moreover, proposals that have been pending for weeks, such as those from Atlas and Energy West, *see* Compl. Ex. 5 & Ex. 12, become inherently uncertain.  After all, an offer on two terms, like any offer, can be revoked at any time without repercussion.  *Burgess*, 206 N.W.2d at 259; *Joe v. Advanced Res. of Mich.*, No. 218719, 2001 WL 1231852, at *1 (Mich. Ct. App. Oct. 16, 2001).  In a fluid and fast-moving oil and gas play, as in Michigan in the summer of 2010, numerous intervening events could cause a company to revoke its proposal, from maxing out its budget, to finding an alternative lease, to developing new geological information.  In those circumstances, a stale and freely revocable offer does not rise to the level of the "specific and reasonable" expectation required for Plaintiff's claim to survive.

### B. Defendants Did Not Intentionally Commit An Improper Or Wrongful Act That Interfered With Plaintiff's Business

Plaintiff's tortious interference claim must fail because neither Chesapeake nor Silver Lake intentionally committed an improper or wrongful act that caused Plaintiff to lose its alleged expectancy.  To properly state this claim, Plaintiff must show "not only that the defendant acted intentionally, but further that he acted improperly or without justification."  *Bonelli v.*

17

*Volkswagon of Am., Inc.*, 421 N.W.2d 213, 221 (Mich. Ct. App. 1988); *see also Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988). Improper conduct includes "illegal, unethical, or fraudulent" conduct. *Feaheny v. Caldwell*, 437 N.W.2d 358, 365-66 (Mich. Ct. App. 1990). When the defendant's actions were motivated by legitimate business reasons, the acts will not constitute an improper motive or an interference. *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996).

Plaintiff's allegations amount to nothing more than acts of "legitimate business," which do not constitute tortious interference under Michigan law. Here, the alleged tortious interference consists of "manipulation of the market by offering [] large bonus amounts, effectively pricing the competition out of the market, and then defaulting on their obligation to pay." Compl. ¶ 125. In other words, Defendants submitted a higher bonus price than the competition, entered into a negotiation with Plaintiff, but, before the negotiations concluded, made a business decision to "limit[]" bonus prices and "only leas[e] in certain areas." Compl. ¶ 102. These are the exact sorts of competitive bidding and straightforward business decisions that are protected from liability. *See Feldman v. Green*, 360 N.W.2d 881, 888-91 (Mich. Ct. App. 1984); *Formall*, 421 N.W.2d at 293 (actions "motivated by legitimate personal and business reasons are shielded from liability against [a claim of tortious interference]").

In addition, where, like here, a tortious interference claim is predicated on alleged interference with a potential contract, Plaintiff "is required to go further and show that he was not only about to [enter the contract], but would, *but for* the malicious interference of defendants, have entered into the contract." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 408 (6th Cir. 1999) (internal quotation marks omitted) (emphasis added).

Plaintiff cannot establish the required "but for" causation.  To do so, Plaintiff must show that but for Defendants' proposal on bonus and royalty prices (the alleged intentional, wrongful interference), it would have finalized a lease with a competitor.  The chronology of events sounds the death knell for Plaintiff on this point.  Atlas submitted its proposal to Plaintiff on May 14, 2010; Energy West submitted its proposal to Plaintiff on June 22, 2010.  It was not until July 15, 2010, however, that Plaintiff decided to pursue a lease with Silver Lake.  Plaintiff, therefore, could have accepted Atlas's offer for 62 days and Energy West's offer for 23 days *before* the alleged interference even came about.  It never did.  Under those circumstances, Plaintiff cannot contend that Defendants' actions somehow caused it to lose those purported expectancies.

