IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

THE TENEYCK MINERAL TRUST,
BY C. ANDREW TEN EYCK, TRUSTEE,  Case No.: 1:14-cv-00201

    Plaintiff,  Honorable Gordon J. Quist

vs.

CHESAPEAKE ENERGY CORPORATION,
SILVER LAKE ENERGY, LLC,
ENCANA CORPORATION and
ENCANA OIL & GAS, (USA) INC.

    Defendants,

---

**PLAINTIFF TEN EYCK MINERAL TRUST'S RESPONSE TO DEFENDANT SILVER LAKE ENERGY, LLC'S MOTION TO DISMISS**

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION ...................................................................................................................1 | |
| | A. | Silver Lake mischaracterizes the applicable pleading standard........................................ 1 |
| | B. | Ten Eyck's allegations plausibly suggest that Silver Lake knowingly joined the conspiracy ............................................................................................................................ 1 |
| II. | BACKGROUND ...................................................................................................................3 | |
| | A. | In the aftermath of a fiercely competitive auction, Chesapeake forms Silver Lake to acquire leases .................................................................................................................... 3 |
| | B. | Top officials at Encana and Chesapeake collude to depress the elevated market prices .................................................................................................................................. 3 |
| | C. | Silver Lake dupes Ten Eyck into accepting its offer for Ten Eyck's mineral rights............. 4 |
| | D. | Silver Lake is aware of and participates in a collusive, anticompetitive scheme with Chesapeake and Encana..................................................................................................... 5 |
| III. | LAW AND ARGUMENT.........................................................................................................7 | |
| | A. | In its Motion to Dismiss, Silver Lake fails to apply the proper pleading standard applicable to Ten Eyck's Complaint .................................................................................. 7 |
| | B. | Ten Eyck established a factual basis in its Complaint sufficient to reasonably infer Silver Lake's knowledge .................................................................................................... 9 |
| | C. | Ten Eyck sufficiently pled Silver Lake's knowing participation in the anticompetitive scheme ............................................................................................................................. 12 |
| | D. | Ten Eyck sufficiently plead Silver Lake's acquiescence in the conspiracy...................... 13 |
| | E. | Ten Eyck adequately pled its fraudulent misrepresentation claim against Silver Lake ................................................................................................................................. 13 |
| | F. | Ten Eyck adequately pled its civil conspiracy claim against Silver Lake ........................ 15 |
| IV. | CONCLUSION....................................................................................................................16 | |

## TABLE OF AUTHORITIES

**Federal Cases**

*Brown v. Donco Enters. Inc.*
  783 F.2d 644, 646 (6th Cir. 1986) .................................................................................. 7

*Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Ass'n, Inc.*
  730 F. Supp. 2d 451 (D. Md. 2010) ............................................................................... 7

*Copperweld Corp. v. Indep. Tube Corp.*
  467 U.S. 752, 771 (1984) ............................................................................................... 7

*Erie Cnty. v. Morton Salt, Inc.*
  702 F.3d 860 (6th Cir. 2012) .......................................................................................... 7

*Flinkote Co. v. Lysford*
  246 F.2d 368 (1968) ..................................................................................................... 15

*In re Dairy Farmers of America, Inc.*
  2013 WL 212908 (N.D.Ill. Jan. 18, 2013 ..................................................................... 12

*In re Elec. Books Antitrust Litig.*
  859 F.Supp.2d 671 (S.D.N.Y. 2012) .............................................................................. 8

*In re Packaged Ice Antitrust Litig.*
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ........................................................................ 7

*In re Polyurethane Foam Antitrust Litig.*
  799 F. Supp. 2d 777, 783 (N.D. Ohio 2011) ................................................................. 8

*In re Se Milk Antitrust Litig.*
  555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008) ............................................................... 7

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*
  62 F.3d 967 (7th Cir. 1995) .......................................................................................... 13

*NorthStar Energy LLC v. Encana Corporation*
  Case No. 1:13-cv-00200-PLM, Dkt. 37 (W.D. Mich. March 10, 2014) .................... 1, 7, 8, 12

*Ohio Willow Wood Co. v. Alps S. LLC*
  2011 WL 1237582 (S.D. Ohio Mar. 29, 2011) .............................................................. 8

*United States v. Paramount Pictures, Inc.*
  334 U.S. 131, 161 (1948) .............................................................................................. 13

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*
  156 F.3d 535 (4th Cir. 1998) ........................................................................................ 13

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
   648 F.3d 452, 457-459 (6th Cir. 2011)................................................................................ 12

**State Cases**

*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*
   257 Mich. App. 365, 384; 670 N.W.2d 569 (Mich. App. 2003)............................................ 16

*Converse v. Blumrich*
   14 Mich. 109, 123 (1866) ................................................................................................. 14

