IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

THE TENEYCK MINERAL TRUST,
BY C. ADREW TENEYCK, TRUSTEE,                    Case No.: 1:140-cv-00201

        Plaintiff,                              Honorable Gordon J. Quist

vs.

CHESAPEAKE ENERGY CORPORATION,
SILVER LAKE ENERGY, LLC,
ENCANA CORPORATION and
ENCANA OIL & GAS, (USA) INC.

        Defendants,

_____

PLAINTIFF TEN EYCK MINERAL TRUST'S RESPONSE
TO DEFENDANT ENCANA CORPORATION'S MOTION TO DISMISS

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................................. 1

        A.      Chesapeake and Encana dominate a hypercompetitive northern Michigan market for oil
                and gas leases ........................................................................................................................ 1

        B.      While Encana hatches a scheme to depress prices, Ten Eyck receives an offer from Atlas
                and negotiates with others ...................................................................................................... 2

        C.      Ten Eyck continues to negotiate with others and receives additional offers from Energy
                West and Silver Lake ............................................................................................................. 3

        D.      While offers from Atlas, Energy West, and Silver Lake are pending, Encana and
                Chesapeake enact their scheme to depress prices .................................................................. 4

        E.      Chesapeake reneges on its agreement with Ten Eyck ............................................................ 6

III.    LEGAL ARGUMENT ...................................................................................................... 7

        A.      Standard of review ................................................................................................................. 7

        B.      Applying the *Twombly* standard here, Ten Eyck need only plead enough facts regarding
                tortious interference to raise a reasonable expectation that discovery will reveal further
                evidence ................................................................................................................................. 7

        C.      Ten Eyck's Complaint adequately pled direct evidence regarding its reasonable business
                expectancies, which Encana interfered with ........................................................................... 8

        D.      Ten Eyck's pleadings plausibly suggest that Encana (and the conspiracy) targeted Ten
                Eyck ...................................................................................................................................... 11

        E.      Encana's interference prevented Ten Eyck from consummating any deal for its acreage ........... 15

IV.     CONCLUSION .................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Baker v. Dennis Brown Realty, Inc.*
    433 A.2d 1271 (N.H. 1981) .......................................................................................... 11

*Barrette Outdoor Living, Inc. v. Michigan Resin Representatives, LLC*
    2012 WL 760925, at *6 (E.D. Mich. Mar. 8, 2012) ..................................................... 16

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007) .................................................................................................. 7, 8

*Consolidated Rail Corp. v. Grand Trunk Western R.R. Co.*
    No. 09-10179, 2009 WL 3460334, at *5, 16-18 (E.D. Mich. Oct. 22, 2009) ............. 11

*Dowd. v. Iantosca*
    538 N.E.2d 33 (Mass. 1989) ...................................................................................... 10

*Edward Dean v. Mark Sypniewski*
    2012 WL 6567608 (W.D. Mich. 2012) ........................................................................ 13

*Encana Oil and Gas (USA) Inc. v. Zaremba Family Farmsi*
    No. 1:12-cv-00369-PLM (W.D. Mich. Dec. 3, 2013) .................................................... 3

*Erie County v. Morton Salt, Inc.*
    702 F.3d 860, 869 (6th Cir. 2012) ............................................................................... 8

*Hoffman v. Roberto*
    85 B.R. 406, 416 (W.D. Mich. 1987)............................................................................ 8

*In re Baseball Antitrust Litig.*
    75 F. Supp. 2d 1189, 1203-1204 (D. Kan. 1999) ........................................................ 8

*JDC Management v. Reich*
    644 F. Supp. 2d 905, at 943-44 (W.D. Mich. 2009) ..................................................... 7

*Kennedy v. Kennedy*
    819 S.W.2d 406 (Mo. App. 1991)............................................................................... 10

*Martin v. Wing*
    667 P.2d 1159 (Wyo. 1983) ....................................................................................... 10

*Midwest Auto Auction, Inc. v. McNeal*
    No. 11-14562, 2012 WL 3478647 (E.D. Mich. Aug. 14, 2012) .................................. 10

*New York Carpet World, Inc. v. Grant*
    912 F.2d 463 (4th Cir. 1990) ..................................................................................... 11

*NorthStar Energy LLC v. Encana Corp.*
Case No. 1:13-cv-00200-PLM, Dkt. 37 (W.D. Mich. Mar. 10, 2014)......................................................8

*Ohio Willow Wood Co. v. Alps S. LLC*
2011 WL 1237582, at *11 (S.D. Ohio Mar. 29, 2011).............................................................................8

*ParaData Computer Networks, Inc. v. Telebit Corp.*
830 F. Supp. 1001, 1007 (E.D. Mich. 1993) ..............................................................................10, 16

*Spectrum Cubic, Inc. v. Grant Prods. de Mexico, S.A. de C.V.*
2013 WL 504650, at *6 (W.D. Mich. Feb. 8, 2013)...........................................................................14

*Tucker v. Middleburg-Legacy Place*
539 F.3d 545 (6th Cir. 2008) .........................................................................................................7

*Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*
623 F.3d 281, 287 (6th Cir. 2010) ...............................................................................................14

