## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

—————————

THE TEN EYCK MINERAL TRUST,
BY C. ANDREW TEN EYCK, TRUSTEE,

        Plaintiff,

vs.

CHESAPEAKE ENERGY CORPORATION,
SILVER LAKE ENERGY, LLC,
ENCANA CORPORATION and
ENCANA OIL & GAS, (USA) INC.

        Defendants,

Case No.: 1:14-cv-00201

Honorable Gordon J. Quist

---

## PLAINTIFF TEN EYCK MINERAL TRUST'S RESPONSE TO DEFENDANT CHESAPEAKE ENERGY'S MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

A.    Encana Discloses Test Results from a Promising New Oi and Gas
      Play in Michigan ........................................................................................ 2

B.    Encana and Chesapeake Fiercely Compete for State Leases and Pay Top Dollar ........... 2

C.    Ten Eyck Receives Solicitations Regarding its Acreage and Enters an
      Agreement with Chesapeake's Agent, Silver Lake ................................................. 3

D.    Senior Executives at Encana and Chesapeake Collude to Depress Prices ..................... 6

E.    Chesapeake Reneges on its Agreement with Ten Eyck ......................................... 8

F.    Chesapeake's Overall Scheme to Renege on Oil and Gas Agreements ....................... 8

G.    Encana and Chesapeake Do Not Compete in the Second State
      Lease Sale - Prices Plummet ...................................................................... 10

LAW AND ARGUMENT ....................................................................................... 10

A.    Standard of Review .................................................................................. 10

B.    Ten Eyck's Complaint States an Adequate Claim for Breach of Contract .................... 11

      1.    Ten Eyck Adequately Pled the Existence of a Contract
            Between the Parties ........................................................................ 11

            a.    Ten Eyck Plead a Meeting of the Minds ........................................ 11

            b.    The Parties Reached Agreement on all Essentional Terms .................... 12

      2.    The Statute of Frauds does Not Bar Ten Eyck's Contract Claim ...................... 13

      3.    Ten Eyck's Quasi-Contract Claim is Adequately Pled ................................ 15

            a.    Good Faith and Fair Dealing ...................................................... 15

            b.    Ten Eyck Sufficiently Pled that Chesapeake was
                  Unjustly Enriched ................................................................ 16

      4.    Ten Eyck's has Sufficiently Pled its Tortious Interference Claim ..................... 17

            a.    Ten Eyck has sufficiently pled a "reasonably likely" business
                  expectancy with which Chesapeake interfered ................................ 17

            b.    Chesapeake committed both per se wrongful and malicious acts ............ 18

      5.    Ten Eyck's Adequately Pled a Fraud Claim Against Chesapeake ..................... 20

            a.    Statements (1) and (2) are pled with particularity ............................ 21

            b.    Statements (3) and (4) are false ................................................ 21

            c.    Statements (6) - (9) are not statements of future expectation ................ 22

i

6.      Ten Eyck has Adequately Pled a Fraudulent Inducement

        Claim Against Chesapeake ...................................................................................24

CONCLUSION        ...................................................................................................................25

## TABLE OF AUTHORITIES

**Federal Cases**

*Barrette Outdoor Living, Inc. v. Mich. Resin Representatives, LLC*
2012 WL 760925 (E.D. Mich Mar. 8, 2012) .............................................................................. 19, 20

*Consol. Rail Corp. v. Grand Truck W. RR.*
2009 WL 3640334 (E. D. Mich. Oct. 22, 2009) .............................................................................. 18

*Dansbury v. EOG Res. Inc.*
2014 WL 2737841 (M.D. Penn. June 13, 2014) .............................................................................. 17

*DirectTV, Inc. v. Treesh*
487 F.3d 471 (6th Cir. 2007) ..................................................................................................... 1, 11

*Dow Chem. Co. v. Gen. Elec. Co.*
2005 WL 1862418 (E.D. Mich. Aug. 4, 2005) ................................................................................ 14

*Encana Oil & Gas, Inc. v. Zaremba Family Farms*
No. 1:12-cv-00369-PLM (W.D. Mich. Dec. 3, 2013) ...................................................... 19, 20, 24, 25

*Faber v. FJH Music Co., Inc.*
2007 WL 1098259 (E. D. Mich. 2007) .......................................................................................... 18

*Gillis v. Wells Fargo Bank, N.A.*
875 F. Supp. 2d 728 (E.D. Mich. 2012) ........................................................................................ 14

*Hoffman v. Roberto*
85 B.R. 406 (W. D. Mich. 1987) .................................................................................................... 17

*Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*
2008 WL 205209 (E. D. Mich. Jan 22, 2008) ................................................................................ 21

*In re Baseball Antitrust Litig.*
75 F. Supp. 2d 1189 (D. Kan. 1999) ............................................................................................. 17

*JDC Management LLC v. Reich*
644 F. Supp 2d 905 (W.D. Mich. 2009) ........................................................................................ 10

*LULAC v. Bredesen*
500 F.3d 523 (6th Circ. 2007) ...................................................................................................... 17

*Mich. Reg'l Council of Carpenters v. New Century Bancorp, Inc.*
99 F. App'x 15 (6th Cir. 2004) ................................................................................................. 14, 15

*Oakrock Exploration Co. v. Killam.*
87 S.W.3d 685 (Tex. App. 2002) .................................................................................................. 12

i

*Paradata Computer Networks, Inc. v. Telebit Corp.*
830 F. Supp. 1001 (E. D. Mich. 1993) ......................................................................................... 18

*Ryan v. United States*
136 U.S. 68 (1890) ....................................................................................................................... 14

*Saab Auto AB v. GMC*
953 F.Supp.2d 782 (E. D. Mich. 2013) ........................................................................................ 18

*Tucker v. Middleburg Legacy Place*
539 F.3d 545 (6th Circ. 2008) ...................................................................................................... 10

**State Cases**

*Brennan v. Duncan*
27 N.W.2d 320 (Mich 1947) ........................................................................................................ 18

*Foreman v. Foreman*
701 N.W.2d 167 (Mich. App. 2005) ............................................................................................. 24

*In re Camfield Estate*
88 N.W.2d 388 (Mich. 1958) ..................................................................................................... 162

*Jim Bob, Inc. v. Mehling*
433 N.W.2d 451 (Mich. App. 1989) .................................................................................. 18, 20, 24

*Kelly-Stehney & Assoc., Inc. v. MacDonald's Indus. Prods., Inc.*
693 N.W.2d 394 (Mich. App. 2005) ..................................................................................... 11, 14

*Keywell & Rosenfeld v. Bithell*
657 N.W.2d 759 (Mich. App. 2002) ............................................................................................. 16

*Krammer Asphalt Paving Co., Inc. v. East China Twp. Sch.*
504 N.W.12d 635 (Mich 1993) ..................................................................................................... 16

*Opdyke Inv. Co. v. Norris Gran Co.*
320 N.W.2d 836 (Mich 1982) ....................................................................................................... 11

*Van Tassel v. McDonald Corp.*
407 n.w.2D 6 (Mich. App. 1987) .................................................................................................. 23

*Zurcher v. Herveat*
605 N.W.2d 329 (Mich. App. 1999) ............................................................................................. 13

**Other**

Restatement (First) of Restitution § 1 cmt. b (1937) ) ............................................................. 16,17

## INTRODUCTION

In its Motion to Dismiss, Chesapeake places the cart in front of the horse. Instead of arguing based on the proper standard applicable to a motion to dismiss – one which takes the allegations in the Complaint as true, construes them in Ten Eyck's favor, and draws all reasonable inferences in Ten Eyck's favor – Chesapeake postures its arguments as ones made for summary judgment. But not only is Chesapeake's framework for analysis incorrect in the context of a motion to dismiss, it also wrongfully assumes that Ten Eyck has had the benefit of discovery in this matter (as Ten Eyck would have in the summary judgment context). At this early pleading stage, Ten Eyck has not had the benefit of discovery. Even without it, Ten Eyck has alleged the requisite facts for each of its causes of action.