Finally, the theory of Plaintiff's claim threatens to turn the tortious interference tort on its head.  A week after receiving Atlas's proposal, Plaintiff reached out to Chesapeake to solicit its involvement in the bidding process, Compl. ¶ 92, presumably because it was dissatisfied with Atlas's offer and wanted to gin up additional competition for its land.  Silver Lake submitted a proposal to Plaintiff on June 17, 2010, and it was likely no coincidence that Plaintiff received a slightly higher offer from Energy West just five days later.  Compl. ¶ 97 & Ex. 12.  Plaintiff then informed Silver Lake of Energy West's offer, leading to yet another increased proposal.  Compl. ¶¶ 98-99.  Plaintiff should not be allowed to solicit companies into a bidding process, use those companies to drive up the others' bids, and then claim that the sought-after involvement is unlawful if a final agreement is not consummated.  To hold otherwise would have a significant chilling effect on potential bidders across industries.

## V.     PLAINTIFF'S FRAUD-BASED CLAIMS FAIL AS A MATTER OF LAW

Fraud claims are subject to the heightened standard set forth in Federal Rule of Civil Procedure 9(b), which provides that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Thus, to

satisfy Rule 9(b), a plaintiff claiming fraud must specify in its complaint "the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006).  "Additionally, the pleading must 'allege with specificity who had made the particular misrepresentations . . . .'" *Moore v. U.S. Bank, N.A.*, No. 1:12-CV-1087, 2013 WL 1500594, at *4 (W.D. Mich. Apr. 10, 2013) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992)).

### A.    Plaintiff Fails To State A Claim For Fraudulent Misrepresentation

To successfully plead fraudulent misrepresentation under Michigan law, for each alleged representation a plaintiff must establish six separate elements:  "(1) that the defendant made a material representation, (2) that the representation was false, (3) [that] when the defendant made the representation, [the] defendant knew that it was false, or made it recklessly without knowledge of its truth or falsity, (4) that the defendant made it with the intent that the plaintiff would act upon it, (5) that the plaintiff acted in reliance upon it, and (6) that the plaintiff suffered injury." *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727, 732 (Mich. Ct. App. 1996).  "[T]he allegedly false statements must relate to past or existing facts, not to future promises or expectations." *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000); *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976).

Plaintiff relies on the following alleged misrepresentations to make its fraud claim:

- (1) Silver Lake represented to Plaintiff it had an office in Traverse City, Michigan. Compl. ¶ 130.

- (2) Silver Lake represented to Plaintiff that Silver Lake and its principal were developing the Collingwood Shale in Michigan and were in it for "the long haul."  Compl. ¶ 131.

- (3) Silver Lake was acquiring oil and gas leases in the area.  Compl. ¶ 132(a).

20

- (4) Silver Lake was acting as the agent for NMEC, one of the premier oil and gas exploration companies in the country. Compl. ¶ 132(b).

- (5) Silver Lake had checked the records and found that the prospective lessor owned all or part of the mineral interest underlying its property. Compl. ¶ 132(c).

- (6) Silver Lake and Chesapeake wanted to make the prospective lessor a "very attractive offer" for an oil and gas lease. Compl. ¶ 132(d).

- (7) Silver Lake and Chesapeake would give the lessor the "best offer available" based upon where the property fell within their area of interest. Compl. ¶ 132(e).

- (8) Silver Lake and Chesapeake represented that they wanted to be the "last bidder." Compl. ¶ 134.

- (9) Silver Lake and Chesapeake represented that Plaintiff would be paid $1,800 per acre for its mineral rights. Compl. ¶ 138.

None of these statements satisfies Rule 9(b).

### 1. Statements (1) and (2) are not pleaded with particularity

As a threshold matter, nowhere in the complaint does Plaintiff specify when and where Silver Lake represented to Plaintiff (1) that it had an office in Traverse City, Michigan or (2) that Silver Lake and its principal were in it for "the long haul." That deficiency alone causes the alleged statements to fail Rule 9(b)'s basic pleading with particularity requirement. *Sanderson*, 447 F.3d at 877 ("[A]t a minimum, Rule 9(b) requires that the plaintiff specify the who, what, when, where, and how of the alleged fraud." (internal quotation marks omitted)). Nor could Plaintiff credibly claim that whether Silver Lake had an office in Traverse City was material to Plaintiff's decision to pursue Defendants' bid. Moreover, Statement (2) is insufficient because it is simply a statement about a future expectation. *E.g.*, *Cook*, 210 F.3d at 658; *Roy Annett, Inc. v. Kerezsy*, 57 N.W.2d 483, 485 (Mich. 1953).