*Holcomb v. Noble*
   69 Mich. 396, 399; 37 N.W.  497 (1888) ........................................................................... 14

*Irwin v. Carlton*
   369 Mich. 92, 97; 119 N.W.2d 617 (1963) ........................................................................ 14

*United States Fidelity & Guaranty Co. v. Black*
   412 Mich. 99, 115-16; 313 N.W.2d 77 (1981).................................................................... 14

**Other**

*The Use and Misuse of Sight and Time Drafts in Oil and Gas Leasing Transactions*,
   Rocky Mt. Mineral Law Inhst., 29 RMMLF Inst. 19 (1983) ................................................... 3

I. INTRODUCTION

    A. **Silver Lake mischaracterizes the applicable pleading standard.**

In its Motion to Dismiss, Defendant Silver Lake Energy LLC ("Silver Lake") raises only two unique arguments, separate from those asserted by Defendant Chesapeake Energy Corporation ("Chesapeake") in its separately-filed Motion to Dismiss.  Dkt. 8, 9.  Both of these new arguments are premised on Silver Lake's contention that, because Plaintiff Ten Eyck Mineral Trust ("Ten Eyck") does not point to a specific email, communication, or other evidence which *conclusively proves* that Silver Lake knew it was participating in Chesapeake and Encana's anticompetitive scheme, Ten Eyck has not sufficiently plead its antitrust and fraud claims.  That, however, is a clear mischaracterization of the applicable pleading standard.

Ten Eyck need not show a "smoking gun."  Instead, at the pleading stage, Ten Eyck is merely required to state a factual basis to *plausibly suggest* that Silver Lake had a "conscious commitment" to the anticompetitive scheme.  *NorthStar Energy LLC v. Encana Corp.*, No. 1:13-cv-00200-PLM, Dkt. 37, at *22 (W.D. Mich. March 10, 2014).  Put another way, Ten Eyck must plead sufficient facts to show that discovery into the extent of Silver Lake's knowledge *could be* fruitful.  *Id.*  And, when, as here, the proof of the conspiracy is in the hands of the conspirators, dismissal at the pleading stage is highly disfavored and rarely warranted.  *Id.*

    B. **Ten Eyck's allegations plausibly suggest that Silver Lake knowingly joined the conspiracy.**

Ten Eyck's allegations clearly set forth a factual basis to reasonably infer that Silver Lake knowingly participated, including:

1

- On July 16, 2010, Chesapeake gave the directive, conveyed via its subsidiary Northern Michigan Exploration Company ("NMEC"),[1] to OIL Niagaran ("OILN") that "effective immediately all lease prices were to be dropped by 50%" and to "rescind all offers not in those parameters."

- That same day, Dave McGuire from OILN responded to this directive asking whether it was a "coincidence" that Encana – Chesapeake's fiercest competitor for northern Michigan mineral rights – simultaneously dropped its leases by 50%.

- The next day, at a July 17 meeting attended by Wayne Baker of RedSky Land, LLC ("RedSky")[2] and Al Courtier of Silver Lake to discuss finalizing the addendum to Ten Eyck's lease, Ten Eyck's attorney was told by Baker that "all pending oil and gas lease offers were being cut by 50%;" but they would finalize Ten Eyck's addendum, as Ten Eyck and Silver Lake had an agreed to lease. Dkt. 1, ¶ 101.

- Three days later, on July 21, 2010, Silver Lake reneged on its lease deal with Ten Eyck by purporting to rescind its already accepted lease offer to Ten Eyck. Dkt. 1, ¶ 102.

- Chesapeake and its affiliates (NMEC, Silver Lake, OILN, and Western Land Services) voided "more than 93% of the private sector oil and gas leases that had been entered into during the summer of 2010 . . . allegedly due to title defects." Dkt. 1, ¶ 74. The historic average title failure rate for mineral leases in Michigan is 3%. *Id.*

The following inferences can be drawn out of the above chronology:

(1) Silver Lake received the July 16 instructions from NMEC (to slash prices by 50% and rescind all offers), because: the NMEC was the Chesapeake entity responsible for taking assignment of leases from Silver Lake, and RedSky and Silver Lake officials confirmed to Ten Eyck's attorney, the next day (July 17), that they were cutting "all pending offers by 50%;"

(2) Silver Lake knew what it was instructed to do was wrong, as it is reasonable to infer that Silver Lake, like OILN, would recognize the absurdity of two supposedly fierce competitors, like Encana and Chesapeake, simultaneously cutting their price by 50% unless they were working together for an

---

[1] Chesapeake formed Northern Michigan Exploration Company, LLC ("NMEC") for the purposes of taking assignment of certain oil and gas leases from Silver Lake. NMEC is a subsidiary of Chesapeake with a registered office and resident agent in Michigan.