*Wilkey v. Hull*
366 Fed. App's 634 (6th Cir. 2010) .................................................................................................16

**State Cases**

*Brennan v. Duncan*
27 N.W.2d 320, 322-323 (Mich. 1947) ...........................................................................................9

*Feldman v. Green*
360 N.W.2d 881, 886 (Mich. App. 1984) .......................................................................................14

*Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*
421 N.W.2d 289, 292-93 (Mich. App. 1988) .................................................................................13

*Jim Bob, Inc. v. Mehling*
443 N.W. 2d 451, 463 (Mich. App. 1989) ......................................................................................16

*Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*
268 N.W.2d 296, 299 (Mich. App. 1978) .........................................................................................7

*Wilkerson v. Carlo*
300 N.W.2d 658, 659-660 (Mich. Ct. App. 1980) .............................................................................9

**Federal Statutes**

Fed. R. Civ. P. 12(b)(6).......................................................................................................................7

Fed. R. Civ. P. 12(c) ...........................................................................................................................7

I.      INTRODUCTION

Encana's Motion to Dismiss asks this Court to read Ten Eyck's allegations in a vacuum – not drawing any reasonable inferences from its acts to further its collusive scheme (with Chesapeake) to depress then-pending offerings for mineral leases in northern Michigan.  It does so despite the fact that Encana's antitrust and tortious interference acts or conduct share the same motive – depressing lease prices or offerings – and same targets – mineral owners in their area of mutual interest, which included Ten Eyck.  When the *Twombly* standard is properly applied, it is reasonable to infer, from Ten Eyck's pleadings, that:

- Ten Eyck had a valid expectation of doing business with Atlas, Energy West, and Silver Lake (all of whom offered to acquire Ten Eyck's mineral rights);

- Encana's acts to conspire to depress prices targeted Ten Eyck, as Ten Eyck's acreage fell within Encana and Chesapeake's area of mutual interest and both Encana (via, Energy West) and Chesapeake (via, Silver Lake) wanted to acquire Ten Eyck's rights; and

- Encana's acts accomplished their goals, inducing Ten Eyck to terminate and lose out on the Atlas offer and preventing Silver Lake from honoring its lease obligations to Ten Eyck.

This case, therefore, is not one of the rare antitrust conspiracy cases where a claim should be dismissed before any discovery has been conducted.  Instead, Ten Eyck must be afforded ample opportunity for discovery into the allegations (and inferences therefrom) that it has pled, and Encana's request for dismissal must be denied.

II.     STATEMENT OF FACTS.

A.      Chesapeake and Encana dominate a hypercompetitive northern Michigan market for oil and gas leases.

In April 2010, promising flowback tests on Encana's "Pioneer Well" in Missaukee County resulted in heightened excitement that the Utica/Collingwood shales in northern Michigan might be a commercially viable oil and gas play.  Dkt. 1, ¶ 21.  At the May 4, 2010 State of Michigan oil and gas lease auction,

Chesapeake and Encana were the dominant buyers of leases from which the Utica/Collingwood could be exploited.  Dkt. 1, ¶¶ 39-40.  Through intermediary bidders, the two companies fiercely competed, spending almost $165 million combined (of the $178 million paid for leases at that auction) and acquiring the rights to develop more than 84,000 acres of state lands.  *Id.*  The average winning bid at the auction was $1,413 per acre; and 83% of those winning bids had competing offers.  *Id.*  Prime acreage at the May auction sold for approximately $5,000 per acre.  *Id.*

**B.      While Encana hatches a scheme to depress prices, Ten Eyck receives an offer from Atlas and negotiates with others.**

In 2010, Ten Eyck held oil and gas rights to 625 acres in northern Michigan.  Dkt. 1, ¶ 36.  This acreage included the right to explore and drill for oil or gas from the Utica/Collingwood formations.  *Id.*  In the wake of the State's May auction, private landowners were receiving offers of more than $3,000 per acre in June of 2010.  Dkt. 1, ¶ 41.  In or around this same time, Ten Eyck became aware of these substantial bonuses.  Dkt. 1, ¶ 42.

On May 14, 2010, Ten Eyck received a written offer from Atlas Oil and Gas Company ("Atlas") to lease Ten Eyck's minerals rights.  Dkt. 1, ¶ 44.  Atlas's offer included a $750 per acre bonus on all of Ten Eyck's 625 acres, located in Kalkaska County.  *Id.*  But, knowing the bonuses being paid after the May auction for mineral rights within the vicinity of Ten Eyck's property, Ten Eyck sought additional bids.  *Id.*

On May 21, 2010, Ten Eyck engaged the services of Topp Law as counsel and to assist Ten Eyck in putting its property out for bid in the presently very competitive leasing market.  Dkt. 1, ¶ 100.  Bids were solicited for Ten Eyck's property from numerous companies, including Encana, Energy West, Western Land Services, and others.  Dkt. 1, ¶ 104.  While Ten Eyck was entertaining bids, top officials at Chesapeake and Encana hatched a "joint strategy" to avoid bidding against one another, and their affiliates, with the objective of depressing the prices both were paying for Utica/Collingwood acreage.  Dkt. 1, ¶ 45.