Stated simply, Ten Eyck alleges that Chesapeake (through its agent) reached an agreement to lease Ten Eyck's 625 mineral acres during July of 2010. But, after that deal was struck, Chesapeake reneged on its prior agreement. While Chesapeake attempts to isolate each document comprising the agreement and ignore the conduct of the parties in reaching the agreement, the allegations in the Complaint must be taken as true and construed as a whole. When this proper construction is applied, each of Ten Eyck's claims must survive Chesapeake's motion to dismiss.

Contrary to Chesapeake's arguments otherwise, the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the ground upon which it rests." *JDC Management*, 644 F. Supp. 2d 905, 944 (W.D. Mich 2009) (internal citations omitted). In this vein, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* at 944. Finally, as here, in reviewing a Rule 12(b)(6) motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

1

With these precepts in mind, Chesapeake's Motion must be denied. Notably, Chesapeake does not dispute the adequacy of Ten Eyck's allegations as to its claim that Chesapeake and Encana engaged in an anticompetitive conspiracy in restraint of trade. Instead, Chesapeake asks the Court to ignore the requisite pleading standards, make specific findings of fact, and draw all inferences in Chesapeake's favor on Ten Eyck's various state law claims. But, as explained below, taken as true and with all reasonable inferences made in Ten Eyck's favor, Chesapeake's motion should be denied, and Ten Eyck is entitled to proceed to discovery in this matter.

## STATEMENT OF FACTS

### A.    Encana Discloses Test Results from a Promising New Oil and Gas Play in Michigan

In April 2010, excitement regarding the viability of a new oil and gas play in Michigan heightened when the results of the initial flowback tests on an exploratory well in Missaukee County, the "Pioneer Well," became public and indicated that the Utica/Collingwood shales might present a commercially viable oil and natural gas play. Dkt. 1, ¶¶ 33-34. The Collingwood shale is an oil and natural gas formation lying roughly 9,000-12,000 feet below Northern Michigan and is approximately 40-45 feet thick. *Id.* ¶ 32. The Utica shale is a thicker formation lying immediately above the Collingwood shale. *Id.* The effort to secure and develop oil and gas from the Utica/Collingwood shale is very capital intensive, not only for the acquisition of oil and gas rights, but also due to the costs and resources needed to horizontally drill, hydraulically fracture, and develop the infrastructure to successfully exploit the formation. *Id.* ¶ 35. Encana and Chesapeake were two of the few industry players in 2010 that had the resources and desire to exploit the Utica/Collingwood formations. *Id.*

### B.    Encana and Chesapeake Fiercely Compete for State Leases and Pay Top Dollar

In early 2010, Encana and Chesapeake were in direct and fierce competition to acquire oil and gas rights in northern Michigan. *Id.* ¶ 38. At the May 2010 State of Michigan oil and gas lease auction, Chesapeake and Encana were the dominant buyers of state oil and gas leases from which the

2

Utica/Collingwood formations could be exploited. *Id.* ¶¶ 39-40. Through intermediary bidders, the two companies spent almost $165 million combined to acquire the rights to develop more than 84,000 acres of state lands. *Id.* The bidding for such leases was highly competitive, particularly between Encana and Chesapeake; and resulted in substantial prices being paid for acreage. *Id.* ¶ 40. The average winning bid at the auction was $1,413 per acre; and 83% of those winning bids had competing offers. *Id.* Prime acreage at the May auction sold for approximately $5,000 per acre. *Id.*

## C.  Ten Eyck Receives Solicitations Regarding its Acreage and Enters an Agreement with Chesapeake's Agent, Silver Lake

In 2010, Ten Eyck held oil and gas rights to 625 acres in northern Michigan. *Id.* ¶ 36. This acreage included the right to explore and drill for oil or gas from the Utica/Collingwood formations. *Id.* After the State auction, private landowners were receiving offers of more than $3,000 per acre in June of 2010. *Id.* ¶ 41. In or around this same time, Ten Eyck became aware of these substantial bonuses.[1] *Id.* ¶ 42.

On May 14, 2010, Ten Eyck received a written offer from Atlas Oil and Gas Company ("Atlas") to pay a lease bonus for Ten Eyck's minerals of $750 per acre. Dkt. 1-5; Dkt. 1, ¶ 44. Knowing that the similar leases at the recent May auction sold for more than three times that amount, Ten Eyck responded that it thought $750 was on the low end. Dkt. 1, ¶ 44.

On May 20, 2010, Ten Eyck sent an email to Chesapeake's land leasing mailbox inquiring if Chesapeake was interested in leasing its mineral rights. *Id.* ¶ 92. Chesapeake contracted with Silver Lake to acquire oil and gas leases for its own account in the State of Michigan. *Id.* ¶ 28.

On May 21, 2010, Ten Eyck engaged the services of Topp Law as counsel and to assist it in placing its property out for bid in the presently very competitive leasing market. *Id.* ¶ 100. Bids were

---

[1] A bonus is paid to a landowner before oil and gas production occurs for the privilege of exploring for and developing oil and gas. The amount of a bonus is a function of the lessee's perceived value of the property, and the bonus is to be paid regardless of whether or to what extent the lease ultimately proves to be profitable. In contrast, a royalty is the landowner's share of production free of the cost of production. A royalty is paid only when oil and gas is produced.

solicited for Ten Eyck's property from numerous companies, including Encana, Energy West, Western Land Services and others. *Id.* ¶ 104.

On June 9, 2010, Al Couturier, agent for Silver Lake, sent Ten Eyck a "Solicitation Letter." Dkt. 1-8; Dkt. 1, ¶ 93. In that Solicitation Letter, Silver Lake represented, in part, the following:

a. That Silver Lake was acquiring oil and gas leases in the area;

b. That Silver Lake was acting as the agent for Northern Michigan Exploration Company, LLC, ("NEMC")[2] one of the premier oil and gas exploration companies in the country;

c. That Silver Lake had checked the records and found that the prospective lessor owned all or part of the mineral interest underlying its property;

d. That they wanted to make the prospective lessor a "very attractive offer" for an oil and gas lease;

e. That they would give the lessor the "best offer available" based upon where the property fell within their area of interest.

*Id.*

On June 16, 2010, Couturier sent Ten Eyck an email confirming that Silver Lake wanted to acquire the Ten Eyck's mineral lease. Dkt. 1, ¶ 94. On that same date, Ten Eyck informed Couturier that it had been receiving bids on the mineral lease from other companies and invited Silver Lake to submit its offer for royalty percentage, bonus payment, and primary and secondary terms. *Id.*

On June 17, 2010, Couturier sent another email to Ten Eyck again stating that Silver Lake wanted to lease Ten Eyck's minerals, and could offer Ten Eyck a 3/16 royalty and between $1,200 to $1,500 per acre as a bonus. *Id.* ¶ 95. Ten Eyck asked Couturier whom Silver Lake was taking the leases for and whether Silver Lake would be the operator/drilling company. *Id.* ¶ 96. Couturier replied "all I can tell you at this time is the home office is in OK City and that we will be the Co. that will be doing the drilling". *Id.* The same day, Silver Lake prepared and submitted to Ten Eyck an executed Letter of Intent, for Ten Eyck's

---

[2] Chesapeake formed NMEC, for the purposes of taking assignment of certain oil and gas leases from Silver Lake. Dkt. 1, ¶ 66.