### 2. Statements (3), (4), and (5) are not false

Statements (3), (4), and (5), all based on the solicitation letter Silver Lake sent to Plaintiff on June 9, 2010, cannot plausibly be alleged as false. Plaintiff alleges that statement (3), that

21

Silver Lake was acquiring oil and gas leases in the area, Compl. ¶ 132(a) & Ex. 8, is false

because Silver Lake did not in fact acquire oil and gas leases in the area, Compl. ¶ 133(c).

However, the actual statement by its own terms states only that Silver Lake was in the process of

acquiring oil and gas leases in the area, not that it had acquired them. *See* Compl. Ex. 8 ("Our

company is currently acquiring oil and gas leases in the area captioned above . . . ."). In fact,

Plaintiff itself pleads that Silver Lake was engaged in acquiring leases for Chesapeake. *See*

Compl. ¶ 28 ("Chesapeake . . . [has] representative companies acquiring mineral rights in

multiple states, including Silver Lake acquiring leases for Chesapeake in Michigan.").

   Plaintiff alleges that Statement (4), that Silver Lake was acting as the agent for NMEC,

one of the premier oil and gas exploration companies in the country, is false because NMEC

"was not one of the premier oil and gas exploration companies in the country." Compl. ¶ 133.

This misquotes the letter, which stated only: "We are representing one of the premier oil and gas

exploration companies in the country," without stating which particular company. Compl. Ex. 8.

The actual statement in the letter is not a misrepresentation at all, because Silver Lake was in fact

representing Chesapeake, "one of the premier oil and gas exploration companies in the country,"

as Plaintiff acknowledges in the complaint. Compl. ¶ 2 ("Chesapeake and Encana are two of the

most prominent oil and gas exploration companies in the nation . . . ."). In any event, Plaintiff

could not possibly plead that it relied upon the alleged misrepresentation regarding NMEC; the

complaint states that Silver Lake informed Plaintiff that it was working for Chesapeake *prior to*

Plaintiff deciding to pursue Defendants' bid. Compl. ¶ 98.

   As for statement (5), that Silver Lake had checked the records and found that the

prospective lessor owned all or part of the mineral interest underlying its property, Plaintiff has

simply failed to allege its falsity. Statement (5), therefore, cannot be the basis of Plaintiff's fraud

claim either. *Compare* Compl. ¶ 132 (listing alleged misrepresentations) *with* Compl. ¶ 133

(stating purported basis for falsity of each misrepresentation listed in paragraph 132).

### 3. Statements (6)-(9) are statements of future expectation

Statements (6)-(9), that Defendants wanted to make Plaintiff a "very attractive offer,"

"the best offer available," be the "last bidder," and "that Plaintiff would be paid $1,800 per acre

for its mineral rights," are all statements of future expectation.[8] The law is clear that statements

of mere opinion or pertaining to future events do not constitute fraud. *See, e.g.*, *Van Tassel v.*

*McDonald Corp.*, 407 N.W.2d 6, 9 (Mich. Ct. App. 1987) (finding that the defendant's

statements regarding the plaintiff's "bright future" were "purely speculation as to future events");

*Seit-Olsen v. Reliance Appraisals*, *LLC*, No. 264470, 2006 WL 1113936, at *4 (Mich. Ct. App.

Apr. 27, 2006) ("[W]e find no basis for a claim of fraud on these facts. The representations, as

phrased, are more an expression of opinion than an expression of fact."); *Schuler v. Am. Motors*

*Sales Corp.*, 197 N.W.2d 493, 495 (Mich. Ct. App. 1972) ("Plaintiff's allegations that defendants

misrepresented the inventories as to their value and salability are not such as will support an

action in fraud. Such expressions are statements of opinion, not fact."). Since each of the four

alleged statements above are either "an expression of opinion," "pure[] speculation as to future

events," or both, they "are not such as will support an action in fraud."