[2] RedSky is an Oklahoma LLC who Chesapeake contracted with to assist in the leasing activity in the State of Michigan. Dkt. 1, ¶ 71.

2

    anticompetitive purpose, and that it was improper and illegal to renege on already agreed to lease deals with mineral owners, like Ten Eyck;[3] and

(3) Silver Lake – in response to NMEC/Chesapeake's directions – made a conscious decision to join in on this wrongful scheme to renege on already agreed to leases, including Silver Lake reneging on its lease deal with Ten Eyck.

Drawing such reasonable inferences from Ten Eyck's allegations, as well as the inferences described more fully below, Ten Eyck has clearly plead enough to show that discovery *could* yield further proof that Silver Lake knowingly participated in Chesapeake and Encana's scheme to crash the northern Michigan, oil and gas market. Therefore, as in almost all antitrust cases, dismissal is not appropriate at the pleading stage, and Ten Eyck should be given the opportunity to take discovery.

## II. BACKGROUND

### A. In the aftermath of a fiercely competitive auction, Chesapeake forms Silver Lake to acquire leases.

Chesapeake incorporated Silver Lake within two weeks of the May 4, 2010, State of Michigan auction. Dkt. 1, ¶ 21. Bidding at the auction was very competitive – particularly between Encana and Chesapeake, whose head-to-head bidding caused the prices for mineral leases to skyrocket. *Id.* at ¶¶ 2-3, 39-41. The auction yielded a record-setting $178 million for the State of Michigan, "more than all the money raised in the previous 81 years of the State's mineral lease sales." *Id.* When Silver Lake began acquiring leaseholds for Chesapeake, in mid-May, mineral lease prices had skyrocketed to more than $3,000 per acre. *Id.*

### B. Top officials at Encana and Chesapeake collude to depress the elevated market prices.

On May 14, 2010, Ten Eyck received a written offer from Atlas Oil and Gas Company ("Atlas") to lease Ten Eyck's mineral rights. Dkt. 1, ¶ 44. Atlas's offer included a $750 per acre bonus on all of

---

[3] Treating one's agreed to leases with mineral owners as "speculative options" – as Silver Lake did here – is the illegal process referred to in the oil and gas industry as "cold drafting." *See* R. Knutson and S. Magerfleisch, *The Use and Misuse of Sight and Time Drafts in Oil and Gas Leasing Transactions*, Rocky Mt. Mineral Law Inst., 29 RMMLF Inst. 19 (1983).

3

Ten Eyck's 625 acres, located in Kalkaska County. *Id.* But, knowing the bonuses being paid after the May auction for mineral rights within the vicinity of Ten Eyck's property, Ten Eyck sought additional bids. *Id.* While Ten Eyck was entertaining bids, top officials at Chesapeake and Encana hatched a joint strategy to avoid bidding against one another, and their affiliates, with the objective of depressing the prices both were paying for Utica/Collingwood acreage. Dkt. 1, ¶ 45.

On June 6, 2010, after having had initial discussions (the content of which is unknown to Ten Eyck at this time), Chesapeake VP Doug Jacobson sent an email to Encana USA VP John Schopp, copying Aubrey McClendon, Chesapeake's CEO, and Jeff Wojahn, Encana USA's president, stating, "Sorry for the delay in getting back to you here. . . Our proposal is pretty simple, but hopefully should be effective for us both. . . ." Dkt. 1, ¶ 46. Jacobson proposed a strategy to avoid competing over leases that included swapping land already leased in Michigan and dividing up counties and private landowners where new leases might be secured. "ECA would be responsible for new leasing in Charlevoix, Cheboygan, Missaukee and western Roscommon Counties while CHK would be responsible for leasing in Emmett [sic], Antrim, Kalkaska, western Otsego and western Crawford counties." The non-buying company would have "the option of acquiring 50% of the acreage acquired by the other . . . on the same terms as the initial acquiring party." *Id.* The next day, Schopp replied (adding Encana CEO Randy Eresman to the thread), "This looks like a great start." Dkt. 1, ¶ 47. And, from there, as set forth in the Complaint, the details of the anticompetitive conspiracy were fleshed out, both verbally and in writing. Dkt. 1, ¶¶ 48-63.