By June 6, 2010, after having had initial discussions (the content of which is unknown to Ten Eyck at this time),[1] Chesapeake VP Doug Jacobson sent an email to Encana USA VP John Schopp, copying Aubrey McClendon, Chesapeake's CEO, and Jeff Wojahn, Encana USA's president, stating, "Sorry for the delay in getting back to you here. . . Our proposal is pretty simple, but hopefully should be effective for us both. . . ."  Dkt. 1, ¶ 46.  Jacobson proposed a strategy to avoid competing over leases that included swapping land already leased in Michigan and dividing up counties and private landowners where new leases might be secured. "ECA would be responsible for new leasing in Charlevoix, Cheboygan, Missaukee and western Roscommon Counties while CHK would be responsible for leasing in Emmett [sic], Antrim, Kalkaska, western Otsego and western Crawford counties."  The non-buying company would have "the option of acquiring 50% of the acreage acquired by the other . . . on the same terms as the initial acquiring party."  *Id.*  The next day, Schopp replied (adding Encana CEO Randy Eresman to the thread), "This looks like a great start."  Dkt. 1, ¶ 47.

### C.     Ten Eyck continues to negotiate with others and receives additional offers from Energy West and Silver Lake.

On June 9, 2010, Couturier at Silver Lake sent Ten Eyck a "Solicitation Letter."  Dkt. 1, ¶ 93; Dkt. 1-8.  In that Solicitation Letter, Silver Lake represented, in pertinent part here, that it was interested in oil and gas rights in Ten Eyck's area, wanted to make Ten Eyck a "very attractive offer" for its mineral rights, and would give Ten Eyck the "best offer available" based on where the property fell within Silver Lake's area of interest.  *Id.*

---

[1] With discovery not yet begun, Ten Eyck currently possesses only a fraction of the relevant information that will prove its claims, including (1) the small handful of email correspondence obtained from filings in *Encana Oil and Gas (USA) Inc., v. Zaremba Family Farms et al.*, No. 1:12-cv-00369-PLM (W.D. Mich. Dec. 3, 2013), and (2) the email correspondence and other documents identified in news reports.  Further information clearly exists about acts taken by Encana and Chesapeake to allocate bid responsibility, including the discussions pre-dating this June 6 email exchange, but that information is in the custody and control of Encana and Chesapeake.

On June 16, 2010, Silver Lake, via Couturier, emailed Ten Eyck confirming that it wanted to acquire Ten Eyck's mineral rights. Dkt. 1, ¶ 94. That same day, June 16, Ten Eyck informed Couturier that it was entertaining other bids and invited Silver Lake to submit an offer including royalty percentage, bonus payment, and primary and secondary terms. *Id.* The next day, June 17, 2010, Couturier presented Ten Eyck with a Letter of Intent, offering to lease Ten Eyck's minerals for the following terms: 3/16 royalty, $1,500 per acre bonus, primary term of 5 years, and secondary term of 5 years. Dkt. 1, ¶ 97. Five days later, on June 22, 2010, Ten Eyck received a written offer from Energy West, leasing on behalf of Encana. Dkt. 1, ¶ 98. Energy West offered to lease Ten Eyck's Excelsior Township acreage at a 3/16 royalty and $1,750 per acre bonus. *Id.*

On July 7, 2010, Ten Eyck informed Couturier of Energy West's offer. Dkt. 1, ¶ 98. In response, Couturier told Ten Eyck to forget the Letter of Intent (as that was only to buy time) and now he wanted to get the actual oil and gas lease signed. *Id.* He also increased his lease bonus offer to $1,750 on all 625 acres to match the per acre bonus offered by Energy West. *Id.* He also "advised" Ten Eyck not to sign with any of its competitors, as Silver Lake (and Chesapeake) wanted to be the "last bidder." *Id.* That same day, shortly after the phone call, Couturier conveyed to Ten Eyck that he was increasing the bonus per acre to $1,800 and, in turn, sent Ten Eyck an oil and gas lease form that would be used along with the previously offered terms of a 3/16th royalty, $1,800 per acre bonus, and 5 plus 5 year terms. Dkt. 1, ¶ 99.

Relying on Silver Lake's offer and other promises (to consummate a lease), Ten Eyck, through its counsel, accepted Silver Lake's offer on July 15, 2014. Dkt. 1, ¶ 100.

D.   **While offers from Atlas, Energy West, and Silver Lake are pending, Encana and Chesapeake enact their scheme to depress prices.**

While Ten Eyck was entertaining bids and accepting its lease with Chesapeake, Encana set into motion its "joint strategy" to depress lease price offerings in northern Michigan. Dkt. 1, ¶ 45. Encana's acts in furtherance of this "joint strategy" kicked off no later than the June 6, 2010 email from Jacobson to

Schopp (described in detail above). That June 6 email kicked off a series of communications between Encana and Chesapeake, both written and verbal, about how to allocate bidding responsibility.