4

review and signature, to lease Ten Eyck's 625 mineral acres with a payment of 3/16 royalty, $1,500 per acre bonus, primary term of 5 years, and secondary term of 5 years. *Id.* ¶ 97.

On June 22, 2010, Ten Eyck, through counsel, also received an offer from Energy West of a 3/16 royalty and $1,750 per acre bonus for Ten Eyck's 80 acres in Excelsior Twp., *Id.* ¶ 98; *see also* Dkt. 1-12; at the time, Ten Eyck was also in negotiations with Western Land Services. Dkt. 1, ¶ 104.

On July 7, 2010, Ten Eyck informed Couturier of Energy West's offer. *Id.* ¶ 98. Couturier told Ten Eyck he was working for Chesapeake, to forget the Letter of Intent (as that was only to buy time) and now he wanted to get the actual oil and gas lease signed. *Id.*. He also increased his lease bonus offer to $1,750 on all 625 acres to match the Energy West offer. *Id.* Couturier stated that the gas had been in the ground for millions of years so Ten Eyck should not rush to sign with any competitor, adding emphatically, "We want to be the last bidder." *Id.* ¶ 98. That same day, shortly after the phone call, Couturier conveyed to Ten Eyck that he was increasing the bonus per acre to $1,800 and, in turn, sent Ten Eyck an oil and gas lease form that would be used along with the previously offered terms of a 3/16th royalty, $1,800 per acre bonus, and 5 plus 5 year terms. *Id.* ¶ 99.

On July 15, 2010, Ten Eyck, through counsel, notified Couturier that Ten Eyck accepted Silver Lake's offer to lease at a 3/16 royalty and $1,800 per acre. *Id.* ¶ 100; Dkt. 1-9, p. 1. Ten Eyck's counsel also sent Couturier a lease addendum, which confirmed the essential terms agreed to by the party, and proposed certain modifications to other non-material terms of the agreement. Dkt. 9-3.

At a meeting between Couturier, Wayne Baker, agent for RedSky, and Ten Eyck's counsel on July 17, 2010, Baker stated that all pending oil and gas lease offers were being cut by 50%. Dkt. 1, ¶ 101. But, since Silver Lake had reached agreement to terms with the Ten Eyck, it would honor its agreement. *Id.* Baker also identified the revisions Silver Lake now wanted counsel to make to the addendum. *Id.* The addendum was revised as requested by Baker, but notably, the addendum did not alter the essential terms of the parties' agreement. Dkt. 9-3.

On July 19, 2010, Couturier contacted Ten Eyck's counsel and requested that the amended addendum be sent to him that day. Dkt. 1, ¶ 101. The revised addendum was sent to Couturier as requested on July 19, 2010. *Id.*; Dkt. 1-10, p. 2-3. Later on August 2, 2010, Baker confirmed to McFerron that there was an offer and acceptance by Ten Eyck via email on July 15. Dkt. 1, ¶ 103; Dkt. 1-11, p. 1.

**D.** **Senior Executives at Encana and Chesapeake Collude to Depress Prices**

While Ten Eyck was entertaining bids and entering into its agreement with Chesapeake, top officials at Chesapeake and Encana hatched a scheme to depress prices for mineral rights in northern Michigan. *Id.* ¶ 45. By at least June 6, 2010, Chesapeake and Encana executives started discussions of a collusive, joint strategy to avoid direct competition between the two companies, and their affiliates, in acquiring leases for Utica/Collingwood acreage, with the objective of depressing the prices both were paying for such leases.[3] *Id.*

On June 6, 2010, Chesapeake VP Doug Jacobson sent an email to Encana USA VP John Schopp, copying Aubrey McClendon, Chesapeake's CEO, and Jeff Wojahn, Encana USA's president. *Id.* ¶ 46. Jacobson noted the subject as "CHK/ECA-Mi," and then wrote, "Our proposal is pretty simple but hopefully should be effective for both of us," as he laid out the plan. *Id.* He offered a strategy that included swapping land already leased in Michigan and dividing up counties and private landowners where new leases might be secured. *Id.* "ECA would be responsible for new leasing in Charlevoix, Cheboygan, Missaukee and western Roscommon Counties while CHK would be responsible for leasing in Emmett [sic], Antrim, Kalkaska, western Otsego and western Crawford counties." *Id.*

Jacobson's email began a series of communications between high-level executives at both companies regarding the scheme. *Id.* ¶¶ 45-63, 75-76, 81-90. For example, on June 15, 2010, Jacobson sent an email to Schopp suggesting that they discuss plans to split up where and from whom each company would lease land in Michigan. *Id.* ¶ 50. The reasoning he gave to Schopp was the following:

---

[3] Ten Eyck has explained the details of this collusive strategy in its Complaint. Dkt. 1, ¶¶ 45-63, 75-76, 81-90.

"when you are back in the saddle, I'd like to visit with you about the implications of the impact of our competition on acreage prices and whether or not the sooner we do this the better shot we have of keeping acreage prices from continuing to push up." *Id.* Later that same day, on June 15, 2010, Chesapeake CEO Aubrey McClendon forwarded the email correspondence between Chesapeake VP Doug Jacobson and Encana VP John Schopp quoted in the previous paragraph to Encana USA CEO Jeff Wojahn and Encana CEO Randy Eresman. *Id.* ¶ 51. McClendon assured Eresman that Chesapeake was working toward their agreement: "Fyi, pushing from our end to save us both some money, Aubrey." *Id.* Eresman responded: "Agreed. The sooner the better. Thanks for continuing to move this forward." *Id.*

Also, on June 16, 2010, McClendon sent an email to Jacobson and others at Chesapeake stating that it was time "to smoke a peace pipe" with Encana "if we are bidding each other up." *Id.* ¶ 52. In response, Jacobson reported to McClendon that he had contacted Encana "to discuss how they want to handle the entities we are both working to avoid us bidding each other up in the interim." *Id.* ¶ 53. McClendon replied, "Thanks." *Id.* A Chesapeake internal document dated June 16, 2010, setting forth a summary of Michigan land deals, confirmed that McClendon "does not want to complete [sic] with Encana on this deal if CHK is interested." *Id.* ¶ 54.

Thereafter, Encana and Chesapeake coordinated their bids for oil and gas interests of private landowners in part through the exchange of drafts of a purported "area of mutual interest" agreement. *Id.* ¶ 57, 60. These drafts expressly communicated those areas and landholders over which Encana would have exclusive bidding responsibility, and those over which Chesapeake would have exclusive bidding responsibility. *Id.* ¶ 61, 62. This exchange of drafts and related discussions did not result in Chesapeake and Encana actually entering into an area of mutual interest agreement. *Id.* ¶ 63. That proved unnecessary, as the parties were able to achieve their intended and true purpose of dividing the northern Michigan market, coordinating their offers to mineral rights owners, and ultimately depressing prices and competition in the market. *Id.*

The Defendants' conspiracy had immediate effects. *Id.* ¶ 64. In the weeks after the discussions began, Defendants sharply cut the prices they were offering for land in Michigan, and average lease prices sharply plunged in areas that had been hotly contested. *Id.*

**E.    Chesapeake Reneges on its Agreement with Ten Eyck**

On July 21, 2010, Ten Eyck's counsel received a telephone call followed by an email from Couturier where he purported to rescind Silver Lake's already accepted offer, *Id.* ¶ 102; Dkt. 1-9, p. 1, stating that Silver Lake was rescinding all offers, as only leasing in certain areas and that any bonus would be limited to $500 with a 1/6 royalty. *Id.* Thus, despite the offer, acceptance, and agreement on all material terms in the lease, Silver Lake refused to honor its agreement. *Id.* However, as Ten Eyck later discovered, Silver Lake's refusal to honor its agreement was part of a much larger scheme perpetrated by Chesapeake and its agents.