### B. Plaintiff Fails To State A Claim For Fraud In The Inducement

While, in general, "actionable fraud must be predicated on a statement relating to a past

or an existing fact . . . Michigan also recognizes fraud in the inducement. Fraud in the

inducement occurs [only] where a party materially misrepresents future conduct under

circumstances in which the assertions may reasonably be expected to be relied upon and are

---

[8] Additionally, for the reasons stated on pages 24-25 *infra*, these alleged statements were all in fact true at the time Defendants made them. *See* Compl. ¶¶ 91, 125, 135.

23

relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 219 (Mich. Ct. App. 1995). To establish fraud in the inducement, a party must show the same six elements that one must show to establish fraudulent misrepresentation. *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006).

This claim must fail because (1) Plaintiff was not fraudulently induced to do anything for which it might recover damages, and (2) it has failed to plausibly plead that Defendants materially misrepresented future conduct.

Plaintiff was never fraudulently induced to "remov[e] its minerals from the market." Compl. ¶ 140. As demonstrated in Sections II and III.B, Plaintiff's minerals could not possibly have been removed from the market because a lease agreement was never consummated. Thus, Plaintiff has no damages from this alleged wrong, as it was not "induced" into any agreement. And, if the Court finds that an enforceable contract exists, Plaintiff has failed to allege a harm *independent of* a breach of contract. *See Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 304 (6th Cir. 2008) ("The Michigan Court of Appeals has emphasized that fraud in the inducement is not available for a breach of a contract's terms, lest fraud in the inducement claims swallow all breach-of-contract claims."); 27 Williston on Contracts § 69:53 (4th ed. 2014) ("[A] fraud claim must have an identity independent from a related contract claim, and accordingly . . . the alleged fraud must be 'collateral and extraneous' to the contract.").

Second, Plaintiff has not plausibly pleaded that Defendants materially misrepresented future conduct. The forward-looking statements that Plaintiff claims were fraudulent, *e.g.*, that Defendants were in it for "the long haul," wanted to make Plaintiff a "very attractive offer," and "that Plaintiff would be paid $1,800 per acre for its mineral rights," were in fact true at the time Defendants made them, according to Plaintiff's own allegations. Indeed, Plaintiff alleges that

24

Defendants acted consistently with those statements:  Defendants at first proposed $1,200 to $1,500 an acre, Compl. ¶ 95, then matched a competing company's bid of $1,750/acre, Compl. ¶ 98, and finally raised their bid to $1,800/acre, Compl. ¶ 99.  What is more, finding that Defendants knew that those statements were false when made would contradict Plaintiff's theory of the case—*i.e.*, that until Chesapeake and Encana reached the alleged antitrust agreement, the two companies were in fact in fierce competition.  Compl. ¶¶ 5, 38, 41.  The complaint does not allege that an anticompetitive agreement took effect before "mid-July," Compl. ¶ 65, despite allegations of earlier negotiations of a possible scheme, Compl. ¶¶ 45-63.  As the statements at issue here were allegedly made prior to mid-July (on June 9 and July 7 (Compl. ¶¶ 93, 98-99)), Defendants could not have known at the time that their statements of future intent would not come to pass.  Thus, Plaintiff's fraud in the inducement claim fails.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss Counts III, IV, V, and VI of the complaint should be granted.

Dated:  May 29, 2014

<div style="margin-left:45%">

By:  s/  Molly S. Boast
Molly S. Boast
Jason D. Hirsch
Hanna A. Baek
Ryan D. Tansey
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 1000
Tel. (212) 230-8800
Fax (212) 230-8888
molly.boast@wilmerhale.com
jason.hirsch@wilmerhale.com
hanna.baek@wilmerhale.com
ryan.tansey@wilmerhale.com

</div>