C. **Silver Lake dupes Ten Eyck into accepting its offer for Ten Eyck's mineral rights.**

On June 16, 2010, Silver Lake emailed Ten Eyck confirming that it wanted to acquire Ten Eyck's mineral rights. Dkt. 1, ¶ 94. That same day, June 16, Ten Eyck informed Silver Lake that it was entertaining other bids and invited Silver Lake to submit an offer including royalty percentage, bonus payment, and primary and secondary terms. *Id.* The next day, June 17, 2010, Silver Lake presented Ten Eyck with a Letter of Intent, offering to lease Ten Eyck's minerals for the following terms: 3/16 royalty,

4

$1,500 per acre bonus, primary term of 5 years, and secondary term of 5 years. Dkt. 1, ¶ 97. Five days later, on June 22, 2010, Ten Eyck received a written offer from Energy West, leasing on behalf of Encana. Dkt. 1, ¶ 12. Energy West offered to lease Ten Eyck's Excelsior Township acreage at a 3/16 royalty and $1,750 per acre bonus. Dkt. 1, ¶ 98.

Knowing that there was a competing offer from Energy West, Silver Lake – on July 7, 2014 – raised the bonus component of its offer to $1,800 per acre, to beat all other offers, and sent an oil and gas lease to Ten Eyck, incorporating all the offered terms. Dkt. 1, ¶ 99. In making this July 7 offer, Silver Lake said to "forget the Letter of Intent (as that was only to buy time)"; instead, Silver Lake wanted to get an oil and gas lease signed. Dkt. 1, ¶ 98. It also "advised" Ten Eyck not to sign with any of its competitors, as Silver Lake (and Chesapeake) wanted to be the "last bidder." *Id.* Relying on Silver Lake's offer and other promises (to consummate a lease), Ten Eyck, through its counsel, accepted Silver Lake's offer on July 15, 2014. Dkt. 1, ¶ 100.

### D. Silver Lake is aware of and participates in a collusive, anticompetitive scheme with Chesapeake and Encana.

Ten Eyck accepted Silver Lake's offer without any reason to know of the anticompetitive conspiracy (then playing out behind-the-scenes). The same cannot be said for Silver Lake. In this mid-July timeframe, Encana and Chesapeake – two formerly fierce competitors over northern Michigan acreage – had simultaneously cut their bonus offerings by at least 50%. Dkt. 1, ¶ 65. NMEC conveyed that 50% price drop directive to Chesapeake's affiliates, including Silver Lake. Dkt. 1, ¶ 66. That included NMEC notifying OILN on July 16, 2014 "that effective immediately all leasing prices were to be dropped by 50% and . . . to rescind all offers outside of these parameters." *Id.* Noting the absurdity that two formerly fierce competitors would suddenly and simultaneously slash their prices by 50%, Dave McGuire of OILN questioned whether this was a "coincidence?" *Id.*

5

The next day, on July 17, at a meeting held to finalize the addendum to Ten Eyck's lease, Ten Eyck's attorney learned via Wayne Baker, a representative from RedSky, of Chesapeake's 50% price cut on all leases. Dkt. 1, ¶ 101. However, Baker and Al Couturier of Silver Lake – at that meeting – finalized the addendum with Ten Eyck's attorney, because Ten Eyck and Silver Lake had reached agreement on lease terms. *Id.*  Four days later, on July 21, 2010, McFerron emphatically told Couturier that Silver Lakes's area of interest has been limited to a "nine section grid we have been put." Dkt. 1-11, p. 2.  That same day, Silver Lake reneged on its deal with Ten Eyck by purporting to rescind its already agreed to lease with Ten Eyck. Dkt. 1, ¶ 102.

By July 25, 2010, Chesapeake and its affiliates had put a freeze "on all acquisition and leasing efforts." Dkt. 1, ¶ 67.  On or around July 28, 2010, "ALL Leasing and the lease related jobs insofar as curative All title and All abstracting" were stopped. *Id.*  When asked whether leases with completed title work should be paid, NMEC reiterated to Chesapeake's affiliates "There should be no misunderstanding . . . we do not wish for you to tender payments on any leases." Dkt. 1, ¶ 68.

This modus operandi – to not pay any leases no matter what – was clearly and brazenly carried out by Chesapeake and its affiliates. Silver Lake, from August to December of 2010, proceeded to improperly fail leases it agreed to earlier that summer. Dkt. 1, ¶¶ 70-71.  In September, RedSky and Silver Lake hired "several title agents and landmen for the express purpose of carrying out Defendants' collusive strategy of voiding acquired oil and gas leases." *Id.*  This has been confirmed by Joe McFerron, affiliated with both RedSky and Silver Lake, who admits in a December 21, 2010 email communication that they were instructed to fail all leases. *Id.*  As a result, Chesapeake and its affiliates (NMEC, Silver Lake, OILN, and Western Land Services) voided "more than 93% of the private sector oil and gas leases that had been entered into during the summer of 2010 . . . allegedly due to title defects." Dkt. 1, ¶ 74.  Absent the kind of misconduct described above, the historic average title failure rate for mineral leases in Michigan is 3%. *Id.*

III.  LAW AND ARGUMENT

    A. **In its Motion to Dismiss, Silver Lake fails to apply the proper pleading standard applicable to Ten Eyck's Complaint.**

An illegal agreement under 15 U.S.C. § 1 may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (internal quotations omitted).  An agent (or subagent) to a member of such an illicit scheme can be found to have joined the scheme if it knowingly and actively participated in that scheme.  *Brown v. Donco Enters. Inc.*, 783 F.2d 644, 646 (6th Cir. 1986); *see also*, *In re Se Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008) (interpreting *Brown* as only requiring – at the motion to dismiss stage – short allegations that defendant "participated in, authorized, directed and/or knowingly approved or ratified" the illegal conduct complained of).