For example, on June 15, 2010, Jacobson sent an email to Schopp suggesting that they discuss plans to split up where and from whom each company would lease land in Michigan. Dkt. 1, ¶ 50. The reasoning he gave to Schopp was the following: "when you are back in the saddle, I'd like to visit with you about the implications of the impact of our competition on acreage prices and whether or not the sooner we do this the better shot we have of keeping acreage prices from continuing to push up." *Id.* Later that same day, on June 15, 2010, Chesapeake CEO Aubrey McClendon forwarded Jacobson's June 6 email proposing county and landowner bid allocation to Encana USA CEO Jeff Wojahn and Encana CEO Randy Eresman. Dkt. 1, ¶ 51. McClendon assured Eresman that Chesapeake was working toward their agreement: "Fyi, pushing from our end to save us both some money, Aubrey." *Id.* Eresman responded: "Agreed. The sooner the better. Thanks for continuing to move this forward." *Id.*

On June 16, 2010, McClendon sent an email to Jacobson and others at Chesapeake stating that it was time "to smoke a peace pipe" with Encana "if we are bidding each other up." Dkt. 1, ¶ 52. In response, Jacobson reported to McClendon that he had contacted Encana "to discuss how they want to handle the entities we are both working to avoid us bidding each other up in the interim." Dkt. 1, ¶ 53. McClendon replied, "Thanks." *Id.* A Chesapeake internal document dated June 16, 2010, setting forth a summary of Michigan land deals, confirmed that McClendon "does not want to complete [sic] with Encana on this deal if CHK is interested." Dkt. 1, ¶ 54.

Thereafter, Encana coordinated its bids for oil and gas interests of private landowners in part through the exchange of drafts of a purported "area of mutual interest" agreement. Dkt. 1, ¶¶ 57, 60. These drafts expressly communicated those areas and landholders over which Encana would have exclusive bidding responsibility, and those over which Chesapeake would have exclusive bidding responsibility. Dkt. 1, ¶¶ 61, 62. This exchange of drafts and related discussions did not result in

5

Chesapeake and Encana actually entering into an area of mutual interest agreement.  Dkt. 1, ¶ 63.  That proved unnecessary, as Encana, with the help of Chesapeake, was able to achieve its intended and true purpose of dividing the northern Michigan market, coordinating their offers to mineral rights owners, and ultimately depressing prices and competition in the market.  *Id.*  The exchange of drafts and discussions surrounding this purported "area of mutual interest agreement" was nothing more than a sham vehicle used by Encana and Chesapeake to facilitate illegal and anticompetitive planning to depress lease offerings.  *Id.*

Encana and Chesapeake's conspiracy had immediate effects on market prices.  Dkt. 1, ¶ 64.  In the weeks after the discussions began, Encana and Chesapeake sharply cut the prices they were offering for land in Michigan, and average lease prices sharply plunged in areas that had been hotly contested.  *Id.*  At the time, Chesapeake and Encana, often acting through their representatives or affiliates, were the largest lease buyers in Michigan.  *Id.*

E.      Chesapeake reneges on its agreement with Ten Eyck.

On July 21, 2010, Ten Eyck's counsel received a telephone call followed by an email from Couturier where he purported to rescind Silver Lake's already accepted offer, Dkt. 1, ¶ 102; stating that Silver Lake is rescinding all offers, are only leasing in certain areas and any bonus would be limited to $500 with a 1/6 royalty.  *Id.*  Thus, despite the offer, acceptance, and agreement on all material terms in the lease, Silver Lake refused to honor its agreement.  *Id.*  This proved to be part of a larger scheme by Encana and Chesapeake to renege on leases agreed to earlier that summer, only to return and pick up leases at the State of Michigan's October auction for pennies on the dollar.  Dkt. 1, ¶¶ 65-76.  That included, for example, Encana reneging on its Letter of Intent agreement with the Zarembas on July 15, 2010. Dkt. 1, ¶¶ 65.

LEGAL ARGUMENT.

A.      Standard of review.

This Court has recognized that, even after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a

defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) faces a heavy burden:

> Our Circuit cautions that district courts should not overstate the hurdle that *Twombly* establishes for plaintiffs to survive a Rule 12(b)(6) or Rule 12(c) motion:
>
> In *Erickson v. Pardus*, decided two weeks after *Twombly*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" The opinion in Erickson reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." We read the *Twombly* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*JDC Management v. Reich*, 644 F. Supp. 2d 905, at 943-44 (W.D. Mich. 2009) (citations omitted)(citing

*Tucker v. Middleburg-Legacy Place,* 539 F.3d 545, 550 (6th Cir. 2008)).

B.      Applying the *Twombly* standard here, Ten Eyck need only plead enough facts regarding tortious interference to raise a reasonable expectation that discovery will reveal further evidence.

The elements of a claim for tortious interference with a business expectancy are: "(1) the existence

of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; (2)

knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference

inducing or causing the breach or termination of the relationship or expectancy; and (4) resultant damage to

the party whose relationship or expectancy has been disrupted."  *Northern Plumbing & Heating, Inc. v.*

*Henderson Bros., Inc.,* 268 N.W.2d 296, 299 (Mich. App. 1978).