**F.    Chesapeake's Overall Scheme to Renege on Oil and Gas Agreements**

On July 16, 2010, David Bolton of NMEC notified David McGuire of OIL Niagaran ("OILN," one of Chesapeake's leasing agents) that effective immediately all leasing prices were to be dropped by 50% and directed him to rescind all offers outside this parameter that were not signed and in his hands by noon that day. Dkt. 1, ¶ 66. In an email that same day, McGuire noted that Encana had started reducing its offers in equal measure and asked whether this was a "coincidence." *Id.*

On July 25, 2010, Brian Exline of Chesapeake notified McGuire, "effective immediately, please freeze all acquisition and leasing efforts… [F]reeze all activity until further notice." *Id.* ¶ 67. On July 28, 2010, Leslie Irish of OILN instructed OILN representatives to stop all title curative work: "[W]e got shut down yesterday, we were told to stop ALL Leasing and the lease related jobs insofar as curative, All title and ALL abstracting." *Id.*

8

In addition to slashing prices on pending negotiations, Defendants began to seek ways to avoid the contracts they had already entered into at a time when prices were still affected by the May auction.  *Id.* ¶ 68.  On July 30, 2010, Irish asked Henry Hood, VP of Chesapeake, to confirm whether leases would still be paid by Chesapeake when title work was already completed.  Bolton of Chesapeake/NMEC responded on behalf of Henry Hood, "[T]hat was not our instruction.  There should be no misunderstanding, as Henry advised, we do <u>not wish for you to tender payments on any leases</u>."    *Id.*

After the shutdown in July of 2010, NMEC instructed all of its agents and brokers to fail all titles under leases taken by the brokers after the May auction.  *Id.* ¶ 69.  Likewise, McGuire has admitted that Chesapeake instructed OILN, to fail as many leases as it could, and OILN followed through on that request as Chesapeake had instructed.  *Id.*  Consistent with the bad-faith approach that Chesapeake took in dealing with other mineral rights owners like Ten Eyck, McGuire has admitted that Chesapeake's agent, NMEC, sent rejection letters to lessors in situations where he did not believe that title defects existed.  *Id.* ¶ 70.

Chesapeake's attempt to extricate itself from the obligation to pay the lessors the bonus money due under the oil and gas leases is consistent with Chesapeake's practice of treating oil and gas leases, not as contracts, but as speculative options.  *Id.* ¶ 72.  Chesapeake prides itself in sending its "land acquisition machine" into a new shale play to grab up as many oil and gas leases as fast as possible to tie up the mineral rights before its competitors can.  *Id.*  Then, in the event Chesapeake determines it would be to its advantage to avoid those obligations for whatever reason, Chesapeake reneges on the leases and claims that the titles contain a defect or uses any other rationale in an attempt to justify its cancellation/rejection of the leases.  *Id.*

That is exactly what Chesapeake and its agent, Silver Lake, did to Ten Eyck and to other victims in Michigan in 2010 to avoid paying the higher bonus amounts it had already contractually agreed to pay.  *Id.* ¶ 73.  More than 93% of the private sector oil and gas leases that had been entered into during the summer

of 2010 were subsequently voided by Chesapeake and/or its agents (NMEC, Silver Lake, OILN, and WLS), allegedly due to "title defects." *Id.* ¶ 74. Historically, the average mineral title failure rate in Michigan is less than 3%. *Id.*

## G.  Encana and Chesapeake Do Not Compete in the Second State Lease Sale – Prices Plummet

At the auction of state land on October 26, 2010, Chesapeake and Encana did not buy any state land in the same county. *Id.* ¶ 75. This stood in stark contrast to the May 2010 state auction just months earlier (but before their collusive activity) where they had competed vigorously and bid each other up for tracts in the same counties. *Id.* As detailed in the Complaint, emails leading up to the auction reveal Defendants' collusive efforts. *Id.*; Dkt. 1-7.

A comparison of the results of the State of Michigan's May land auction with those of the October auction shows just how effective the Defendants' conspiracy was. Dkt. 1, ¶ 76. The State's May auction fetched $178 million for 118,000 acres at an average price per acre of $1,413. *Id.* The State's October auction fetched only $9.7 million for 274,000 acres—that is, more than twice the acreage of the May auction, but $170 million less. *Id.* The average winning bid in October was only $46 per acre, with most of the State's acreage selling for the minimum bid of $13 per acre. *Id.* Thus, the collusive agreement between Chesapeake and Encana had worked, and Ten Eyck was a victim left in its wake.

## LAW AND ARGUMENT

### A.  Standard of Review

This Court has recognized that, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *JDC Management, LLC, v. Reich,* 644 F. Supp. 2d 905, 943-944 (W.D. Mich. 2009) (citing *Tucker v. Middleburg-Legacy Place,* 539 F.3d 545, 550 (6th Cir. 2008)). Also, in reviewing a Rule 12(b)(6) motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in favor of the

plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); see also *JDC Management*, 644 F.

Supp. 2d at 943.

### B.    Ten Eyck's Complaint States an Adequate Claim for Breach of Contract

#### 1.    Ten Eyck Adequately Pled the Existence of a Contract Between the Parties

Ten Eyck has alleged in its Complaint that the following items constitute the agreement between

the parties:

- The June 17, 2010 Letter of Intent: Identified Ten Eyck's 625 acres, 3/16 royalty, primary term of 5 years, and secondary term of 5 years, $1,500 per acre bonus. Dkt. 1, ¶ 97.

- Couturier's increase to $1,800 per acre and the oil and gas lease sent to Ten Eyck by Couturier on July 7, 2010. Dkt. 1, ¶ 99.

- Ten Eyck's July 15, 2010 acceptance of Silver Lake's Offer. Dkt. 1, ¶ 100.

Taken together, these documents evidence the parties' mutual intent to be bound to an agreement and

contain all material terms, thereby satisfying the statute of frauds. Indeed, on August 2, 2010,

Chesapeake's agent confirmed with Chesapeake that its offer had been accepted by Ten Eyck's counsel.

*Id.* ¶ 103.

#### a.    Ten Eyck Pled a Meeting of the Minds

Chesapeake argues that Ten Eyck's claim for breach of contract cannot stand because the parties

never signed a lease agreement. But Michigan law is clear that parties may enter into contracts without

reducing that agreement to a single document. See *Kelly-Stehney & Assoc., Inc. v. MacDonald's Indus.*

*Prods., Inc.*, 693 N.W.2d 394, 398 (Mich. App. 2005). This is consistent with the authority cited by

Chesapeake. *See Opdyke Inv. Co. v. Norris Gran Co.,* 320 N.W.2d 836, 838 (Mich. 1982) (a contract may

be formed, even without a fully executed and integrated agreement between the parties). As detailed

above, Ten Eyck has identified multiple documents which, considered together with the parties' conduct

and course of dealing, constitute the contract between Chesapeake and Ten Eyck.

11

Contrary to Chesapeake's claim in its Brief that Ten Eyck failed to allege "that the parties had a meeting of the minds on all material terms and that Defendants evinced an intent to be bound without the execution of a formal writing," Dkt. 9, p. 6, the Complaint plainly alleges that the parties were in agreement on the essential terms discussed above. Dkt. 1 ¶¶ 91-110.) Moreover, the Complaint alleges that the parties intended to be bound without the formal execution of an oil and gas lease – Ten Eyck *is* alleging that, through its July 7 offer, Chesapeake intended to be bound even without a signed oil and gas lease in place. *Id.* Simply stated, Ten Eyck has sufficiently alleged the existence of a meeting of the minds with respect to the agreement between Ten Eyck and Chesapeake.