Ten Eyck's pleadings need not "prove that [the conspirator's] participation in the alleged illegal scheme was probable or certain," *NorthStar Energy LLC v. Encana Corp.*, No. 1:13-cv-00200-PLM, Dkt. 37, at *22 (W.D. Mich. March 10, 2014), or "tend[] to exclude the possibility of independent action by the [parties]."  *Erie Cnty v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012)  (fact pattern that tends "to exclude the possibility of lawful, independent conduct" is required at the summary judgment – not the pleading – stage of a lawsuit); *Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Ass'n, Inc.*, 730 F. Supp. 2d 451, 462 (D. Md. 2010) (plaintiff does not need to show "sufficient *evidence* of concerted action" at the motion to dismiss stage) (emphasis original).  Nor is it necessary for Ten Eyck's allegations to answer "all the specific questions about 'who, what, when and where'" as long as the Complaint "put[s] defendants on fair notice concerning the basic nature [of one's claims]."  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005-06 (E.D. Mich. 2010)  (at the pleading stage, "*Twombly* does not require specific allegations of time, place or person").

7

Instead, *Twombly* "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also*, *NorthStar Energy*, No. 1:13-cv-00200-PLM, Dkt. 37, at *22. Actions must not be dismissed at the pleading stage when there are sufficient facts to reasonably infer *that discovery could yield evidence of participation*. *NorthStar Energy*, No. 1:13-cv-00200-PLM, Dkt. 37, at *23-24 (no dismissal where "reasonable expectation that discovery could reveal" evidence that another Chesapeake affiliate, OILN, knowingly participated in Chesapeake and Encana's conspiracy). *See also Ohio Willow Wood Co. v. Alps S. LLC*, 2011 WL 1237582 (S.D. Ohio Mar. 29, 2011) (denying motion to dismiss because "discovery *could* yield evidence" that a conspirator's alleged fraudulent or anticompetitive conduct were done "in furtherance of an overall scheme to create a monopoly") (emphasis added); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 783 (N.D. Ohio 2011) (need only allege facts to "raise a reasonable expectation" for discovery of an illegal agreement).

And where, as here, the proof of the anticompetitive scheme is largely in the hands of the alleged conspirators, dismissals prior to discovery are *rarely* appropriate. *NorthStar Energy*, No. 1:13-cv-00200-PLM, Dkt. 37, at *22-23 ("[antitrust] claims should rarely be dismissed for insufficiency because the proof of the conspiracy is in the hands of the conspirators"); *see also*, *Ohio Willow Wood*, 2011 WL 1237582 at *11 ("dismissal [of antitrust claims] before ample opportunity for discovery should be granted very sparingly"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) (citing *Twombly*, 550 U.S. at 557) (if plausible to infer participation, "[a] claim may survive motion to dismiss even if a judge believes the chances of recovery to be very remote or unlikely.")

### B. Ten Eyck established a factual basis in its Complaint sufficient to reasonably infer Silver Lake's knowledge.

Throughout its Complaint, Ten Eyck shores up its allegations with ample evidentiary and factual support. For example, Ten Eyck's Complaint first sets the backdrop for Chesapeake and Encana's conspiracy, alleging:

- On May 4, 2010, the State held a record-setting lease auction resetting the price for oil and gas rights in northern Michigan; and the frenzied, head-to-head competition between Chesapeake and Encana at and in the aftermath of the State's May auction. Dkt. 1 at ¶¶ 2-3.

- Two weeks later after the May auction, Chesapeake incorporated Silver Lake to acquire leases on its behalf, at a time when prices for mineral leases had skyrocketed to more than $3,000 an acre. Dkt. 1 at ¶¶ 2-3, 21.

- In June and early July 2010, Silver Lake knew of the desirability of Ten Eyck's leasehold position, and, when told Energy West was competing for Ten Eyck's rights, Silver Lake bested all other offers and said "forget an LOI," it wanted to get a lease signed. Dkt. 1, ¶ 94.