Post-*Twombly*, Ten Eyck's pleadings need not prove that the existence of each element was "probable or certain," *NorthStar Energy LLC v. Encana Corp.*, Case No. 1:13-cv-00-PLM, Dkt. 37 p. 22 (W.D. Mich. Mar. 10, 2014), or "tend[] to exclude the possibility of independent action by the [defendants]." *Erie County v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) (the presentation of evidence that tends "to exclude the possibility of lawful, independent conduct" is required at the summary judgment – not the pleading – stage of a lawsuit).  Instead, *Twombly* "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting one's claims.  *Twombly*, 550 U.S. at 556; *see also NorthStar* at 22.  But, when, as here, the proof of the anticompetitive scheme is largely in the hands of the conspirator (and its co-conspirators), dismissal – prior to discovery – is rarely appropriate.  *NorthStar at 22*; *see also*, *Ohio Willow Wood Co. v. Alps S. LLC*, 2011 WL 1237582, at *11 (S.D. Ohio Mar. 29, 2011)("[D]ismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly").

> C.    **Ten Eyck's Complaint adequately pled direct evidence regarding its reasonable business expectancies, which Encana interfered with.**

In order to assert a claim for tortious interference with a business expectancy, Michigan law requires a plaintiff to allege "more than a mere hope for a future business opportunity or the innate optimism of the salesman."  *In re Baseball Antitrust Litig.*, 75 F. Supp. 2d 1189, 1203-1204 (D. Kan. 1999) (applying Michigan law) (internal quotation marks and citations omitted). But, it does not require allegations to demonstrate a "guaranteed relationship[,] . . . because anything that is prospective in nature is necessarily uncertain, and *we are not here dealing with certainties, but with reasonable likelihood or probability.*" *Id.* (emphasis added); *see also Hoffman v. Roberto*, 85 B.R. 406, 416 (W.D. Mich. 1987) (plaintiff must show "reasonable expectation of profit, not mere wishful thinking"). A sufficient expectation for a tortious interference claim can be alleged by identifying specific third parties (or an identifiable

prospective class of third persons) with whom the plaintiff has *a reasonable expectation of doing business*. *Id.; see also Wilkerson v. Carlo*, 300 N.W.2d 658, 659-660 (Mich. App. 1980).

Ten Eyck has met its burden here. In its Complaint, Ten Eyck identifies specific parties with whom it did not merely have a reasonable expectation of doing business with, but from whom it had *received actual offers*. Specifically, Ten Eyck's pleadings identify offers from three separate entities: Atlas, Energy West, and Silver Lake. Dkt. 1, Compl. ¶¶ 92-100; ¶ 104; Dkt. 1-5. Each of these offers was pending when Encana took acts which interfered with those offerings, as explained below. And each offer had the essential terms that, if accepted, would have bound the respective buyer and Ten Eyck to an enforceable lease. *Brennan v. Duncan*, 27 N.W.2d 320, 322-323 (Mich. 1947) (holding that an offer to sell real estate can be accepted at any time before its withdrawal); *see also Ten Eyck's Response Brief to Chesapeake's Motion to Dismiss*, pp.12-13.

Accordingly, Encana interfered with Ten Eyck's reasonable business expectancy represented by each of these then-pending offers. Before Encana's interference, Ten Eyck had a reasonable expectation that each of the acquiring parties, whether Atlas, Energy West, or Silver Lake, was dealing in good faith and from an arm's length position and it would not disregard its offered lease terms (if accepted) or be induced to withdraw its offer due to improper or anticompetitive inference. But, as explained in detail below, it can be reasonably inferred from Ten Eyck's pleadings that Chesapeake, Silver Lake, and Encana (via Energy West) were not negotiating in good faith or from an arms' length position with Ten Eyck and their actions induced the termination of each of these offers. Such offers were not "wishful thinking" on Ten Eyck's part, as Encana argues, but real, pending business expectancies. And that, but for Encana (and Chesapeake's) acts of interference, Ten Eyck would have accepted and consummated a deal under one of these offers. Dkt. 1, ¶¶ 121-22.

Contrary to Encana's assertion, this Court's decision in *NorthStar Energy LLC v. Encana Corp., et al.*, does not support Encana's position here. In *NorthStar*, this Court dismissed NorthStar's tortious

interference claim against Encana, holding that NorthStar's advantageous leasehold position in the northern Michigan market, *on its own*, was not sufficient to form a reasonably likely business relationship or expectation that it "could receive [bids of] $3,000 or more an acre."[2] *Northstar,* Case No. 1:13-cv-00200-PLM, Dkt. 37 pp. 15-16. However, Ten Eyck has not merely alleged, as Encana asserts, "the hope that if it had continued to entertain bids instead of accepting Chesapeake/Silver Lake's bid, it would have sold its rights to a different competitor at peak profitability."[3] *Id.* Rather, Ten Eyck has identified three separate parties with pending offers for its acreage.