### b.  The Parties Reached Agreement on all Essential Terms

As discussed above, the writings exchanged between the parties and the allegations in the Complaint establish each of these essential terms. Chesapeake identified Ten Eyck's 625 mineral acres in its June 9, 2010 Solicitation Letter. Dkt. 1,¶ 93. Chesapeake also outlined that the term of the lease would consist of a 5 year primary term, and a 5 year secondary term. *Id.* ¶ 97.) The term of the lease dictated that Chesapeake was obligated to drill a well within either the 5 year primary term, or 5 year secondary term – if it did not, the language of the lease dictated that Chesapeake would forfeit its oil and gas lease with plaintiffs. *Id.* Finally, the Complaint alleges that the parties agreed on a 3/16 royalty. *Id.* ¶ 98. Thus, the Complaint adequately alleges an agreement on all essential terms of the lease. The authority Chesapeake cites supports this conclusion. See *Oakrock Exploration Co. v. Killam,* 87 S.W.3d 685, 690-91 (Tex. App. 2002) (explaining that the term of lease, the time for commencement of drilling, and the amount of royalties are the essential terms of an oil and gas lease).

Chesapeake's attempt to use the addendum prepared by Ten Eyck's counsel to further its argument is unavailing. Because the addendum did not alter the material terms of the agreement, sending it did not constitute a rejection of Silver Lake's July 7 offer. Michigan law is clear that "[f]or a response to an offer to be deemed an acceptance as opposed to a counteroffer, the material terms of the agreement

cannot be altered." *Zurcher v. Herveat*, 605 N.W.2d 329, 343 (Mich. App. 1999) (assessing whether a purported acceptance that altered the terms of a contract for sale of real property actually altered the material terms of that contract—namely the parties, property, or the consideration). Here, Ten Eyck accepted Chesapeake's offer, and the addendum did not alter the material terms.[4] Thus, Chesapeake's argument regarding the addendum is nothing more than a red herring. The addendum does not alter the conclusion that the July 7 offer and July 15 acceptance created a binding contract.

### 2.    The Statute of Frauds does Not Bar Ten Eyck's Contract Claim

As discussed above, the agreement between Chesapeake and Ten Eyck was memorialized by Silver Lake's offer and oil and gas lease on July 7, 2010, and Ten Eyck's July 15 acceptance email. In addition to its unavailing argument regarding Ten Eyck's breach of contract claim, Chesapeake also argues that the Michigan statute of frauds precludes that claim for three reasons. First, it argues that neither the oil and gas lease nor the addendum was signed by either party. Second, it argues that the July 15, 2010 email from Ten Eyck's attorney to Silver Lake, which evidenced Ten Eyck's acceptance of Chesapeake's offer, was not signed by Chesapeake. Finally, it argues that Ten Eyck's attorney was not authorized to accept Chesapeake's offer on Ten Eyck's behalf.[5] Dkt. 9, p. 11-13. Chesapeake's arguments are without merit.

_____

[4] The terms of the addendum confirm this fact: it states that it is for "625 acres" and confirms a 3/16 royalty – which is entirely consistent with the parties' agreement. Dkt. 9-3, p. 1. While Ten Eyck maintains that the addendum did not alter the material terms of the agreement, whether it did so is a question of fact to be resolved by the factfinder, making dismissal at this time improper. *Zurcher v. Herveat*, 605 N.W.2d. at 344.

[5] Chesapeake's argument in this regard should be dismissed. Ten Eyck's Complaint alleges that he notified Silver Lake "through counsel" that he was accepting Silver Lake's offer. Dkt. 1, ¶ 100. The Complaint also attaches the email from Ten Eyck's attorney to Silver Lake in which his attorney is clearly accepting Silver Lake's offer on Ten Eyck's behalf. Dkt. 1-9. The Complaint also includes an exchange of emails between Silver Lake and Topp, in which Silver Lake acknowledges that Topp was acting as Ten Eyck's representative. *See* Dkt. 1-10; Dkt. 1-11 ("I think that their [sic] was a verbal offer and acceptance by Ms. Topp on behalf of Eyck by e-mail Joe."; "I am forwarding the E-Mail I got from Susan Topp lawyer fore [sic] TenEyck mineral Trust 625 acres.").

As an initial matter, the emails between Silver Lake and Ten Eyck's counsel satisfy the signature requirement of the statute of frauds. As several courts have recognized, one or more of the writings may be in an electronic format, such as e-mail. See *Mich. Reg'l Council of Carpenters v. New Century Bancorp, Inc.*, 99 F. App'x 15, 22 (6th Cir. 2004) (email was a sufficient "writing" to satisfy the statute of frauds requirement that the writing be signed by the party to be charged); *see also Gillis v. Wells Fargo Bank, N.A.*, 875 F. Supp. 2d 728, 733 (E.D. Mich. 2012) (collecting cases and holding that e-mails 'signed by' Wells Fargo's apparent agent in combination with other documents satisfy the statute of frauds.); *Dow Chem. Co. v. Gen. Elec. Co.*, 2005 WL 1862418, at *25 (E.D. Mich. Aug. 4, 2005).

The Michigan Supreme Court "has declined to adopt narrow and rigid rules for compliance with the statute of frauds . . . . Instead the Court has adopted a case-by-case approach." *Kelly-Stehney & Assoc., Inc. v. MacDonald's Indus. Prods., Inc.*, 693 N.W.2d 394, 398 (Mich. App. 2005). Under this approach, the statute does not require that the entire agreement be in writing, but only requires that "a note or memorandum of the agreement" is in writing and signed. *Id*. Moreover, Michigan law is clear that a "note or memorandum" is sufficient to satisfy the statute of frauds *even if it consists of several separate documents, not all of which are signed by the party to be charged, and none of which is a sufficient memorandum in itself. Kelly-Stehney & Assoc., Inc.*, 693 N.W.2d at 113 (quotation marks and citations omitted); *see also Ryan v. United States*, 136 U.S. 68, 83 (1890) ( "the principle is well established that a complete contract, binding under the statute of frauds, may be gathered from letters, writings, and telegrams between the parties relating to the subject-matter of the contract, and so connected with each other that they may be fairly said to constitute one paper relating to the contract").

As explained above, the written agreement here for purposes of the statute of frauds included the July 7 email from Couturier, the oil and gas lease attached to it, and Ten Eyck's July 15 acceptance. The July 7 email – containing the offer of $1,800 bonus and a 3/16 royalty on all 625 acres (and attaching an oil

14

and gas lease) – contained Couturier's name and contact information, including that he was acting as the authorized agent of Silver Lake Energy, LLC. [6] *Id.* ¶ 99.

A week later, on July 15, 2010, Ten Eyck accepted Silver Lake's offer in an email from Ten Eyck's attorney, Susan Topp. The email stated: "Mr. Ten Eyck has decided to accept Silver Lakes offer of 3/16 and $1800 for all the Ten Eyck and Trust property. I am meeting with Wayne Baker [Red Sky's agent] on Saturday to work out the details of the Addendum." The end of the email contained Topp's name and contact information. *Id.* ¶ 100; Dkt. 1-9. While Topp then met with Wayne Baker and Couturier on July 17, 2010 to negotiate non-material terms, the parties were bound by Couturier's offer and Ten Eyck's acceptance.