From this backdrop, this Court can reasonably infer that Silver Lake knew of the hypercompetitive state of the northern Michigan oil and gas market in May and June of 2010 – particularly between the two fiercest competitors in that market, Chesapeake and Encana.

From there, Ten Eyck then continues to set forth facts showing the absurdity of the actions taken by the conspirators:

- On July 15, 2010, Ten Eyck accepted Silver Lake's offer for its mineral rights at price terms far less than what was paid for similar Utica/Collingwood acreage at or in the aftermath of the State's May auction. Dkt. 1, ¶ 100.

- In this same mid-July timeframe, Encana and Chesapeake, both simultaneously slashed their maximum per acre bonus amount they were offering for Utica/Collingwood interests in northern Michigan by 50% or more. Dkt. 1, ¶ 65.

- On July 16, 2010, David Bolton of NMEC notified David McGuire of OILN that effective immediately all leasing prices were to be dropped by 50% and directed him *to rescind all offers outside this parameter that were not signed and in his hands by noon that day.* Dkt. 1, ¶ 66.

9

- That same day, July 16, 2010, McGuire of OILN noted that Encana had also simultaneously dropped its bidding by 50% and questioned whether this was a "coincidence?" Dkt. 1, ¶ 66.

- The next day, at a July 17 meeting attended by Wayne Baker of RedSky and Al Courtier of Silver Lake to discuss finalizing the addendum to Ten Eyck's lease, Ten Eyck's attorney was told by Baker that "all pending oil and gas lease offers were being cut by 50%;" but they would finalize Ten Eyck's addendum, as Ten Eyck and Silver Lake had an agreed-to lease. Dkt. 1, ¶ 101.

- Three days later, on July 21, 2010, Silver Lake discloses that their area of interest has been limited to a nine section grid and reneged on its lease deal with Ten Eyck by purporting to rescind its already accepted offer to Ten Eyck. Dkt. 1, ¶ 102; Dkt. 1-11, p. 2.

These allegations, as explained previously, provide a reasonable basis to infer that Chesapeake and NMEC gave Silver Lake the same July 16 directive that was given to OILN, ordering it to rescind leases. These allegations also allow this Court to infer that – even though Silver Lake knew what it was being asked to do was wrong and arising out of clearly collusive, anticompetitive conduct by Chesapeake and Encana, including a simultaneous 50% price drop – Silver Lake decided to join in on the conspiracy. Furthermore, these allegations allow the inference that Silver Lake's participation is reflected in its July 21, 2010 decision to renege on its already agreed-upon lease with Ten Eyck.

Finally, Ten Eyck's Complaint goes on to tell the story of how Silver Lake saw the conspiracy to its completion:

- By July 25, 2010, Brian Exline of Chesapeake reiterated to McGuire of OILN, "effective immediately, please freeze all acquisition and leasing efforts… [F]reeze all activity until further notice." Dkt. 1, ¶ 67.

- On July 28, 2010, Leslie Irish of OILN instructed OILN representatives to "stop ALL Leasing and the lease related jobs insofar as curative, All title and ALL abstracting." Id.

- On July 30, 2010, Irish asked Henry Hood, VP of Chesapeake, to confirm whether leases would still be paid by Chesapeake when title work was already completed. Bolton of Chesapeake/NMEC responded on behalf of Henry Hood, "[T]hat was not our instruction. There should be no misunderstanding, as Henry advised, we do not wish for you to tender payments on any leases." Dkt. 1, ¶ 68.

10

- After the July shutdown on leasing, the directive "to fail all leases" was conveyed by NMEC to Chesapeake's agents and brokers, including Silver Lake. Dkt. 1, ¶ 69.

- Silver Lake – from August to December of 2010 – proceeded to improperly fail leases it agreed to earlier in the summer. Dkt. 1, ¶¶ 70-71.

- In September, Silver Lake hired "several title agents and landmen for the express purpose of . . . voiding acquired oil and gas leases." *Id.*

- Chesapeake and its affiliates (NMEC, Silver Lake, OILN, and Western Land Services) voided "more than 93% of the private sector oil and gas leases that had been entered into during the summer of 2010 . . . allegedly due to title defects," when the historic failure rate is 3%. Dkt. 1, ¶ 74.

A finder of fact can reasonably infer from the above that Silver Lake never withdrew from the scheme, despite ample evidence of the clearly illicit and anticompetitive acts being asked of it, including to "fail all leases" at unprecedented rates. Instead, Silver Lake saw the scheme through to its completion, when the market bottomed out at the State's October auction.