Such pending, written offers from *others* – which were passed over due to the interference – are valid business expectancies. *ParaData Computer Networks, Inc. v. Telebit Corp.*, 830 F. Supp. 1001, 1007 (E.D. Mich. 1993) (holding it sufficient to allege that a pending offer was passed on due to a false and maliciously made offer to buy); *see also Kennedy v. Kennedy*, 819 S.W.2d 406 (Mo. App. 1991) (finding that valid business expectancy existed based on allegations showing negotiations between plaintiffs and Forest Service for exchange of property and statement of intent setting forth broad terms of agreement); *Dowd. v. Iantosca*, 538 N.E.2d 33 (Mass. 1989) (finding a prospective contractual relationship existed even where prospective buyer of real property had failed to sign purchase agreement until after offer expired); *Martin v. Wing*, 667 P.2d 1159 (Wyo. 1983) (holding that valid prospective contractual relationship existed where prospective homebuyer's initial offer had lapsed but homebuyer remained in contact with sellers); *Baker v. Dennis Brown Realty, Inc.*, 433 A.2d 1271 (N.H. 1981) (holding that prospective purchaser's offer

---

[2] There is no blanket rule of law in Michigan that "the competitive bidding process does not rise to the requisite level of a business expectancy. " Neither *NorthStar* nor *Midwest Auto Auction, Inc. v. McNeal*, No. 11-14562, 2012 WL 3478647, at *7 (E.D. Mich. Aug. 14, 2012) stand for such a rule. It is also significant that, although *Midwest Auto* dismissed an interference claim by a disappointed bidder in a county auction, alleging interference by the winning bidder and the seller, that court – in making its decision – did say that, if the *seller* had made the claim against the *bidders*, it would likely have been actionable.

[3] Encana asserts that "the 'business expectancy' identified by Ten Eyck is only its expectation that it would receive lucrative future bids from oil and gas companies other than Chesapeake" in the future. Dkt. 7, p. 7. This is incorrect. As stated above, Ten Eyck's business expectancies included the written offers it *had already* received from Silver Lake, Atlas and Energy West.

to buy a home was sufficient to create a prospective business relation and that interference with this relation was actionable).[4]  And, at the very least, Ten Eyck should be permitted discovery on this issue. *Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, 2009 WL 3460334, at *5, *16-18 (E.D. Mich. Oct. 22, 2009) (existence of a valid business expectancy is a question of fact appropriately left for summary judgment or trial).

> ### D.  Ten Eyck's pleadings plausibly suggest that Encana (and the conspiracy) targeted Ten Eyck.

Despite Encana's assertions to the contrary, Ten Eyck has plausibly alleged that Encana, as well as Chesapeake and Silver Lake, "knew of its business relationships and expectancies with the others making offers for Ten Eyck's mineral rights."  Dkt. 1, ¶ 124.  That knowledge by Encana can reasonably be inferred from the follow sequence of events:

- No later than June 6, 2010, top officials at Chesapeake and Encana hatched their plan to depress market prices by dividing up responsibility for new leasing by market and by landowner, with each company having "the option of acquiring 50%" of what the other acquired. Dkt. 1, ¶¶ 7, 46.

- Such a proposal was made at a time when Chesapeake already knew about advantageous position of Ten Eyck's acreage, via a May 20, 2010, email from Ten Eyck to the Chesapeake's land leasing mailbox, and after receipt of Atlas's offer to Ten Eyck on May 14, 2010.  Dkt. 1, ¶¶ 92, 104.

- By June 9, 2010, Chesapeake, via its affiliate Silver Lake, had identified Ten Eyck as a property it wanted to acquire, and sent Ten Eyck a "Solicitation Letter" saying Chesapeake wanted to make the "best offer available" based upon where the property fell in Chesapeake's area of interest.  Dkt. 1, ¶ 93.

---

[4] Encana also relies on *New York Carpet World, Inc. v. Grant*, 912 F.2d 463 (4th Cir. 1990).  Its brief states that the Fourth Circuit held that "a leasing offer made to Plaintiff was insufficient to create a reasonable certainty that Plaintiff would have accepted the offer, absent the alleged interference, and thus there was no cognizable business expectancy."  Dkt. 7, p. 8. In *Grant*, the Fourth Circuit reached that determination only *after* the trial court conducted a bench trial and made an evidentiary finding that the plaintiff "was not certain to have renewed the lease had Grant not misrepresented the status of the lease . . . ." *Grant*, 912 F.2d at *2. The holding in *Grant* has no bearing on the sufficiency of Ten Eyck's tortious interference claims at the pleading stage.

- By June 17, 2010, Chesapeake had prepared and provided Ten Eyck with an LOI to lease all of Ten Eyck's acreage for a "3/16 royalty, $1,500 per acre bonus, primary term of 5 years, and secondary term of 5 years."  Dkt. 1, ¶ 95.

- Five days later, on June 22, 2010, Energy West offered to acquire Ten Eyck's mineral rights on the same basic terms, except Energy West offered a bonus price of "$1,750 per acre."  Dkt. 1, ¶ 104.

That same day as Energy West's offer, June 22, an Encana executive team met in Calgary, Alberta, and voted to move forward with its joint efforts with Chesapeake to coordinate bidding in northern Michigan.  Dkt. 1, ¶ 58.  After that, Chesapeake, Encana, and their affiliates coordinated their bidding efforts under the guise of a purported "area of mutual interest" agreement.  Dkt. 1, ¶ 60.  Only Silver Lake ended up making a subsequent offer on July 7, 2010, which Ten Eyck accepted.  Dkt. 1, ¶¶ 98-100.