Accepting Ten Eyck's allegations as true and drawing all reasonable inferences in its favor, Ten Eyck sufficiently pled that there can be no question that the emails exchanges on July 7 and July 15, along with the attached oil and gas lease, created a binding agreement which satisfies the statute of frauds. *See Mich. Reg'l Council of Carpenters*, 99 F. App'x at 22; *Gillis*, 875 F. Supp. 2d at 733; *Dow Chem. Co.*, 2005 WL 1862418, at *25 (E.D. Mich. Aug. 4, 2005).

## 3. Ten Eyck's Quasi-Contract Claim is Adequately Pled

### a. Good Faith and Fair Dealing

In its motion, Chesapeake misconstrues Ten Eyck's breach of contract claim and advances the argument that a cause of action for the breach of the duty of good faith and fair dealing cannot stand on its own. Ten Eyck does not allege its breach of contract claim on Chesapeake's breach of this duty alone – rather, Ten Eyck alleges that Chesapeake's breach of this duty is but one other basis for its claim, along with Chesapeake's refusal to honor its agreement with Ten Eyck.

---

[6] Though not attached to Ten Eyck's Complaint, Chesapeake does not dispute the allegations regarding the July 7 email, namely that on July 7, Couturier, as an authorized representative of Silver Lake (and Chesapeake) sent an email to Susan Topp, a duly authorized representative of Ten Eyck, amending Chesapeake's prior offer by raising the bonus price to $1,800 per acre and attaching the oil and gas lease approved by Chesapeake. *See* Dkt. 9-1, p. 1, ¶ 3 (acknowledging the July 7 email and oil and gas lease).

15

### b.    Ten Eyck Sufficiently Pled that Chesapeake was Unjustly Enriched

Chesapeake argues that Ten Eyck did not sufficiently plead the elements of unjust enrichment; specifically, that it did not state a benefit received by defendants.  Dkt. 9, p. 22.  This is incorrect.

First, Chesapeake claims Ten Eyck alleges an "option agreement" existed between Chesapeake and Ten Eyck.  This is simply not true.  Ten Eyck alleges the existence of an oil and gas lease – not an option contract.  But Ten Eyck *does* allege that Chesapeake *treated* the oil and gas lease as an option, albeit one it did not legitimately negotiate or pay for.  Ten Eyck's unjust enrichment claim relates to the binding agreement between Ten Eyck and Chesapeake and is pled in the alternative to Ten Eyck's breach of contract claim.  Where there are questions of fact concerning the existence and terms of the contract, a claim for unjust enrichment can be maintained until the fact-finder makes a determination on whether there is an enforceable contract. *Keywell & Rosenfeld v. Bithell*, 657 N.W.2d 759, 776-77 (Mich. App. 2002).  Here, even if the court were to find the parties' agreement unenforceable, Chesapeake is liable to Ten Eyck on the basis of Ten Eyck's unjust enrichment claim.

Contrary to Chesapeake's arguments, Ten Eyck sufficiently pled that defendants received a benefit.  A person confers a benefit upon another "if he gives to the other possession of or some other interest in land . . . or in any way adds to the other's security or advantage.  He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss." Restatement (First) of Restitution § 1 cmt. b (1937).[7]  The test to determine whether the retention of a benefit is unjust as between two parties depends on a reasonable person standard: whether "reasonable men in like situation as those who received and are benefited . . . naturally would and ought to understand and expect compensation was to be paid ." *In re Camfield Estate*, 88 N.W.2d 388, 393 (Mich. 1958) (quotation marks and citations omitted).

---

[7] *See Kammer Asphalt Paving Co., Inc. v. East China Twp. Sch.*, 504 N.W.2d 635, 640 (Mich. 1993) (approvingly citing the Restatement (First) of Restitution § 1).

Chesapeake received an advantage in that it no longer had to compete and pay more for Ten Eyck's property – Ten Eyck's lands were removed from the market, thereby precluding other companies from competing for and developing those lands. Chesapeake treated this as an option, allowing it to either buy the property at the agreed terms or cast it aside if it later determined that foregoing the purchase of the property was to its advantage. Conferring an advantage or saving the other from expense are benefits that Ten Eyck reasonably expected compensation for. Restatement (First) of Restitution § 1 cmt. b (1937); see also *Dansbury v. EOG Res., Inc.,* 2014 WL 2737841, at *13 (M.D. Penn. June 13, 2014) (holding that unjust enrichment claim survived because potential operator gained certain legal rights to plaintiffs' land that no one else could assert, even if oil and gas was not produced).

At this early stage, Ten Eyck simply has to set forth direct or inferential allegations respecting all the material elements of unjust enrichment sufficient to sustain recovery under some viable legal theory. *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Ten Eyck has done so.

**4. Ten Eyck has Sufficiently Pled its Tortious Interference Claim**

**a. Ten Eyck has sufficiently pled a "reasonably likely" business expectancy with which Chesapeake interfered.**

Michigan law requires a plaintiff to allege "more than a mere hope for a future business opportunity or the innate optimism of the salesman." *In re Baseball Antitrust Litig.*, 75 F. Supp. 2d 1189, 1203-04 (D. Kan. 1999) (applying Michigan law) (citations and quotations omitted). But it does not require allegations to demonstrate a "guaranteed relationship" either, "because anything that is prospective in nature is necessarily uncertain, and *we are not here dealing with certainties, but with reasonable likelihood or probability*." *Id.* (emphasis added). Such an expectation can be alleged by identifying specific third parties (or an identifiable prospective class of third persons) with whom the plaintiff has reasonable expectation of doing business with. *Id.; see also, Hoffman v. Roberto,* 85 B.R. 406, 416 (W.D. Mich. 1987) (allegations must demonstrate a "reasonable expectation of profit, not mere wishful thinking").

17

Ten Eyck has done that here. Ten Eyck identifies *specific* parties with whom Ten Eyck not only had a *plausible* expectation of doing business with but from whom Ten Eyck had received *actual, written offers*. That includes written offers from Atlas and Energy West, on behalf of Encana, which were still pending on July 7, 2012, when Chesapeake interfered. Dkt. 1, p. 28, ¶ 104; Dkt. 1-5 (Atlas offer); Dkt. 1-12 (Energy West offer); *Brennan v. Duncan*, 27 N.W.2d 320, 322-323 (Mich. 1947) (holding that an offer to sell real estate can be accepted at any time before its withdrawal). In the case of Atlas, the terms were as follows:

- 625 acres
- $750 per acre
- 5 year primary term, 5 years secondary term
- 1/6th royalty

Dkt. 1, ¶ 121. Energy West's offer similarly contained all essential terms. Dkt. 1, ¶ 121.

Ten Eyck's allegations, when accepted as true, set forth a scenario where Ten Eyck would have accepted the pending offers with Energy West or Atlas if Chesapeake had not interfered. That exceeds the required standard to plead a "reasonably likely" business expectancy.[8]  *Paradata Computer Networks, Inc., v. Telebit Corp.*, 830 F. Supp. 1001, 1007 (E.D. Mich. 1993) (finding a pending offer passed on due to a false and maliciously made offer to buy is sufficient). The reasonableness of an alleged business expectancy is a question of fact that is appropriately left for summary judgment or trial. *See Consol. Rail Corp. v. Grand Truck W. R.R.*, 2009 WL 3640334, at *5, *16-18 (E.D. Mich. Oct. 22, 2009).