Despite these reasonable inferences that can be drawn from Silver Lake's actions, Silver Lake now insists that Ten Eyck's Complaint is insufficient. Silver Lake would have this Court believe that Ten Eyck's Complaint should be dismissed because Ten Eyck has not yet come forth with a "smoking gun" confirming that Silver Lake absolutely knew of and chose to participate in Chesapeake and Encana's anticompetitive scheme. But it is not at all surprising or unusual that such definitive proof is presently unavailable to Ten Eyck, at a time before it has taken a single deposition or requested or received a single document through discovery. Despite being limited to only those documents which happen to have been leaked to the media, Ten Eyck has pled a compelling antitrust claim against Silver Lake. This Court should reject Silver Lake's invitation to hold Ten Eyck to a standard of proof that is practically impossible at this stage of the proceedings.

11

### C. Ten Eyck sufficiently pled Silver Lake's knowing participation in the anticompetitive scheme.

In its Motion to Dismiss, Silver Lake attempts to demonstrate that this is lawsuit is similar to those "rare" antitrust cases where discovery is not warranted. *NorthStar Energy*, No. 1:13-cv-00200-PLM, Dkt. 37, at *22-23. But this is not the case here. Silver Lake's participation cannot be dismissed be dismissed here as being nothing more than routine business dealings, or "guilt by association."[4] *See Watson Carpet*, 648 F.3d at 457-59 ("ferreting out the most likely reason for the conspirator's conduct is not appropriate at the pleadings stage").

In fact, Ten Eyck has stated a reasonable basis to infer that Silver Lake knowingly joined and never withdrew from the clearly illicit, anticompetitive scheme hatched by Chesapeake and Encana. *Id.* (holding it sufficient to state a *single* plausible basis to infer that defendant's continued acts were continued adherence to the conspiratorial plan); *see also In re Dairy Farmers of America, Inc.*, 2013 WL 212908, *4-7 (N.D. Ill. Jan. 18, 2013) (holding sufficient plaintiff's allegations regarding defendant's concerted acts in furtherance of another's illicit scheme, coupled with the "unnatural effect on the market" and an alleged "motive" to join the conspiracy). Accordingly, discovery into the extent of Silver Lake's knowledge and participation is appropriate here. *NorthStar Energy*, No. 1:13-cv-00200-PLM, Dkt. 37, at *22-23.

---

[4] To be clear, these were not mere routine business dealings. Nor is Silver Lake guilty only by association. When Chesapeake gave its directives to OILN, its representatives clearly recognized the illegal and anticompetitive nature of what they were being asked to do. Dkt. 1, ¶¶ 66-68. That includes OILN's McGuire, who questioned whether Chesapeake and Encana's coordinated 50% price cuts mid-July were a "coincidence;" as well as OILN's Irish, who asked Henry Hood to confirm, in the wake of the "fail all leases" directive, whether leases – with completed title work – would still be paid. *Id.* In the end, Silver Lake was failing leases, at an unprecedented rate, that it clearly knew should be honored.

12

### D. Ten Eyck sufficiently plead Silver Lake's acquiescence in the conspiracy.

In *Paramount Pictures*, the Supreme Court stated that "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948). *Paramount Pictures* has resulted in a litany of cases across the circuits holding that "the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 973 (7th Cir. 1995) ; *see also Flinkote Co. v. Lysford*, 246 F.2d 368, 374-75 (1968) (in a job-allocation conspiracy in which the supplier to the conspirators "could have acquired knowledge of the conspiracy" . . . and "with such inferred knowledge, participated in the conspiracy, and aided it;" such acts in aid of the conspiracy "would constitute knowing participation."). A common motive is not even necessary; as it is enough to be conscious of the conspiracy and know that it will have anticompetitive effects. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 (4th Cir. 1998).

Silver Lake was conscious of (or it can be inferred that Silver Lake knew of) the illicit scheme and its anticompetitive effects, as described above. As such, pursuant to *Paramount Pictures* and its progeny, Silver Lake at the very least acquiesced or aided Chesapeake and Encana in carrying out that scheme. Accordingly, whether by inference of a plausible agreement to join or by acquiescing to participation in the illicit scheme, Ten Eyck has stated actionable claims against Silver Lake.

### E. Ten Eyck adequately pled its fraudulent misrepresentation claim against Silver Lake.

Silver Lake also contends that Ten Eyck has failed to plead one element of its fraudulent misrepresentation claim – namely, that Silver Lake knowingly made a false representation. Specifically, Silver Lake asserts that Ten Eyck's fraudulent misrepresentation claim must fail because there are no allegations (1) "that Silver Lake knew of the discussions between Chesapeake and Encana . . . such that Silver Lake also could have 'tied up the Plaintiff's mineral rights and then determine[d] at a later time

13

whether to honor or disregard their obligation"; or (2) "that Silver Lake knew about Chesapeake's future intent to pay Plaintiff" when it offered and agreed to lease for $1,800 per acre. Dkt. No. 11, p. 12.