Several reasonable inferences can be drawn from the above sequence of events.  *First*, Ten Eyck's acreage fell into the "area of mutual interest" where Chesapeake and Encana wanted to acquire mineral rights.  *Second*, since the offers from Atlas, Energy West, and Silver Lake occurred before or in the midst of the conspiracy's allocation of bid responsibility, including who would handle Kalkaska County (where Ten Eyck's acreage was located), it is reasonable to infer that the conspirators discussed Ten Eyck, including how to resolve their then-competing offers to Ten Eyck.

Finally, even based on the limited information currently available to Ten Eyck, Ten Eyck has alleged a sufficient factual basis to reasonably infer that Encana took or participated in acts to further the conspiracy that interfered with Ten Eyck's offers from Atlas, Energy West, and Silver Lake, as well as Ten Eyck's agreement to lease with Silver Lake.  That includes Encana:

- coordinating a mid-July lease price reduction of 50% or more with Chesapeake, Dkt. 1, ¶¶ 65-66;

- reneging on deals with other mineral owners, including Encana and Chesapeake's coordinated and simultaneous exit from their negotiations and Encana reneging on its LOI agreement with the Zarembas on July 15, 2010,  Dkt. 1, ¶ 65;

- continuing to exchange proprietary information (with its purported arch-enemy) in June-July 2010, which can reasonably be inferred to include how to handle or dispose of the Ten Eyck acreage, Dkt. 1, ¶¶ 45-62; and

- agreeing (or conspiring with Chesapeake to agree to) leases with private landowners in May, June and early/mid-July to prevent them from entertaining bids from other potential purchasers (leases, which – in the end – they did not honor); and stringing those landowners along until those involved in the conspiracy had the opportunity to speculate the market or to "reset" the pricing level for such mineral rights, Dkt. 1, ¶ 7;

- all of which culminated in Encana's purported departure from the northern Michigan market, only to return to collude with Chesapeake and buy acreage for pennies on the dollar at the State's October auction. Dkt. 1, ¶¶ 7-9.

It is reasonable to infer that, but for these and other not yet discovered acts by Encana in furtherance of the conspiracy, Ten Eyck would have consummated a lease deal with Atlas, Energy West, or Silver Lake. And, since the proof of the full extent of Encana's affirmative acts of interference is in its own and its co-conspirator's hands, discovery is appropriate there. *NorthStar*, Case No. 1:13-cv-00200-PLM, Dkt. 37, p. 22; *see also*, *Dean v. Sypniewski*, No. 11-10249, 2012 WL 6567608, at *5-6 (W.D. Mich. 2012) (stating that requirement of showing "specific, affirmative acts" corroborating complaint's inference of wrongful conducts applies at summary judgment stage, not pleadings stage) *report and recommendation accepted*, 2012 WL 6567601 (E.D. Mich. Dec. 17, 2012).

In any event, contrary to Encana's argument, the requirement that "a plaintiff must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference[,]" *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 292-93 (Mich. App. 1988), does not apply to Ten Eyck's tortious interference claim in this case. *See also* Dkt. 7, p. 11. As the other cases cited by Encana make clear, the required showing of "specific, affirmative acts" applies only where a plaintiff's tortious interference claim is based on the intentional performance of a lawful act for an unlawful purpose, as opposed to *per se* wrongful conduct:

13

> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship. *Under the latter instance*, plaintiff necessarily must demonstrate, with specificity, affirmative acts by the interferor which corroborate the unlawful purpose of the interference."

*Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. App. 1984) (emphasis added); *accord Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 287 (6th Cir. 2010) ("To establish that a *lawful act was done with malice and without justification*, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference.") (emphasis added); *Spectrum Cubic, Inc. v. Grant Prods. de Mexico, S.A. de C.V.*, 2013 WL 504650, at *6 (W.D. Mich. Feb. 8, 2013) (same). Ten Eyck's Complaint contains numerous allegations regarding Encana's anticompetitive activities in its antitrust claims – claims that Encana does not challenge in its motion.  *See, e.g.*, Dkt. 1, ¶¶ 7-11, 45-63; s*ee also* Dkt. 7, p. 1. These facts are more than sufficient to satisfy Ten Eyck's obligation to allege Encana's improper interference with Ten Eyck's business expectancies.

Moreover, Encana cannot distinguish this case from *Encana Oil & Gas, Inc. v. Zaremba Family Farms et al.*, No. 1:12-cv-00369-PLM, Dkt. 181 (W.D. Mich. Dec. 3, 2013).  In *Zaremba,* the Court held that sufficient facts had been pled for Zaremba to proceed against Encana based on Encana's per se wrongful conduct and tortious interference with the business relationship between the Zarembas and Chesapeake (which is no different than Plaintiff's allegations of per se conduct by Encana that amount to tortious interference with the business relationship between Plaintiff and Chesapeake and Atlas).  *Id.* at 22.  As this Court found "[b]ecause Encana had no intention of negotiating or completing a final agreement, the offer itself interfered with a business relationship between the Zarembas and Chesapeake.  The Zaremba's motivation for accepting the offer from Encana, rather that the offer from Chesapeake, was premised on incomplete and faulty information."  *Id.*