### b. Chesapeake committed both per se wrongful and malicious acts.

Tortious interference also requires the doing of either a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationships of another. *Jim Bob, Inc., v. Mehling*, 433 N.W.2d 451, 462-463 (Mich. App. 1989); *see also*,

---

[8] Chesapeake cites *Saab Auto AB v. GMC*, 953 F.Supp.2d 782 (E.D. Mich. 2013) in support of its argument of no reasonable business expectancy.    In *Saab*, the Court found that the business expectancy was premised on an "agreement to negotiate." That is clearly not the case here. Ten Eyck negotiated the essential terms to an oil and gas lease with Atlas and Energy West, which – as alleged and explained previously in this brief – it would have accepted but for the interference.

*Faber v. FJH Music Co., Inc.,* 2007 WL 1098259, at *10 (E.D. Mich. 2007). A per se wrongful act is one that is "inherently wrongful or an act that can never be justified under any circumstances." *Id.* Chesapeake and Silver Lake committed both types of acts.

*First*, Ten Eyck has sufficiently pled *per se* wrongful acts. Counts I and II of the Complaint charge Chesapeake and Encana with conspiring together to enter into a horizontal, anticompetitive agreement. For purposes of this motion, they do not contest those counts. Antitrust violations of this nature are *per se* wrongful acts. *Encana Oil & Gas, Inc. v. Zaremba Family Farms et al.*, No. 1:12-cv-00369-PLM, Dkt. 181, p. 14 (W.D. Mich. Dec. 3, 2013). As this Court has already recognized in *Zaremba*, "a horizontal agreement between competitors for oil and gas leases, constitutes a *per se* anticompetitive agreement." *Id.*

*Second*, simply arguing, as Chesapeake has done here, that it acted for valid business reasons is not a basis for the dismissal of an otherwise plausible interference claim. *See Jim Bob,* 443 N.W.2d at 462-463 (stating that "a defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right"); *see also*, *Barrette Outdoor Living, Inc., v. Mich. Resin Representatives, LLC*, 2012 WL 760925, at *6 (E.D. Mich. Mar. 8, 2012). Ten Eyck clearly alleges that Chesapeake's actions were not legitimate, as follows:

- Chesapeake conspired with the other Defendants to improperly take acreage off the market, including Ten Eyck's, for the improper purpose of "crashing the market" and "resetting" the market price for acreage. Dkt. 1, ¶¶ 7, 10, 55, 75-76.
- Chesapeake and Silver Lake intentionally misrepresented their intentions and agreed to lease terms with Ten Eyck artificially (and without competition) speculate on the success or lack of success of the market and with no intention of closing on the deal. *Id.* ¶¶ 129-139.
- And, Chesapeake reneged on and breached its obligations (including its covenant of good faith and fair dealings) under its lease with Ten Eyck. *Id.* ¶¶ 107-110.

These allegations, when accepted as true, leave no room to find a legitimate business reason for Chesapeake (and Silver Lake) committing these acts. Instead, they were done for the malicious purpose of interfering with Ten Eyck's ability to negotiate with other buyers (including, Energy West and Atlas) on an

19

arms' length basis and therefore constitute properly pled malicious acts. *See Jim Bob,* 443 N.W.2d at 462-463; *Barrette Outdoor,* 2012 WL 760925, at *15-16.

Finally, this Court's recent finding in *Zaremba* is instructive here. Based on a very similar set of allegations, this Court held, in pertinent part:

> The Zarembas allege that Encana had no intention of completing a final agreement for the Zarembas' leases or to honor its representations to the Zarembas. This Court must therefore infer from the counterclaim that Encana's motivation for its negotiation with the Zarembas was not a legitimate business reason, but something else. Even if Encana acted consistently with the Letter of Intent, the counterclaim alleges facts establishing that Encana intentionally misled the Zarembas, inducing the Zarembas to agree to the Letter of Intent and to forgo the opportunity with Chesapeake. Because Encana had no intention of negotiating or completing a final agreement, the offer itself interfered with a business relationship between the Zarembas and Chesapeake. The Zarembas' motivation for accepting the offer from Encana, rather than the offer from Chesapeake, was premised on incomplete and faulty information.

*See Zaremba*, No. 1:12-cv-00369-PLM, Dkt. 181, p. 22.

Like the Zarembas, Ten Eyck has alleged that Chesapeake and Silver Lake intentionally misrepresented their intentions to prevent Ten Eyck from leasing with Atlas and/or Energy West and agreed to lease terms for clearly improper purposes and with no intention of closing the deal. It is therefore necessary to infer, as this Court did in *Zaremba*, that Chesapeake's motivation in its negotiations with Ten Eyck was not for a legitimate business reason. As a result, Chesapeake's offer to Ten Eyck – when done with such malicious motives – is an actionable interference claim, on which Ten Eyck is entitled to discovery.

**5**.      **Ten Eyck Adequately Pled a Fraud Claim Against Chesapeake**

In the Complaint, Ten Eyck alleges an expansive fraudulent scheme perpetrated by Chesapeake and its agents in relation to oil and gas leases in northern Michigan in 2010. This scheme included, as in the case of Ten Eyck, Chesapeake locking up acreage for itself to prevent the competition from leasing those lands, and then, at Chesapeake's whim, backing out of agreements struck with those landowners. That is precisely what happened to Ten Eyck, and the allegations in the Complaint related to the same

20

support its fraud claims. In carrying out its fraudulent scheme, Chesapeake made numerous material

representations to Ten Eyck through its affiliate, Silver Lake, during the course of the parties' negotiations

for the lease of Ten Eyck's mineral rights. As discussed below, there is no legitimate basis for Chesapeake

to contend that the facts set out above and more fully in the Complaint fail to state a fraud claim.

In its motion, Chesapeake challenges nine of the misrepresentations alleged in the Complaint,

numbering them (1) through (9). For ease of reference, Ten Eyck responds to each misrepresentation as

identified as Chesapeake.

### a.      Statements (1) and (2) are pled with particularity.

Ten Eyck has stated its fraud claim with particularity as required by Rule 9(b) of the Federal Rules

of Civil Procedure. Chesapeake challenges the specificity of only two of the misrepresentations described

in the Complaint: (1) that "Silver Lake represented to Plaintiff it had an office in Traverse City, Michigan;"

and (2) that "Silver Lake represented to Plaintiff that Silver Lake and its principal were developing the

Collingwood Shale in Michigan and were in it for 'the long haul.'" Dkt. 9, p. 21. But it is clear from the

Complaint that these representations were made in the course of Ten Eyck's negotiations with Silver Lake

between June 9, 2010 (when Silver Lake sent its Solicitation Letter) and July 15, 2010 (when Ten Eyck

accepted Silver Lake's and Chesapeake's lease offer). This is sufficient to satisfy the particularity

requirements of Rule 9(b). *See Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*, 2008 WL 205209, at

\*13 (E.D. Mich. Jan. 22, 2008).

### b.      Statements (3) and (4) are false.

Chesapeake next asserts that certain alleged misrepresentations cannot be the predicate for a

fraud claim because they were actually true.[9]  Chesapeake first points to statement (3), that Silver Lake

was acquiring oil and gas leases in the area and suggests this statement was true, because "the actual

---

[9] Chesapeake also argues that statement (5) is not false. Because the other statements alleged in Ten
Eyck's Complaint are false, even if statement (5) is true, Ten Eyck's fraud claim survives.

21

statement [in the Solicitation Letter] by its own terms states that Silver lake was *in the process of* acquiring

oil and gas leases . . . ." Dkt. 9, p. 22 (emphasis added). Regardless of Chesapeake's contention

concerning what the statement says "by its own terms," the text of the letter reads plainly: "Our company is

currently acquiring oil and gas leases in the area . . . ." Dkt. 1-8. This representation was not true, because

neither Silver Lake nor Chesapeake were in the process of acquiring legitimate leases; rather, as discussed

above, Chesapeake was in the process of tying up the mineral rights of Ten Eyck and others by negotiating

leases it had no intention of abiding by, while conspiring with Encana in the background to depress market

prices in the Utica and Collingwood Shales. Dkt. 1, ¶ 72.