As a threshold matter, Ten Eyck is *not* required to plead that Silver Lake knew its statements to Ten Eyck were false in order to recover against Silver Lake for fraud. For nearly 150 years, the law in Michigan has been that "[i]f one obtains the property of another, by means of untrue statements, *though in ignorance of their falsity*, he must be held responsible as for a legal fraud." *Converse v. Blumrich*, 14 Mich. 109, 123 (1866) (emphasis added); *see also Irwin v. Carlton*, 369 Mich. 92, 97; 119 N.W.2d 617 (1963) (holding that "plaintiff was entitled to have the jury instructed, as he requested the trial judge to do, that defendant might be found guilty of actionable misrepresentation even though the representation was made in good faith believing it to be true"); *Holcomb v. Noble*, 69 Mich. 396, 399; 37 N.W. 497 (1888) (Morse, J., concurring) ("[T]he doctrine is settled here, by a long line of cases, that if there was in fact a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose, he would have a right of action for the damages caused thereby either at law or in equity."); *United States Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 115-16; 313 N.W.2d 77 (1981) ("The innocent misrepresentation doctrine still stands in Michigan today. We have found no case overturning or disapproving of *Converse* and its progeny."); M. Civ. J.I. 128.04 (jury instructions for fraud based on innocent misrepresentation).

The Michigan Supreme Court recited the elements of fraud based on innocent misrepresentation in *Black*:

> Where an action is brought to recover for false and fraudulent misrepresentations made by one party to another (1) in a transaction between them, (2) any representations which are false in fact (3) and actually deceive the other, and (4) are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, (5) where the loss of the party deceived inures to the benefit of the other.

412 Mich. at 116.

Ten Eyck's Complaint satisfactorily alleges each of the above elements. Silver Lake made several false and fraudulent misrepresentations. Dkt. 1, ¶¶ 93, 98, 131-133. These misrepresentations were made in the context of consummating a transaction for an oil and gas lease between Chesapeake and Silver Lake, on one hand, and Ten Eyck, on the other. Dkt. 1, ¶¶ 131-142. Ten Eyck was actually deceived by these misrepresentations, and was harmed by them when it terminated lease negotiations with other interested parties in reliance on them. Dkt. 1, ¶¶ 104-105, 142. Finally, Ten Eyck's loss was Silver Lake's gain; by convincing Ten Eyck to terminate its lease negotiations with other companies, Silver Lake and Chesapeake caused Ten Eyck to remove its mineral rights from the market and obtained a cost-free "option" to purchase those rights, on which they later reneged when they failed to pay Ten Eyck. Dkt. 1, ¶¶ 72, 136-37, 142.

But even if Ten Eyck were required to plead allegations regarding Silver Lake's intent, the Complaint contains ample facts supporting an inference that Silver Lake acted with fraudulent intent in negotiating with Ten Eyck, and that Silver Lake knew the misrepresentations it made to Ten Eyck were false when it made them. Ten Eyck alleges that Silver Lake was an active, involved participant in a scheme with Chesapeake and Encana "to suppress the price that they would pay to mineral owners in Michigan . . . ." Dkt. 1, Compl. ¶ 13. Ten Eyck further alleges that Chesapeake's and Silver Lake's goal was to obtain as many oil and gas leases as fast as it could so as to tie up the mineral rights before competitors could. Dkt. 1, ¶¶ 72-73 ("That is exactly what Chesapeake and its agent, Silver Lake, did in Michigan between August and December of 2010 to avoid paying the higher bonus amounts it had already agreed to pay . . . ."). These allegations, taken as true, would establish that Silver Lake acted with the requisite knowledge and intent to commit fraud based on false representation.

F. Ten Eyck adequately pled its civil conspiracy claim against Silver Lake.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful

15

means." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. App. 2003). Some separate, actionable tort is required to support a claim for civil conspiracy. *Id.* Here, Ten Eyck has adequately alleged state and federal antitrust claims, as well as breach of contract, quantum meruit/unjust enrichment, tortious interference, and fraudulent misrepresentation claims against Silver Lake. Because there are sufficient underlying claims to support Ten Eyck's civil conspiracy claim, the claim should not be dismissed.

## IV. CONCLUSION

For all of the reasons set forth in this Response, Ten Eyck respectfully requests that this Court deny Silver Lake's Motion to Dismiss in its entirety.

Dated: July 16, 2014

By: /s/ David R. Whitfield
Brian J. Masternak (P57372)
Charles N. Ash, Jr. (P55941)
Lance R. Zoerhof (P63980)
David R. Whitfield (P73352)
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
bmasternak@wnj.com
cash@wnj.com
lzoerhof@wnj.com
dwhitfield@wnj.com
616.752.2000
Attorneys for Plaintiff

157408.157408 #10936494-4