E.    Encana's interference prevented Ten Eyck from consummating any deal for its acreage.

Encana argues that Ten Eyck's pleadings must fail because they fail to allege that any third party was induced or prevented from entering or continuing a business relationship or expectancy with Ten Eyck. Dkt. 7, p. 9. That is not correct. Instead, Ten Eyck alleges that, in the aftermath of the State's May auction, Encana and Chesapeake began to hatch a collusive scheme that affected Ten Eyck and numerous other private landowners:

> [O]fficials at the very highest levels of Chesapeake and Encana conspired to depress prices for mineral rights interests in northern Michigan by dividing responsibility for dealing with private landowners on a county-by-county basis; agreeing to leases with such landowners to prevent them from entertaining bids from other potential purchasers (leases, which – in the end – they did not honor); and stringing those landowners along until those involved in the conspiracy had an opportunity to "reset" the pricing level for mineral rights interests at the State's next auction in October 2010.

Dkt. 1, ¶ 7. The Complaint is replete with examples of Encana's *per se* wrongful acts of interference – occurring from May 14, 2010 to July 15, 2010, the period of time that Ten Eyck held pending offers from Atlas, Energy West, and/or Silver Lake. Acts which were intended to and, in the end, did interfere with Ten Eyck's business expectancies with each of these companies. They include:

- Encana's vice president, John Schopp, sent an e-mail to Chesapeake's vice president, Doug Jacobsen on June 7, 2010, offering suggestions on how to "maximize [the] effectiveness" of a collusive scheme between Encana and Chesapeake, suggesting that the parties split landowners into two groups so as to avoid bidding against each other. Dkt. 1, ¶ 47.

- Encana's Schopp sent another e-mail on June 17, 2010 to Jacobson at Chesapeake, stating that he felt "that combining forces will be helpful for preventing further [market price] inflation[,]" and that "[a]fter a time, [Encana and Chesapeake] might benefit from some deflation as well." Dkt. 1, ¶ 55.

- Encana's Schopp met with Encana's "executive team", including Encana CEO Randy Eresman and Encana USA CEO Jeff Wojhan, on June 22, 2010 and reported that the objective of Encana's negotiations with Chesapeake was to remove the tug of war between the two competitors for mineral rights in northern Michigan. Dkt. 1, ¶ 58.

- After June 22, Encana coordinated bidding with Chesapeake on the oil and gas interests of private landowners. Dkt. 1, ¶ 60.

15

In the end, Encana and Chesapeake "achieve[d] their intended and true purpose of dividing the northern Michigan market, coordinating their offers to mineral rights owners, and ultimately depressing prices and competition in the market." Dkt. 1, ¶ 63.

Once Chesapeake was assured that it could reset the market for northern Michigan mineral rights through its collusion with Encana, namely when Encana temporarily "exited" the market on July 15, Chesapeake was able to string Ten Eyck along and ultimately renege on its lease. Dkt. 1, ¶ 10. It can also plausibly be inferred here that Encana's pursuit of the anticompetitive scheme:

- prevented Energy West from making any further offers to Ten Eyck after June 22, 2010, when Encana's executive team in Calgary, Alberta voted to move forward with the "joint strategy" with Chesapeake;

- induced Silver Lake to dishonor its agreed to lease with Ten Eyck; and

- induced Atlas to withdraw its offer to Ten Eyck, after the conspiracy crashed the market.

And, finally, despite Encana's argument to the contrary, it is enough for Ten Eyck to allege, as it has here, that Encana's wrongful conduct "ended a business relationship" by inducing *Ten Eyck* to terminate its negotiations with Atlas and Energy West. *Wilkey v. Hull*, 366 Fed. App'x 634 (6th Cir. 2010); *see also, ParaData Computer Networks,* 830 F. Supp. at 1007. Encana cannot escape liability for a tortious inference claims at the pleading stage by asserting that shutting down of leasing and reneging on agreements with minerals owners was for "legitimate" – rather than anticompetitive or other wrongful – reasons. *Jim Bob, Inc. v. Mehling*, 443 N.W. 2d 451, 463 (Mich. App. 1989) ("[A] defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right."); *see also Barrette Outdoor Living, Inc. v. Michigan Resin Representatives, LLC,* 2012 WL 760925, at *6 (E.D. Mich. Mar. 8, 2012) (denying motion to dismiss tortious

interference claim notwithstanding defendants' contention that their conduct was "motivated by legitimate business reasons").[5]

III.    CONCLUSION.

Based on the foregoing, Ten Eyck respectfully requests that this Court deny Encana's Motion to Dismiss in its entirety.

Dated: July 16, 2014                    By: /s/ David R. Whitfield
                                        Brian J. Masternak (P57372)
                                        Charles N. Ash, Jr. (P55941)
                                        Lance R. Zoerhof (P63980)
                                        David R. Whitfield (P73352)
                                        900 Fifth Third Center
                                        111 Lyon Street NW
                                        Grand Rapids, MI 49503-2487
                                        bmasternak@wnj.com
                                        cash@wnj.com
                                        lzoerhof@wnj.com
                                        dwhitfield@wnj.com
                                        616.752.2000
                                        Attorneys for Plaintiff

---

[5] Moreover, Encana would be hard-pressed to argue that violations of antitrust laws can ever serve a *legitimate* business purpose.