Chesapeake then says that statement (4), Silver Lake's representation that it was representing

"one of the premier oil and gas exploration companies in the country," cannot be false because Silver Lake

was working for Chesapeake, and Chesapeake is a premier oil and gas exploration company. Dkt. 9, p.

22. The plain language of the Solicitation reveals the falsity of the statement at issue here. The letter was

signed by Al Couturier, "acting as an authorized agent for Northern Michigan Exploration Company, L L C."

Dkt. 1-8. The only fair reading of the language is that Couturier represented that he was working for NMEC,

which was the "premier oil and gas exploration compan[y]" referred to in the letter. That statement was

false. *Id.* ¶ 133.

      c.    **Statements (6)-(9) are not statements of future expectation.**

Finally, Chesapeake argues that statements regarding Chesapeake and Silver Lake wanting to (6)

make Ten Eyck "a very attractive offer," (7) give Ten Eyck "the best offer available," (8) "be the last bidder,"

and (9) pay Ten Eyck $1,800 per acre for its mineral rights are statements of future expectation that cannot

support a fraud claim. Dkt. 9, p. 23. Chesapeake is wrong.

As a threshold matter, none of these statements are "statements of future expectation," "mere

opinion," or "pertain to future events" as Chesapeake suggests. Chesapeake and Silver Lake represented

on numerous occasions that their intention was to make a legitimate offer for Ten Eyck's mineral rights.

22

These were not statements of future intent or expectation – they were statements regarding Chesapeake's and Silver Lake's then-present intentions at the time the statements were made. As Ten Eyck later discovered, however, these statements were false, as neither Chesapeake nor Silver Lake had any intention of trying to legitimately obtain Ten Eyck's acreage at the bonus price suggested, given Chesapeake's antitrust conspiracy with Encana. Dkt. 1, Compl. ¶ 138.

The cases cited by Chesapeake offer no support for Chesapeake's arguments.[10] In *Seit-Olsen v. Reliance Appraisals, LLC,* the court found that a seller's husband's comment that he thought a two-car garage could be constructed on the property was an "expression of opinion" that could not support the homebuyer's fraud claim. 2006 WL 1113936, at *4 (Mich. App. Apr. 27, 2006). Similarly, in *Schuler v. Am. Motor Sales Corp.*, the plaintiff purchased shares of common stock in a Rambler dealership and later sued, alleging that the dealership misrepresented the value of its new car and auto parts inventories. 197 N.W.2d 493, 494-495 (Mich. App. 1972). The court affirmed judgment against the plaintiff, primarily because he was given detailed schedules revealing the alleged deficiencies in the inventories. *Id.* at 279. The court also concluded that the defendants' representations regarding the value and salability were "statements of opinion, not fact" and could not support a fraud claim. *Id.* at 280.

Here, Chesapeake was not offering its "opinion" as to whether it wanted to make Ten Eyck a good offer on Ten Eyck's mineral rights. Instead, it was misrepresenting facts about its current intentions, while

---

[10]Equally unavailing is Chesapeake's citation to *Van Tassel v. McDonald Corp,* 407 N.W.2d 6 (Mich. App. 1987). In that case, the plaintiff purchased a Baskin-Robbins ice cream franchise and later sued the company's president and others when she did not make as much money as she thought she would. *Id.* at 7-8. The court found that plaintiff could not establish a fraud claim based on the president's statements that she would be "driving big cars, living in a big home, and golfing all day long" because these statements were "purely speculation as to future events." *Id.* at 9. In contrast, Chesapeake's statements regarding its bid for Ten Eyck's mineral rights were not pie-in-the-sky speculations about how much money Chesapeake could hope to make. They were statements regarding Chesapeake's purported intentions to pay $1,800 per acre that were false when made, which were designed to convince Ten Eyck to discontinue negotiations with other bidders and enter into a lease with Chesapeake – one which Chesapeake had no intention to abide by. Dkt. 1, Compl. ¶ 138.

secretly negotiating with Encana to allocate the market and drive prices down for private leases such as Ten Eyck's. Dkt. 1, ¶¶ 129-142.

Finally, even if these misrepresentations were statements of future promises, they would still support Ten Eyck's fraud claim. The Michigan Court of Appeals has recognized that a fraudulent misrepresentation claim "may be based on a promise made in bad faith without intent to perform." *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 459-460 (Mich. App. 1989); *see also Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. App. 2005) ("An unfulfilled promise to perform in the future is actionable where there is evidence that it was made with the present undisclosed intent not to perform.").

6.    **Ten Eyck has Adequately Pled a Fraudulent Inducement Claim against Chesapeake**

As this Court has explained, "[i]n contrast to a claim for fraud, which typically arises from a fraudulent misrepresentation of a past or existing fact, a claim for fraud in the inducement arises when a party materially misrepresents future conduct under circumstances in which the misrepresentation may reasonably be expected to be relied upon, and which is relied upon. Fraud in the inducement is a special kind of fraud that arises during the formation of a contract, but is extraneous to the contract." *Zaremba*, No. 1:12-cv-00369-PLM, Dkt. 181, p. 25. Additionally, this Court has highlighted that the elements for a claim of fraudulent inducement are identical to the elements of a fraud claim. *Id.*

Ten Eyck's pleads sufficient facts to support a fraud in the inducement claim. Ten Eyck has pled that Chesapeake made numerous misstatements regarding its intent in entering the agreement with Ten Eyck – that Chesapeake was in it for the "long haul," that it would provide Ten Eyck with the "best offer available," and that it was acquiring oil and gas leases in the area. Dkt. 1, ¶ 133. Ten Eyck reasonably relied on these misstatements, and accepted Chesapeake's offer instead of entering into an agreement with other companies. *Id.* ¶ 140. Thus, Ten Eyck has adequately pled its fraud in the inducement claim.

Chesapeake's arguments to the contrary should be disregarded. First, even if Chesapeake were correct that there was no agreement between the parties, this conclusion is not fatal to Ten Eyck's fraud

24

claims. As this court noted in *Zaremba*, no binding contract between the parties is necessary for a fraud in the inducement claim. *Zaremba*, No. 1:12-cv-00369-PLM, Dkt. 181, p. 26 ("The letter of intent may not be binding, but Encana's representations . . . provide[] a basis for the fraud allegation."). Second, Chesapeake's argument that its representations were true at the time relies on facts that are in dispute. Contrary to Chesapeake's arguments otherwise, Ten Eyck has alleged that Chesapeake had no intention of honoring its representations at the time the representations were made – specifically, Ten Eyck has alleged that the statements were made in the context of Chesapeake's larger scheme to treat oil and gas leases as mere options. The fact that Chesapeake increased bids on Ten Eyck's property is not inconsistent with that scheme or the larger anticompetitive agreement between Chesapeake and Encana. Because Ten Eyck has carried its burden in pleading fraudulent inducement, Chesapeake's motion should be denied.

## CONCLUSION

Based on the foregoing, Ten Eyck respectfully requests that this Court deny Chesapeake's Motion to Dismiss in its entirety.

Dated: July 16, 2014

By: /s/ David R. Whitfield
Brian J. Masternak (P57372)
Charles N. Ash, Jr. (P55941)
Lance R. Zoerhof (P63980)
David R. Whitfield (P73352)
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
bmasternak@wnj.com
cash@wnj.com
lzoerhof@wnj.com
dwhitfield@wnj.com
616.752.2000
Attorneys for Plaintiff